NO. 22-4322

In The

# United States Court Of Appeals
## For The Fourth Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

### MICHAEL SCOTT HOOVER,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT STATESVILLE**

———————

## JOINT APPENDIX
### Volume I of II
### (Pages: 1 – 331)

———————

David Q. Burgess
DAVID BURGESS LAW, PC
P. O. Box 18125
Charlotte, NC 28218
(704) 377-9800

Amy E. Ray
OFFICE OF THE
  UNITED STATES ATTORNEY
100 Otis Street
Room 233
Asheville, NC 28801
(828) 271-4661

*Counsel for Appellant*                    *Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS
## Volume I of II

Page:

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1

First Superseding Bill of Indictment
   filed October 20, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA10

Government's Notice of Intent to Admit Evidence
   filed April 5, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA13

Government's Proposed Jury Instructions
   filed April 12. 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA31

Transcript of Trial Proceedings
Before the Honorable Kenneth D. Bell
   on April 22, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA58

  Testimony of Jeffrey Gregg:

  Direct Examination by Ms. Spaugh.. . . . . . . . . . . . . . . . . . . . . . . JA72
  Cross Examination by Mr. Freedman. . . . . . . . . . . . . . . . . . . . . . JA76

  Testimony of Avery Turner:

  Direct Examination by Ms. Randall. . . . . . . . . . . . . . . . . . . . . . . JA78
  Cross Examination by Mr. Freedman. . . . . . . . . . . . . . . . . . . . . . JA88

Transcript of Trial Proceedings
Before the Honorable Kenneth D. Bell
      on April 22, 2021, Continued:

Testimony of <u>Nathan Anderson</u>:

Direct Examination by Ms. Spaugh............................. JA91
Cross Examination by Mr. Freedman. ...................... JA161
Redirect Examination by Ms. Spaugh....................... JA172

Testimony of <u>M.C.</u>:

Direct Examination by Ms. Randall. ....................... JA173
Cross Examination by Mr. Freedman. ...................... JA191

Testimony of <u>A.P.</u>:

Direct Examination by Ms. Spaugh............................ JA195
Cross Examination by Mr. Freedman. ...................... JA208
Redirect Examination by Ms. Spaugh....................... JA211

Verdict Form
      filed April 22, 2021. ...................................... JA285

Defendant's Sentencing Memorandum
And Motion for Downward Variance
      filed May 14, 2022. ...................................... JA286

Transcript of Sentencing Hearing
Before the Honorable Kenneth D. Bell
      on May 19, 2022. ...................................... JA296

**Judgment**

    **filed May 23, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA321**

**Notice of Appeal**

    **filed May 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA330**

# **TABLE OF CONTENTS**
## Volume II of II - Under Seal

**Page:**

**Transcript of Jury Voir Dire**
**Before the Honorable Kenneth D. Bell**
　　　　on April 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA332**

**Notice of Objections to Draft Presentence Investigation Report**
　　　　filed July 7, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA444**

**Presentence Investigation Report**
　　　　filed August 19, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA447**

**Government's Motion to Redact Transcript**
　　　　filed May 3, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA474**

**Attached Forensic Psychologist Evaluation to:**
**Defendant's Sentencing Memorandum**
**And Motion for Downward Variance**
　　　　filed May 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA483**

**Statement of Reasons**
　　　　filed May 23, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA485**

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,VICWIT

# U.S. District Court
## Western District of North Carolina (Statesville)
## CRIMINAL DOCKET FOR CASE #: 5:20-cr-00088-KDB-DSC-1

Case title: USA v. Hoover

Date Filed: 09/16/2020

Date Terminated: 05/19/2022

Assigned to: District Judge Kenneth D. Bell
Referred to: Magistrate Judge David S.
Cayer

Appeals court case number: 22-4322 4th
Circuit

### Defendant (1)

**Michael Scott Hoover**
*TERMINATED: 05/19/2022*

represented by **David B. Freedman**
FREEDMAN THOMPSON WITT
CEBERIO & BYRD, PLLC
860 West Fifth Street
Winston-Salem, NC 27101
336-725-1304
Fax: 336-761-8845
Email: dfreedman@ftwcb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Noell P. Tin**
Tin Fulton Walker & Owen, PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: ntin@tinfulton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

### Pending Counts

18:2251(a) and (e) PRODUCTION OF
CHILD PORNOGRAPHY
(1s)

### Disposition

THREE HUNDRED SIXTY (360)
MONTHS imprisonment; LIFE supervised
release; $100 Assessment; $5,000 JVTA
Assessment; $50,000 AVAA Assessment;
Restitution TBD. **9/11/2022 Clerk's Notice:**
Restitution is $0.00.

## JA1

| | |
|---|---|
| 18:2251(a) and (e) PRODUCTION OF CHILD PORNOGRAPHY (2s) | THREE HUNDRED SIXTY (360) MONTHS imprisonment to run consecutively; LIFE supervised release to run concurrently; $100 Assessment; $5,000 JVTA Assessment; $50,000 AVAA Assessment; Restitution TBD. **9/11/2022 Clerk's Notice:** Restitution is $0.00. |
| 18:2252A(a)(5)(B) POSSESSION OF CHILD PORNOGRAPHY (3s) | ONE HUNDRED TWENTY (120) MONTHS imprisonment to run consecutively; LIFE supervised release to run concurrently; $100 Assessment; $5,000 JVTA Assessment; $17,000 AVAA Assessment; Restitution TBD. **9/11/2022 Clerk's Notice:** Restitution is $0.00. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:2251(a)(e) - PRODUCTION OF CHILD PORNOGRAPHY (1-2) | DISMISSED |
| 18:2252A(a)(5)(B) - POSSESSION OF CHILD PORNOGRAPH (3) | DISMISSED |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Stephanie Laboy Spaugh** US Attorney's Office 227 W Trade Street Suite 1650 Charlotte, NC 28202 704-344-6222 Email: stephanie.spaugh@usdoj.gov *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* *Designation: Assistant US Attorney* **Benjamin Bain-Creed** U.S. Attorney's Office 227 West Trade Street Carillon Building, Suite 1650 |

JA2

Charlotte, NC 28202
704-338-3123
Fax: 704-344-6629
Email: benjamin.bain-creed@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Cortney S. Randall**
US Attorneys Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
Email: Cortney.Randall@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/16/2020 | 1 | INDICTMENT as to Michael Scott Hoover (1) count(s) 1-2, 3. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (mga) (Entered: 09/17/2020) |
| 09/16/2020 | 2 | Arrest Warrant Issued *(Sealed - Case Participants)* in case as to Michael Scott Hoover. (Attachments: # 1 Warrant Page Identifier)(mga) (Entered: 09/17/2020) |
| 09/18/2020 | 3 | Application for Writ of Habeas Corpus ad Prosequendum as to Michael Scott Hoover (Spaugh, Stephanie) (Entered: 09/18/2020) |
| 09/18/2020 | 4 | Writ of Habeas Corpus ad Prosequendum Issued as to Michael Scott Hoover Signed by Magistrate Judge David S. Cayer Initial Appearance set for 10/14/2020 10:30 AM in Courtroom 1-1, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. (mga) (Entered: 09/18/2020) |
| 09/18/2020 | 5 | NOTICE OF ATTORNEY APPEARANCE Benjamin Bain-Creed appearing for USA. (Bain-Creed, Benjamin) (Entered: 09/18/2020) |
| 10/08/2020 | 6 | NOTICE OF ATTORNEY APPEARANCE: David B. Freedman appearing for Michael Scott Hoover (Freedman, David) (Entered: 10/08/2020) |
| 10/14/2020 | | Arrest (writ) of Michael Scott Hoover (mek) (Entered: 10/14/2020) |
| 10/14/2020 | | Minute Entry: INITIAL APPEARANCE and ARRAIGNMENT as to Michael Scott Hoover (1) Count 1-2,3 held before Magistrate Judge David S. Cayer. Defendant pled not guilty. Defendant advised of rights & charges. Defendant retained counsel. Government moved for detention. Defendant waived detention hearing. Defendant detained. Government attorney: Christopher S. Hess. Defendant attorney: David B. Freedman. Court Reporter: DCR. (mek) (Entered: 10/14/2020) |
| 10/14/2020 | 7 | **ORDER OF DETENTION as to Michael Scott Hoover. Signed by Magistrate Judge David S. Cayer on 10/14/2020. (mek) (Entered: 10/14/2020)** |
| 10/14/2020 | | **Standard Discovery Order in case as to Michael Scott Hoover. (Click on this link to obtain the Standard Criminal Discovery Order) . Entered by Magistrate Judge David S. Cayer on 10/14/20. (nvc) (Entered: 10/14/2020)** |
| 10/14/2020 | | **SCHEDULING ORDER as to Michael Scott Hoover. (Click on this link to obtain the Standard Arraignment Order) Docket Call set for 10/19/2020 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D.** |

JA3

| | | |
|---|---|---|
| | | Bell. Entered by Magistrate Judge David S. Cayer on 10/14/20. (nvc) (Entered: 10/14/2020) |
| 10/14/2020 | 8 | Unopposed MOTION to Continue Docket Call/Trial by Michael Scott Hoover. Responses due by 10/21/2020 (Freedman, David) (Entered: 10/14/2020) |
| 10/15/2020 | 10 | **ORDER granting 8 Motion to Continue Docket Call/Trial as to Michael Scott Hoover (1). Motion to Continue deadline due by 11/30/2020. Status Conference set for 12/2/2020 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 12/14/2020 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 10/14/2020. (nvc) (Entered: 10/15/2020)** |
| 10/15/2020 | 11 | NOTICE OF ATTORNEY APPEARANCE Cortney S. Randall appearing for USA. (Randall, Cortney) (Entered: 10/15/2020) |
| 10/15/2020 | 12 | PRETRIAL REPORT *(SEALED - Attorney)* as to Michael Scott Hoover (available to USA, Michael Scott Hoover) (Amanda Martin - ars) (Entered: 10/15/2020) |
| 10/20/2020 | 13 | SUPERSEDING INDICTMENT as to Michael Scott Hoover (1) count(s) 1s-2s, 3s. (Attachments: # 1 Unredacted Signature Page, # 2 Case Cover Sheet) (tmg) (Entered: 10/21/2020) |
| 10/22/2020 | 14 | Warrant Returned Executed on 10/6/2020 in case as to Michael Scott Hoover. (tmg) (Entered: 10/22/2020) |
| 10/23/2020 | | NOTICE OF HEARING as to Michael Scott Hoover: Arraignment re: Superseding Indictment set for 11/2/2020 10:35 AM in Courtroom 1-1, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.*(mga) (Entered: 10/23/2020) |
| 11/02/2020 | | Minute Entry: ARRAIGNMENT re: Superseding Indictment as to Michael Scott Hoover (1) Count 1s-2s,3s held before Magistrate Judge David Keesler. Defendant pled not guilty. Government attorney: Kimlani Ford. Defendant attorney: David B. Freedman. Court Reporter: DCR. (mga) (Entered: 11/02/2020) |
| 11/23/2020 | 16 | MOTION to Continue Docket Call/Trial by Michael Scott Hoover. Responses due by 11/30/2020 (Attachments: # 1 Proposed Order) (Freedman, David) (Entered: 11/23/2020) |
| 11/23/2020 | 17 | **ORDER granting 16 Motion to Continue Docket Call/Trial as to Michael Scott Hoover (1). Motion to Continue deadline due by 2/1/2021. Status Conference set for 2/3/2021 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 2/16/2021 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 11/23/2020. (nvc) (Entered: 11/23/2020)** |
| 12/31/2020 | 18 | NOTICE OF ATTORNEY APPEARANCE: David B. Freedman appearing for Michael Scott Hoover (Freedman, David) (Entered: 12/31/2020) |
| 01/14/2021 | 19 | MOTION to Continue Docket Call/Trial by Michael Scott Hoover. Responses due by 1/21/2021 (Attachments: # 1 Proposed Order) (Freedman, David) (Entered: 01/14/2021) |
| 01/15/2021 | 20 | **ORDER granting 19 Motion to Continue Docket Call/Trial as to Michael Scott Hoover (1). Motion to Continue deadline due by 4/5/2021. Status Conference set for 4/7/2021 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 4/19/2021 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D.** |

JA4

| | | |
|---|---|---|
| | | **Bell. Signed by District Judge Kenneth D. Bell on 1/14/2021. (nvc) (Entered: 01/15/2021)** |
| 03/31/2021 | 21 | Request for reciprocal discovery by USA as to Michael Scott Hoover. (Spaugh, Stephanie) (Entered: 03/31/2021) |
| 03/31/2021 | 22 | Request by USA as to Michael Scott Hoover for notice of alibi/insanity defense. (Spaugh, Stephanie) (Entered: 03/31/2021) |
| 04/02/2021 | 23 | NOTICE *of Intent to Call Expert Witness* by USA as to Michael Scott Hoover (Attachments: # 1 curriculum vitae)(Spaugh, Stephanie) (Entered: 04/02/2021) |
| 04/05/2021 | | Set/Reset Hearings as to Michael Scott Hoover: Status Conference RESET for 4/8/2021 at 12:59 PM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. (nvc) (Entered: 04/05/2021) |
| 04/05/2021 | 24 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Michael Scott Hoover (Randall, Cortney) (Entered: 04/05/2021) |
| 04/08/2021 | | Minute Entry: STATUS CONFERENCE as to Michael Scott Hoover held before District Judge Kenneth D. Bell. Government attorney: Cortney Randall and Stepanie Spaugh. Defendant attorney: David Freeman. Court Reporter: Tracy Dunlap 828-771-7217. (nvc) (Entered: 04/12/2021) |
| 04/09/2021 | 25 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Michael Scott Hoover (Spaugh, Stephanie) (Entered: 04/09/2021) |
| 04/12/2021 | | NOTICE OF HEARING as to Michael Scott Hoover: Jury Selection / Jury Trial set for 4/21/2021 09:00 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.* (nvc) (Entered: 04/12/2021) |
| 04/12/2021 | 26 | Proposed Voir Dire by USA as to Michael Scott Hoover (Spaugh, Stephanie) (Entered: 04/12/2021) |
| 04/12/2021 | 27 | Proposed Jury Instructions by USA as to Michael Scott Hoover (Spaugh, Stephanie) (Entered: 04/12/2021) |
| 04/12/2021 | 28 | MOTION in Limine *to Exclude Evidence and Argument* by USA as to Michael Scott Hoover. Responses due by 4/19/2021 (Spaugh, Stephanie) (Entered: 04/12/2021) |
| 04/21/2021 | 29 | WITNESS LIST *(Sealed - Participants)* by USA as to Michael Scott Hoover (Randall, Cortney) (Entered: 04/21/2021) |
| 04/21/2021 | 30 | EXHIBIT LIST by USA as to Michael Scott Hoover (Randall, Cortney) (Entered: 04/21/2021) |
| 04/21/2021 | | Minute Entry: JURY SELECTION as to Michael Scott Hoover held before District Judge Kenneth D. Bell. Jury selected. Jury Trial continues on 4/22/2021 at 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell.Government attorney: Cortney Randall and Stephanie Spaugh. Defendant attorney: David Freeman. Court Reporter: Cheryl Nuccio. (nvc) (Entered: 04/21/2021) |
| 04/22/2021 | 31 | **ORDER RETURNING TRIAL EXHIBITS as to Michael Scott Hoover. Signed by District Judge Kenneth D. Bell on 4/22/2021. (nvc) (Entered: 04/22/2021)** |
| 04/22/2021 | | Minute Entry: JURY TRIAL as to Michael Scott Hoover held before District Judge Kenneth D. Bell. Jury sworn. Opening Statements. Evidence Introduced. Government rested. Defendant rested. Closing arguments. Courts charge. Jury returns verdict. |

JA5

12/15/22, 12:41 PM                                   CM/ECF - LIVE DATABASE - NCWD

|  |  | Government attorney: Cortney Randall and Stepanie Spaugh. Defendant attorney: David Freeman. Court Reporter: Cheryl Nuccio. (nvc) (Entered: 04/22/2021) |
|---|---|---|
| 04/22/2021 | 32 | JURY VERDICT as to Michael Scott Hoover (1) Guilty on Count 1s-2s,3s. (Attachments: # 1 Unredacted Signature Page)(nvc) (Entered: 04/22/2021) |
| 06/25/2021 | 34 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to Michael Scott Hoover. Objections to PSI due 7/9/2021. (available to USA, Michael Scott Hoover) (Lindsay Golding - pjs) (Entered: 06/25/2021) |
| 07/07/2021 | 35 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT *(Sealed - Attorney)* by Michael Scott Hoover; (available to: USA, Michael Scott Hoover) (Freedman, David) (Entered: 07/07/2021) |
| 08/19/2021 | 36 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to Michael Scott Hoover. (available to USA, Michael Scott Hoover) Schedule for Sentence on or after 8/30/2021. (Lindsay Golding - pjs) (Entered: 08/19/2021) |
| 02/08/2022 | 38 | NOTICE OF ATTORNEY APPEARANCE: Noell P. Tin appearing for Michael Scott Hoover (Tin, Noell) (Entered: 02/08/2022) |
| 02/11/2022 | 39 | LETTER addressed to USM re: treatment at jail by Michael Scott Hoover (Attachments: # 1 Envelope)(nvc) (Entered: 02/14/2022) |
| 04/17/2022 | 40 | TRANSCRIPT of Trial Proceedings as to Michael Scott Hoover held on 4/22/21 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER.** Policy at www.ncwd.uscourts.gov Release of Transcript Restriction set for 7/13/2022. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 04/17/2022) |
| 04/19/2022 | 41 | NOTICE to Court Reporter, Cheryl Nuccio of Intent to Request Redaction of 40 Transcript,, by Cortney S. Randall in case as to Michael Scott Hoover (Randall, Cortney) (Entered: 04/19/2022) |
| 04/19/2022 |  | NOTICE OF HEARING as to Michael Scott Hoover: Sentencing set for 5/19/2022 11:10 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(nvc) (Entered: 04/19/2022) |
| 05/03/2022 | 42 | SEALED MOTION *(Sealed - Attorney)* to Redact re 40 Transcript,, (Court Reporter: Cheryl Nuccio) by USA; (available to: USA, Michael Scott Hoover) (Randall, Cortney) (Entered: 05/03/2022) |
| 05/04/2022 | 43 | **ORDER as to Michael Scott Hoover, granting 42 Sealed Motion to Redact 40 Transcript, (Court Reporter: Cheryl Nuccio) by USA. Signed by District Judge Kenneth D. Bell on 5/4/2022. (nvc)** (Entered: 05/04/2022) |
| 05/10/2022 | 44 | REDACTED TRANSCRIPT in case as to Michael Scott Hoover re 40 Transcript,, of Trial Proceedings held on 4/22/21 before Judge Bell. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 05/10/2022) |
| 05/14/2022 | 45 | SENTENCING MEMORANDUM by Michael Scott Hoover (Attachments: # 1 Exhibit A) (Tin, Noell) (Entered: 05/14/2022) |

JA6

| | | |
|---|---|---|
| 05/14/2022 | 46 | MOTION for Leave to File *Two Days Out of Time* by Michael Scott Hoover. Responses due by 5/23/2022 Motions referred to David S. Cayer (Tin, Noell) (Entered: 05/14/2022) |
| 05/16/2022 | | **TEXT-ONLY ORDER granting 46 Motion for Leave to File as to Michael Scott Hoover (1) Entered by District Judge Kenneth D. Bell on 5/16/2022. (nvc)** (Entered: 05/16/2022) |
| 05/18/2022 | 47 | EXHIBIT by Michael Scott Hoover re: 45 Sentencing Memorandum or Response filed by Michael Scott Hoover (Tin, Noell) (Entered: 05/18/2022) |
| 05/18/2022 | 48 | EXHIBIT by Michael Scott Hoover re: 45 Sentencing Memorandum or Response filed by Michael Scott Hoover (Tin, Noell) (Entered: 05/18/2022) |
| 05/19/2022 | | Minute Entry: SENTENCING as to Michael Scott Hoover held before District Judge Kenneth D. Bell. Factual Basis Found. Government attorney: Stephanie Spaugh, Cortney Randall. Defendant attorney: Noell P. Tin. Court Reporter: Cheryl Nuccio. (kab) (Entered: 05/19/2022) |
| 05/19/2022 | 49 | **CONSENT ORDER AND JUDGMENT OF FORFEITURE as to Michael Scott Hoover. Signed by District Judge Kenneth D. Bell on 5/19/2022. (kab)** (Entered: 05/19/2022) |
| 05/23/2022 | 50 | **JUDGMENT as to Michael Scott Hoover (1), Count(s) 1-2, 3, DISMISSED; Count(s) 1s, THREE HUNDRED SIXTY (360) MONTHS imprisonment; LIFE supervised release; $100 Assessment; $5,000 JVTA Assessment; $50,000 AVAA Assessment; Count(s) 2s, THREE HUNDRED SIXTY (360) MONTHS imprisonment to run consecutively; LIFE supervised release to run concurrently; $100 Assessment; $5,000 JVTA Assessment; $50,000 AVAA Assessment; Count(s) 3s, ONE HUNDRED TWENTY (120) MONTHS imprisonment to run consecutively; LIFE supervised release to run concurrently; $100 Assessment; $5,000 JVTA Assessment; $17,000 AVAA Assessment; Restitution to be Determined. Signed by District Judge Kenneth D. Bell on 5/23/2022. (kab)** (Entered: 05/23/2022) |
| 05/23/2022 | 51 | **STATEMENT OF REASONS *(Sealed - Attorney)* re: 50 Judgment. (available to: USA, Michael Scott Hoover). Signed by District Judge Kenneth D. Bell on 5/23/2022. (kab)** (Entered: 05/23/2022) |
| 05/27/2022 | 52 | NOTICE OF APPEAL by Michael Scott Hoover. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, Transcript Order Form, and CJA 24 Vouchers.* Note: Your Transcript Order Form (and CJA 24 if applicable) must be served on the District Court as well as the Circuit Court. (IFP/CJA) (Tin, Noell) (Entered: 05/27/2022) |
| 05/31/2022 | 53 | Transmission of Notice of Appeal as to Michael Scott Hoover to US Court of Appeals re 52 Notice of Appeal. (ejb) (Entered: 05/31/2022) |
| 05/31/2022 | 54 | USCA Case Number as to Michael Scott Hoover [22-4322] for 52 Notice of Appeal, USCA Case Manager: Rickie Edwards. (ejb) (Entered: 06/01/2022) |
| 07/07/2022 | 55 | ORDER of USCA as to Michael Scott Hoover re: appointing David Quentin Burgess as counsel on appeal. [22-4322] (ejb) (Entered: 07/08/2022) |
| 07/14/2022 | 56 | Service/Declaration of Publication by USA as to Michael Scott Hoover re 49 Judgment of Forfeiture (Attachments: # 1 Exhibit A (Declaration of Publication))(Bain-Creed, Benjamin) (Entered: 07/14/2022) |
| 07/28/2022 | 57 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Michael Scott Hoover re 52 Notice of Appeal [22-4322]. Court Reporter: Cheryl Nuccio. Current Deadline: 09/06/2022. Proceedings: April 22, 2021 Jury trial to include Voir Dire, Opening and |

JA7

| | | |
|---|---|---|
| | | Closingstatements and instructions and Sentencing May 19, 2022. Ordering Party: Michael Hoover. (rhf) (Entered: 07/28/2022) |
| 07/28/2022 | 58 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Michael Scott Hoover re 52 Notice of Appeal [22-4322]. Court Reporter: Tracy Dunlap. Current Deadline: 09/06/2022. Proceedings: Status Conference April 8, 2021. Ordering Party: Michael Hoover. (rhf) (Entered: 07/28/2022) |
| 07/28/2022 | 59 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Michael Scott Hoover re 52 Notice of Appeal [22-4322]. Court Reporter: Terry J. Gibson. Current Deadline: 09/06/2022. Proceedings: Initial Appearance October 14, 2020 and Arraignment November 2,2020. Ordering Party: Michael Hoover. (rhf) (Entered: 07/28/2022) |
| 09/06/2022 | 60 | TRANSCRIPT of Initial Appearance as to Michael Scott Hoover held on 10/14/20 before Judge Cayer, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - No.)* Release of Transcript Restriction set for 12/2/2022. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/06/2022) |
| 09/06/2022 | 61 | TRANSCRIPT of Arraignment as to Michael Scott Hoover held on 11/02/20 before Judge Keesler, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - No.)* Release of Transcript Restriction set for 12/2/2022. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/06/2022) |
| 09/06/2022 | 62 | TRANSCRIPT of Voir Dire *(Restricted)* as to Michael Scott Hoover before Judge Bell. Partial Release of Transcript Restriction set for 12/2/2022. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/06/2022) |
| 09/06/2022 | 63 | TRANSCRIPT of Sentencing as to Michael Scott Hoover held on 5/19/22 before Judge Bell, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 12/2/2022. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/06/2022) |
| 09/07/2022 | 64 | NOTICE to Court Reporter, Cheryl Nuccio of Intent to Request Redaction of 63 Transcript - Appeal by Stephanie Laboy Spaugh in case as to Michael Scott Hoover (Spaugh, Stephanie) (Entered: 09/07/2022) |
| 09/08/2022 | 65 | SEALED MOTION *(Sealed - Attorney)* to Redact re 63 Transcript - Appeal (Court Reporter: Cheryl Nuccio) by USA; (available to: USA, Michael Scott Hoover) (Spaugh, Stephanie) (Entered: 09/08/2022) |

JA8

| 09/11/2022 | | NOTICE by Clerk as to Michael Scott Hoover. The determination of restitution was deferred until 8/17/2022. No motion for restitution was filed. Pursuant to the 50 Judgment, restitution becomes $0.00 without further Order of the Court. (mek) (Entered: 09/11/2022) |
| 09/13/2022 | 66 | REDACTED TRANSCRIPT in case as to Michael Scott Hoover re 63 Transcript - Appeal - of Sentencing held on 5/19/22 before Judge Bell. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/13/2022) |
| 10/13/2022 | | **TEXT-ONLY ORDER** *(Sealed - Attorney)* **granting 65 SEALED MOTION to Redact re 63 Transcript - Appeal (Court Reporter: Cheryl Nuccio) as to Michael Scott Hoover (1) by USA (available to: USA, Michael Scott Hoover). Entered by District Judge Kenneth D. Bell on 10/13/2022. (mek)** (Entered: 10/13/2022) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 12/15/2022 12:24:26 | | |
| **PACER Login:** | tmstuckey | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:20-cr-00088-KDB-DSC |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**JA9**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MICHAEL SCOTT HOOVER** | **DOCKET NO. 5:20cr88-KDB**<br><br>**FIRST SUPERSEDING**<br>**BILL OF INDICTMENT**<br><br>**Violations:**<br>18 U.S.C. § 2251(a)<br>18 U.S.C. § 2252A(a)(5)(B) |

FILED
CHARLOTTE, NC

OCT 2 0 2020

US DISTRICT COURT
WESTERN DISTRICT OF NC

### THE GRAND JURY CHARGES:

### COUNT ONE
(Production of Child Pornography)

On or about June 20, 2018, in Wilkes County, within the Western District of North Carolina and elsewhere, the defendant,

### MICHAEL SCOTT HOOVER,

did employ, use, persuade, induce, entice and coerce minor victim 1 to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2251(a) and (e).

### COUNT TWO
(Production of Child Pornography)

On or about August 4, 2019, in Yancey County, within the Western District of North Carolina and elsewhere, the defendant,

### MICHAEL SCOTT HOOVER,

did employ, use, persuade, induce, entice and coerce minor victim 2 to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2251(a) and (e).

## COUNT THREE
(Possession of Child Pornography)

From on or about June 20, 2018 through on or about August 15, 2019, in Wilkes County, within the Western District of North Carolina and elsewhere, the defendant,

### MICHAEL SCOTT HOOVER,

knowingly possessed, and accessed with intent to view, any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), that has been mailed, and shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

JA11

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 2253. The following property is subject to forfeiture in accordance with Section 2253:

a. Any visual depiction or book, magazine, periodical, film, videotape, or other matter which contains any such depiction, which was produced, transported, mailed, shipped, or received during the violations set forth in this bill of indictment;

b. Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from proceeds of the violations;

c. Any property, real or personal, used or intended to be used to commit or promote the violations; and

d. If, as set forth in 21 U.S.C. § 853(p), any property described in (a), (b), or (c) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a), (b) and (c).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds state above:

a. An Apple iPhone seized during the investigation.

A TRUE BILL:

FOREPERSON

R. ANDREW MURRAY
UNITED STATES ATTORNEY

STEPHANIE L. SPAUGH
SPECIAL ASSISTANT UNITED STATES ATTORNEY

**JA12**

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:20CR88-KDB |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SCOTT HOOVER | ) | |
| ———————————————— | ) | |

## GOVERNMENT'S NOTICE OF INTENT TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 404(b) AND 414

Pursuant to Federal Rules of Evidence 414 and 404(b), the United States of America, by and through William T. Stetzer, Acting United States Attorney for the Western District of North Carolina, hereby gives notice of its intent to introduce at trial evidence of Defendant's commission of other acts, and in particular evidence of Defendant's commission of other offenses involving the sexual abuse of the victims and other minors, as well as other visual depictions of the victims and evidence from his iPhone.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.    CONDUCT LEADING TO THE FEDERAL INDICTMENT

Defendant was arrested on August 15, 2019 for eight counts of Felony Indecent Liberties with a Minor, in violation of N.C. Gen Stat. § 14-202.1.  After Defendant's arrest, his employer, Wells Fargo initiated an internal investigation.  As part of the investigation, they collected Defendant's work phone, an iPhone 7 Plus, from his wife on or around August 22, 2019.  As part of the investigation, an employee at Wells Fargo reviewed its contents.  The examiner found a video of a minor masturbating in a "Calculator+" application on the phone.  The examiner, a former Internet Crimes Against Children Task Force member, stopped the review and turned the

1

phone over to law enforcement in Wilkes County.  An agent with the North Carolina State Bureau

of Investigation applied for a search warrant for the phone.  It was executed on August 29, 2019.

The special agent reviewed the data/contents and located two videos that depicted a minor

male, Minor Victim 1, lying on a couch and masturbating. The videos were created on June 19,

2018 with an iPhone 7 Plus.  These videos had been saved to another application in the phone, and

then deleted at some point.   There were also multiple still images of Minor Victim 1

masturbating, or of his penis.  These videos and images were created in Defendant's residence.

The victim was unaware that he was being recorded, or that the visual depictions were produced.

In addition to the visual depictions of Minor Victim 1, there were also visual depictions of

a second minor male, Minor Victim 2, engaging in sexually explicit conduct on Defendant's

iPhone.  There were two copies of the same video, stored in two separate places on the iPhone.

Each video depicted Minor Victim 2 masturbating while standing in the woods.  The video was

captured in slow motion.  There were also three still images of the minor masturbating in the

woods.  All these visual depictions had been created on August 4, 2019 with an iPhone 7 Plus.

Minor Victim 2 was interviewed.  He said that he was hiking with Defendant when Defendant

asked him if he needed to use the restroom.  Minor Victim 2 did. When he was finished,

Defendant came over to Minor Victim 2 and began to play with the minor's penis.  Defendant then

sucked Minor Victim 2's penis.  Defendant placed Minor Victim 2's hand on Minor Victim 2's

penis and told him to stroke it.  Minor Victim 2 noticed that Defendant had his phone at the time,

and that Defendant had recorded it .

On September 16, 2020, the grand jury for the Western District of North Carolina

returned a Bill of Indictment, charging Defendant with three violations.  Count One charges

Defendant with sexual exploitation of a minor, specifically, Minor Victim 1, in violation of 18

2

U.S.C. § 2251. Count Two charges Defendant with sexual exploitation of a minor, specifically, Minor Victim 2, in violation of 18 U.S.C. § 2251. Count Three charges Defendant with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

## II.    OTHER CONDUCT

### A.  Evidence located on Defendant's iPhone

In addition to visual depictions of Minor Victim 1 and Minor Victim 2 described above, the forensic examiner located other evidence pertinent to the investigation during his review of Defendant's iPhone. Defendant's phone also contained other images and videos of Minor Victim 1. There were videos created on September 22, 2018. There is a short video showing Defendant and Minor Victim 1. There is also a video of the victim in a hammock in the woods. Most of his body is hidden from view, but he is masturbating. He was also unaware that he was being recorded. Other still shots show the victim, nude, walking away in the woods. According to Minor Victim 1, he would go hiking and camping with Defendant, along with some other people. There also is another image, taken at another time, that shows Minor Victim 1 lying on his side. The picture depicts him from his stomach to his mid-thigh area. He is only wearing underwear. Again, he did not know that the picture was taken.

The iPhone also contains other relevant information including web history showing searches for "nambla"[1], "selfies boy masterbating," and "selfies boy oh boy."

### B.  Other Uncharged Conduct related to Minor Victim 1

According to Minor Victim 1, he saw Defendant on a regular basis from the time he was about 14 or 15 years old. One of the first times he remembered Defendant behaving inappropriate, Minor Victim 1 and Defendant were in a truck together. Defendant put his hand on Minor Victim

---

[1] NAMBLA is short for an organization called the North American Man/Boy Love Association.

3

1's inner thigh, near his crotch. Minor Victim 1 told him to stop and Defendant did. At some point, Defendant start providing alcohol to Minor Victim 1, including beer and liquor and on one occasion, he offered Minor Victim 1 marijuana.

Defendant would repeatedly try to engage Minor Victim 1 in conversations about masturbation. He would also show Minor Victim 1 pornography. Defendant tried to get Minor Victim 1 to masturbate in front of him. Defendant would claim he see Minor Victim 1 masturbating and make comments about it. Minor Victim 1 remembers Defendant trying to look at him in the shower as well.

### C. Uncharged Conduct related to Minor Victim 2

In addition to the videos located on the iPhone, Minor Victim 2 has disclosed several other disturbing incidents with Defendant. In one incident, Minor Victim 2 was sleeping over at Defendant's home. He woke up to Defendant pulling Minor Victim 2's pants down and playing with his genitals. Defendant also put Minor Victim 2's hand into Defendant's pants and made the minor touch Defendant's penis. This occurred approximately in 2017.

On another occasion, Defendant and Minor Victim 2 were outside together at his home. Defendant told Minor Victim 2 to pull his pants down, but Minor Victim 2 said he did not like that. Defendant indicated that he did not care and then touched Minor Victim 2's penis with his hand, then put his penis in Defendant's mouth. A similar incident happened another time as well. These assaults occurred in 2019.

### D. Other Victims[2]

Multiple other males have come forward to say that Defendant committed similar acts with them when they were minors. In fact, the state investigation into the other victims led to

---

[2] Written reports and recordings of interviews with these victims have been provided to counsel for Defendant.

4

Defendant's arrest, which caused Wells Fargo to collect his phone and the eventual discovery of the pornographic depictions of Minor Victim 1 and Minor Victim 2.

Initially, three minor males, Minor Victim 3, Minor Victim 4, and Minor Victim 5 came forward to law enforcement. Minor Victim 3 told law enforcement that he was at Defendant's home when he was 15 years old. Defendant began massaging him and then played a game of "chicken" where Defendant moved his hands up Minor Victim 3's leg, asking if he was chicken. Defendant put his hand under the shorts and underwear of Minor Victim 3 and held the minor's penis for approximately two minutes. Unfortunately, this was not the only time Defendant touched Minor Victim 3. Defendant touched Minor Victim 3's penis on other occasions, both under and over the victim's shorts. Sometimes they were in Defendant house and sometimes they were in his car. These incidents occurred in 2017 and 2018.

Minor Victim 4 disclosed a similar incident. He told law enforcement that he was in a truck with Defendant and Defendant's daughter. The daughter was asleep in the back seat. Defendant put his hand on Minor Victim 4's leg. Minor Victim 4 pushed Defendant's hand away but Defendant put his hand back on Minor Victim 4's leg. He put his hand on the minor's upper thigh, and then Minor Victim 4's penis "real fast." Minor Victim 4 stated that on another occasion, Defendant was supposed to stretch/pop Minor Victim 4's back by standing behind him, wrapping his arms around Minor Victim 4's chest and lifting him. Instead of wrapping his arms around Minor Victim 4's chest, Defendant stuck his hands down Minor Victim 4's pants and touched his penis. These incidents occurred in 2018-2019.

Minor Victim 5 also reported illegal contact by Defendant. Minor Victim 5 disclosed that Defendant tried to touch Minor Victim 5's penis when Minor Victim 5 was at Defendant's home, and did touch his penis over his clothes on multiple occasions. Minor Victim 5 also reported

5

seeing Defendant try to touch another minor male's crotch.  Furthermore, he told law enforcement that Defendant exposed his penis to Minor Victim 5 and his friend while they were at Defendant's home.

Defendant was arrested by state authorities for offenses involving Minor Victims 3, 4, and 5.  The local media reported the arrests, which prompted another victim to come forward.  Another concerned citizen also reported another potential victim to law enforcement.  Additional interviews were conducted.

Minor Victim 6 told law enforcement that Defendant began sexually abusing him when Minor Victim 6 was between the ages of four and seven and it continued for several years.  According to Minor Victim 6, the molestation would occur in Defendant's living room and while camping outdoors.   Defendant and Minor Victim 6 were in the living room of Defendant's home and Defendant wanted to "teach" the minor about masturbation.  Defendant touched Minor Victim 6's penis and had Minor Victim 6 touch his own penis.  Minor Victim 6 stated that Defendant made him perform oral sex on Defendant and that Defendant performed oral sex on him.  While camping, Defendant put Minor Victim 6's hand on Defendant's penis.

Minor Victim 7 was a friend of Minor Victim 6.  He went on a camping trip with Defendant and Minor Victim 6 in November 2017.  They had all slept in the same tent.  During the night, Minor Victim 7 woke up with Defendant on top of him.  Defendant was trying to get his hand into Minor Victim 7's pants to touch his penis.  Minor Victim 7 was able to grab Defendant's hand while using his other hand to cover his penis.  He said Defendant continued to use his other hand to try to get into Minor Victim 7's pants.  Defendant stated that he wanted to perform oral sex on Minor Victim 7.  Minor Victim 7 was able to stop Defendant, who then left the tent.

Minor Victim 8 learned about Defendant's arrest and contacted law enforcement.  He told

6

law enforcement that he was in a Boy Scout troop that Defendant was involved with back in late 2008-2010. On multiple occasions, Defendant put his hand in Minor Victim 8's pants and felt the minor's genitals. Many of these assaults occurred in Defendant's home but one occurred on an overnight trip to a museum. Defendant also tried to perform oral sex on Minor Victim 8 while Minor Victim 8 was at Defendant's home.

## ARGUMENT

### I.  SOME OF THE EVIDENCE IS ADMISSIBLE BECAUSE IT IS INTRINSIC TO THE CHARGED CRIMES.

The government submits that all of the evidence referenced in this document involving Minor Victim 1 and Minor Victim 2, and the evidence located on his iPhone is proof of Defendant's involvement in the charged conduct, provides background and context to the crimes charged in the indictment, and will serve to complete the story for the jury. The Fourth Circuit has held that "acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, of if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." *United States v. Siegal*, 536 F.3d 306, 316 (4th Cir. 2008)(quoting *United States v. Kennedy,* 32 F.3d 876, 885 (4th Cir. 1994)). In a situation where evidence is presented that arose out of the same series of transactions as the charged offense or that are necessary to complete story of the charged crime, a Rule 404(b) analysis is not necessary but such evidence is still subject to a Federal Rule of Evidence 403 balancing test. *See United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996).

Evidence relevant to Defendant's relationship with the victims and his prurient interest in

minor males, including evidence of his cultivation of a relationship with the victims between 2016 and August 2019, to include all videos and photographs that the defendant took or possessed of the victims, is *res gestae* evidence. The evidence involves the same victims and is part of the same course of conduct that led to the production of the child pornography. Many of the acts took place in the same locations as the charged offenses. Finally, with regard to the uncharged images and videos and other iPhone evidence, they were located on the same iPhone along with the charged images and videos.

The aforementioned evidence demonstrates Defendant's involvement in the charged conduct, provides background and context to the crimes charged in the Indictment, forms an integral and natural part of the account of the offenses, and completes the narrative of the crime. The nature of Defendant's relationship with the victim and his cultivation of the relationship are inextricably intertwined. Introduction of this evidence is necessary to provide the jury with a complete and truthful account of the crimes on trial. Insofar as such evidence is inextricably intertwined with the crimes charged, it is direct evidence of the charged crime and does not implicate Rule 404(b).

## II. EVIDENCE OF DEFENDANT'S PRODUCTION AND POSSESSION OF CHILD PORNOGRAPHY, AND HIS OTHER ACTS WITH MINOR VICTIM 2, MINOR VICTIM 4, AND MINOR VICTIM 6 ARE ADMISSIBLE UNDER FED. R. EVID. 414.

Rule 414(a) provides that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a). Pursuant to Rule 414(d)(2)(C) & (D), "child molestation" includes a crime under state law involving contact between any part of the defendant's body and a child's genitals and anus, or contact between any part of a child's body and the defendant's genitals or anus. A child for these

8

JA20

sections must be under the age of 14. Fed. R. Evid. 414(d)(1).  It also includes "any conduct prohibited by 18 U.S.C. chapter 110." Fed. R. Evid. 414(d)(2)(B).

Evidence is admissible under Federal Rule of Evidence 414 if (1) the defendant is accused of an offense of child molestation; (2) the evidence proffered pertains to the defendant's commission of another act of child molestation; and (3) the evidence is relevant. *United States v. Stamper*, 106 Fed. Appx. 833, 835 (4th Cir. 2004).  In addition, the probative value of the evidence must not be substantially outweighed by the risk of undue prejudice, confusion, or undue delay. *Id.*  Unlike Fed. R. Evid. 404(b), Rule 414 allows the admission of evidence for the purpose of establishing propensity to commit other sexual offenses *United States v. Kelly*, 510 F.3d 433, 437 (4th Cir. 2007).

### A.  <u>The Defendant is Accused of An Offense of Child Molestation</u>

As stated above, child molestation includes any conduct prohibited by 18 U.S.C. Chapter 110.  Fed. R. Evid. 414(d)(2)(B).   In this case, Defendant is charged with two counts of sexual exploitation of a minor in violation of 18 U.S.C. § 2251 and knowingly possessing, or accessing with intent to view, child pornography under 18 U.S.C. § 2252A.  Both crimes are contained in Chapter 110 of Title 18 of the U.S. Code.  *See* 18 U.S.C. §§ 2251 and 2252A.   Thus, the Defendant is accused of an offense of child molestation.

### B.  <u>Evidence of Defendant's Other Acts Pertains to the Defendant's Commission of Another Child Molestation</u>

All the visual depictions of a minor engaged in sexually explicit conduct located on Defendant's iPhone are charged in the Bill of Indictment, and therefore, admissible.  However, the government also intends to offer these images and videos pursuant to Fed. R. Crim. Evid. 414. As explained above, they clearly are acts of "child molestation" because it is conduct prohibited by chapter 110 of Title 18.

9

The government also intends to introduce testimony about Defendant engaging in acts of child molestation with Minor Victim 2[3], Minor Victim 4, and Minor Victim 6, as described above. This contact occurred when the victims were under the age 14 and involved the type of contact listed in Rule 414. Thus, this evidence of Defendant's other acts also pertains to his commission of another child molestation under Fed. R. Evid. 414.

### C. <u>Evidence of Defendant's Production and Possession of Child Pornography and Sexual Contact of Minors is Relevant</u>

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. Rule 414 reflects Congress's view that propensity evidence of other sexual offenses is usually relevant and probative. *Kelly*, 510 F.3d at 437. Here, Defendant's other acts make it more probable that he not only has a sexual interest in children, specifically, minor males, but also has a propensity to produce and possess child pornography of minor males masturbating, and, thus, knowingly did so in the instant case. *See, Kelly*, 510 F.3d at 437-38 (upholding admission of prior conviction for attempted rape of a twelve-year-old child in prosecution for traveling in interstate commerce to engage in illicit sexual conduct with a twelve-year-old as probative of defendant's propensity to molest young children). The Eleventh Circuit has similarly stated that "in prosecutions for possessing or receiving child pornography evidence that a defendant has engaged in child molestation in the past is admissible as evidence that he is more likely to have committed the offense charged." *United States v. Carino*, 368 Fed.Appx. 929, 929-930 (11th Cir. Mar. 11, 2010).

The evidence is also relevant in that it goes to Defendant's knowledge and intent as

---

[3] The government believes that the evidence of crimes involving Minor Victim 2 is intrinsic to the production of the sexually explicit videos of Minor Victim 2, as noted above. However, it is also admissible under Fed. R. Evid. 414.

10

further described below.

### D. __The Probative Value of the Evidence is Not Substantially Outweighed by Any Prejudice, Confusion, or Undue Delay__

Evidence admitted under Rule 414 is subject to Rule 403's balancing test. *Kelly*, 510 F.3d at 437. Thus, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* In applying the Rule 403 balancing test to prior offenses under Rule 414, the court should consider factors including but not limited to: (1) the similarity between the previous offense and the charged crime, (2) the temporal proximity between the two crimes, (3) the frequency of the prior acts, (4) the presence or absence of any intervening acts, and (5) the reliability of the evidence of the past offense. *Id.* at 437-38.

The other acts of child molestation and the charged crime in this case are very similar. Some of the acts involve the sexual exploitation of children and are even violations of the exact same federal statutes. The images and videos were taken a little over a year apart. Furthermore, the images and videos were stored together on the same iPhone. The other evidence, involving the sexual contact with Minor Victim 2, Minor Victim 4, and Minor Victim 6 is similar in that it involved young minor males, frequent conversations about masturbation, occurred in the home and/or in the woods, and to victims close to Defendant.

These acts are much more similar to each other than those that were upheld as admissible in *United States v Mason.* 532 F. App'x 432 (4th Cir. 2013) cert. denied, 134 S. Ct. 659, 187 L. Ed. 2d 436 (U.S. 2013)(unpublished). In *Mason*, the defendant was charged with transportation, receipt, and possession of child pornography. The Fourth Circuit upheld the admission of evidence showing that the defendant had repeatedly sexually molested two boys age 9 and 11 under Rules 414 and 403. *Id.* The Fourth Circuit stated that these acts were similar in that they both involved the exploitation of children. *Id.*

11

In *Kelly*, the court found that the similarity between the prior conviction and the charged offense was striking where the prior conviction was for attempted rape of a twelve-year-old child and the charged offense was for traveling in interstate commerce to engage in illicit sexual conduct with a twelve-year-old. 510 F.3d at 437. Like the evidence in *Kelly,* the evidence that the government plans to introduce almost parallels the charged offenses in the type of victim he selected and the sexual contact he caused.

Next, the temporal proximity between the two crimes, the frequency of the prior acts and the presence of intervening acts also support the admission of the evidence. In this case, the other acts with Minor Victim 2 occurred contemporaneously or shortly before the charged offenses. The acts with Minor Victim 4 and Minor Victim 6 are a little older. The Fourth Circuit has upheld the admission of much older evidence. *See, Kelly*, *Id.* (noting that the fact that the prior conviction was twenty-two years prior to the crimes charged did not alone render the conviction inadmissible given the similarity in the offenses); *United States v. Mason,* 532 F. App'x 432 (4th Cir. 2013)(unpublished*)* (upholding the admission of prior child molestation acts that occurred 12 years prior to the instant offense); *United States v. Rice,* 347 Fed. Appx. 904 (2009)(unpublished) (affirming the admission of child molestation activity that occurred between ten and eighteen years prior to the instant offense). There are no intervening events. These factors, coupled with the similarity between the acts, clearly support the admission of the evidence.

Finally, the evidence that the government seeks to admit is very reliable. First, the images and videos depict the victims who will be testifying and subject to cross-examination. The actual images and videos were recovered from Defendant's iPhone. A forensic copy of the iPhone (and the images and videos) has been made available to counsel for Defendant prior to

12

the trial.  Each of the witnesses were interviewed.  Their recorded interviews have been

provided to Defendant.

Propensity evidence "has indisputable probative value." *United States v. Guardia*, 135

F.3d 1326, 1131 (10th Cir. 1998).   Any prejudice in admitting evidence of Defendant's other

acts is due to its high probative value.  But that does not mean it is unfairly prejudicial.  *See*

*Kelly*, 510 F.3d at 438 (holding that admission of a prior conviction for attempted rape of a

twelve-year-old child in prosecution for traveling in interstate commerce to engage in illicit

sexual conduct with a twelve-year-old was not unfairly prejudicial merely because it tended to

prove defendant's propensity to molest young children);  *Rice*, 347 Fed. Appx 904 (4th Cir.

2009)(unpublished)(Evidence that tends to prove that the defendant has a deviant sexual

attraction towards children is not unfairly prejudicial.)  Therefore, the probative value of the

evidence described above is not substantially outweighed by any unfair prejudice or confusion.

## II.    EVIDENCE OF DEFENDANT'S OTHER ACTS ARE ADMISSIBLE UNDER RULE 404(b) TO PROVE MOTIVE, OPPORTUNITY, INTENT, PREPARATION, PLAN, KNOWLEDGE, IDENTITY AND ABSENCE OF MISTAKE OR ACCIDENT

Given that Rule 414 essentially "supersedes" Rule 404(b)'s treatment of other acts, a

Rule 404(b) analysis is probably unnecessary in this case with regards to the other child

pornography and child molestation involving Minor Victim 2, Minor Victim 4, and Minor Victim

6. *See United States v. Stamper*, 106 Fed.Appx. 833, 835 (4th Cir. 2004)(unpublished).  However,

as Federal Rule of Evidence 404(b) allows the admission of evidence of crimes, wrongs, or other

acts to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

mistake, or lack of accident, it offers a valid alternative basis for the admission of the other acts

evidence.  Additionally, the government seeks to admit other acts of Defendant involving the

other minor males described above.

13

JA25

The evidence described above that the government seeks to admit is admissible under Rule 404(b). Evidence of prior acts is admissible under Rule 404(b) if (1) the evidence is relevant to an issue and not offered to establish the general character of the defendant, (2) the prior act is necessary in that it is probative of an essential claim or an element of the offense, (3) the evidence is reliable, and (4) the probative value of the evidence is not substantially outweighed by confusion or unfair prejudice. *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). "Rule 404(b) is viewed as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir.2008).

A. <u>**Evidence of Defendant's Prior Acts is Relevant to Show Intent, Plan, Knowledge, Identity, Motive, and Absence of Mistake or Accident**</u>

Under the first prong for Rule 404(b) evidence admissibility, the evidence must be relevant to an issue such as an element of the offense. *Queen*, 132 F.3d at 997. Evidence is relevant if it has any tendency to make a fact of consequence to an issue in the case more or less probable than without the evidence. *Id.* at 994. The more similar the prior act is to the act currently charged, the more relevant the evidence of the prior act will be. *Id.* at 997.

Defendant's conduct of production and possession of child pornography, production and possession of erotic, nude and/or surreptitiously recorded images and videos of Minor Victim 1, web history, and other interactions with minor males as describe above is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *United States v. Whorley*, 550 F.3d 326, 338 (4th Cir. 2008) (holding that evidence of defendant's prior conviction for receiving child pornography and terms of his probation was properly admitted to prove the defendant's knowledge and lack of accident or mistake in downloading child pornography and sending or receiving obscene emails). Defendant is

14

currently charged with knowingly exploiting a minor for the purpose of producing a visual depiction, and possessing child pornography. As described above, the evidence the government seeks to introduce is very similar to the current charged acts. All the victims are young, minor males. The contact involved masturbation, contact with the minors' genitals, and often occurred in Defendant's home or on trips. Many of them occurred during the time period charged in the Indictment or shortly before.

Evidence of Defendant's prior acts is relevant to show his intent and motive in filming the victims. Evidence of the prior acts shows that the Defendant has a sexual interest in children, and specifically, the genitals of minor males, which makes it more probable that he intended to create the videos, and did knowingly possess and produce pornographic depictions of the victims. *United States v. Sebolt*, 460 F.3d 910, 916-17 (7th Cir. 2006) (holding prior instances of sexual misconduct with a child victim may establish defendant's sexual interest in children which is relevant motive in a prosecution for child exploitation). Such a person is more likely to create and knowingly possess child pornography rather than to create or possess it by accident. Thus, the evidence is sufficiently similar in nature to the charged offense.

This evidence also negates mistake or accident. Counsel for Defendant has suggested to the government that Defendant did not employ, use, persuade, induce, entice, or coerce the minor victim to engage in sexually explicit conduct *for the purpose* of creating a visual depiction. The government's evidence is necessary to show Defendant intent and purpose in making the visual depictions and that the visual depictions were not created by accident or mistake.

Therefore, evidence of Defendant's prior acts is relevant to an issue other than the Defendant's character because it makes Defendant's motive, opportunity, intent, preparation,

15

**JA27**

plan, knowledge, identity, and absence of mistake or accident in creating and possessing child pornography more probable.

**B.  Evidence of Defendant's Prior Act is Necessary Because it is Probative of An Element of the Crime**

Evidence is necessary where, considered in light of other evidence available to the government, it is an essential part of the crime on trial or where it furnishes part of the context of the crime.  *Queen*, 132 F.3d at 998.  The Government has the burden of proving that the Defendant knowingly used a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction, and knowingly possessed the child pornography and that the offense was not the result of mistake or accident.  Thus, evidence of the Defendant's prior acts is probative of an essential element of the charged crime.  *See Whorley*, 550 F.3d at 338 (upholding admission of prior conviction for receipt of child pornography and terms of probation under Rule 404(b) in prosecution for knowing receipt of child pornography because it showed lack of accident or mistake).

**C.  The Evidence of Defendant's Prior Act is Reliable**

If the evidence is "sufficient to allow the jury to 'reasonably conclude that the act occurred and that the defendant was the actor, then it is reliable'."  *United States v. Van Metre*, 150 F.3d 339, 350 (4th Cir. 1998)(citations omitted).  Evidence is reliable for purposes of Rule 404(b) unless it is so outrageous that it could not be believed by a rational juror that was properly instructed.  *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008).  Here, as described above, the evidence is reliable.  The victims and computer forensic examiner will be subject to cross examination.  The interviews of the victims have been provided to defense counsel. The victims' stories are similar and corroborate each other. All the images and videos and other forensic evidence were located on Defendant's iPhone.  Thus, a jury could reasonably conclude that the

16

act occurred and that the evidence depicts either the victim and/or Defendant.  Therefore,

evidence of defendant's other acts is sufficiently reliable.

**D.  <u>The Probative Value of the Evidence is Not Substantially Outweighed by Any
Confusion or Unfair Prejudice</u>**

The probative value of the evidence of the prior act must not be substantially outweighed

by confusion or unfair prejudice in that it tends to make reason secondary to emotion in the fact-

finding process.  *Queen*, 132 F.3d at 997.  "Relevant evidence is inherently prejudicial; but it is

only unfair prejudice, substantially outweighing probative value, which permits exclusion of

relevant matter under Rule 403."  *United States v. Naranjo,* 710 F.2d 1465, 1469 (10th Cir.

1983).   In the instant case, evidence of Defendant's prior acts involving minor male victims is

highly probative to show that he knowingly committed the charged crimes, what his intent

was, and that it was not a mistake or accident.  There is no suggestion that the evidence of

Defendant's prior acts would invoke emotion in the place of reason or that it would tend to cause

confusion with respect to the currently charged offenses.

In this case, the jury will be required to view images and videos of two minors

engaging in sexually explicit conduct, and will have to hear testimony about the visual

depictions for the government to prove its case, even without the other acts evidence.  So, the

jury will have to see and hear evidence about the sexual exploitation of minors  regardless.

Thus, in this context, the admission of the other acts evidence will not materially alter the level

of prejudice but will be of significant probative value as described above.

 Moreover, any possible confusion or prejudice can be eliminated by a limiting jury

instruction, if requested, explaining the purpose for admitting the evidence of the prior act.  *See*

*Queen*, 132 F.3d at 997 (noting that additional protection against the pitfalls Rule 404(b) protects

against may be provided by a limiting jury instruction when requested explaining the purpose of

17

the evidence and advance notice of the intent to introduce such evidence). Thus, the probative

value of the evidence is not substantially outweighed by any confusion or unfair prejudice.

## **CONCLUSION**

Proving Defendant's propensities, state of mind, knowledge, intent, motive, lack of

mistake or accident, and identity in committing the crimes charged are critical to the quest for

truth in this case. Accordingly, the United States files notice in advance of trial of the general

nature of evidence the United States will offer of other acts, pursuant to Rule 414 and Rule

404(b) of the Federal Rules of Evidence. The government respectfully submits the Court

should, in the sound exercise of its discretion, admit this evidence, for which there is a

presumption of admissibility.


**RESPECTFULLY SUBMITTED**, this the 5th day of April, 2021.

WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

s/ Stephanie L. Spaugh
Special Assistant United States Attorney
NC Bar Number: 47877
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Stephanie.spaugh@usdoj.gov

s/ Cortney S. Randall
Assistant United States Attorney
NC Bar Number: 31510
Attorney for the United States
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
cortney.randall@usdoj.gov

18

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:20CR88-KDB |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SCOTT HOOVER | ) | |
| | ) | |

## **GOVERNMENT'S PROPOSED JURY INSTRUCTIONS**

NOW COMES the United States of America, by and through William T. Stetzer, Acting United States Attorney for the Western District of North Carolina, and submit the following proposed jury instructions for the Court's consideration in the above-captioned case. The United States has consulted with counsel for Defendant. His objection is noted below. The United States respectfully requests the opportunity to propose additional or revised instructions as may be required by the events at trial.

**RESPECTFULLY SUBMITTED**, this the 12th day of April, 2021.

WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

s/ Stephanie L. Spaugh
Special Assistant United States Attorney
NC Bar Number: 47877
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Stephanie.spaugh@usdoj.gov

s/ Cortney S. Randall
Assistant United States Attorney
NC Bar Number: 31510

1

Attorney for the United States
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax:  704.344.6629
cortney.randall@usdoj.gov

2

**Substantive Instructions**

**SUPERSEDING BILL OF INDICTMENT – INTRODUCTION**

The Court will now read the Superseding Bill of Indictment, the statutes the defendant is charged with violating, and the essential elements of these offenses.  You should keep in mind as I review and summarize the charges that when you go into the jury room to decide this case, you will have a copy of the Superseding Bill of Indictment with you, so it will not be necessary for you to try to memorize, while I speak, exactly how the charges are laid out.  My summaries given here will help you, I hope, when you do sit down to a careful consideration of all the issues before you.

3

**PROOF MAY BE DISJUNCTIVE**

Although the Indictment may charge the defendant with committing an offense in several ways, using conjunctive language, it is not necessary for the government to prove that the defendant did each of those things.  It is sufficient if the government proves beyond a reasonable doubt that the defendant did any one of these alternative acts as charged.[1]

---

[1] *United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009), *as corrected* (Mar. 31, 2009) ("It is well established that when the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive.");  *United States v. Fordyce*, 878 F.2d 1431 (4th Cir. 1989) (unpublished) (stating that Section 2252(a)(2) is disjunctive).

4

## "ON OR ABOUT"—EXPLAINED

The Indictment charges that the offenses alleged in the Indictment were committed "on or about" a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the Indictment, it is not necessary for the government to prove that the offenses were committed precisely on the date charged.[2]

---

[2] Kevin F. O'Malley, Jay E. Grenig & William C. Lee, 1A Fed. Jury Prac. & Instr. § 13:05 (6th ed. 2021).

5

**COUNTS ONE AND TWO**
**Production of Visual Depictions of a Minor**
**Engaging in Sexually Explicit Conduct – 18 U.S.C. § 2251(a)**

Defendant MICHAEL SCOTT HOOVER is charged in Counts One and Two of the

Superseding Bill of Indictment as follows:

[**Read Count One**]

[**Read Count Two**]

6

## COUNTS ONE AND TWO
### 18 U.S.C. § 2251(a)

### The Statute

Title 18, United States Code, Section 2251(a), provides, in pertinent part, as follows:

Any person who employs, uses, persuades, induces, entices, or coerces any minor

to engage in…any sexually explicit conduct for the purpose of producing any visual

depiction of such conduct… shall be [guilty of an offense against the United

States],…if that visual depiction was produced or transmitted using materials that

have been mailed, shipped, or transported in or affecting interstate or foreign

commerce by any means, including by computer….

7

## COUNTS ONE AND TWO
### 18 U.S.C. § 2251(a)

### The Essential Elements

For you to find the defendant guilty of Using a Minor to Produce a Visual Depiction of a Minor Engaging in Sexually Explicit Conduct charged in Counts One and Two of the Superseding Bill of Indictment, the Government must prove the following elements beyond a reasonable doubt:

First:     That the Minor named in Counts One and Two of the Superseding Bill of Indictment was under the age of eighteen;

Second:     That the defendant used or employed or persuaded or induced or enticed or coerced the Minor named in Counts One and Two to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and

Third:     That the visual depiction was produced using materials that had been mailed, shipped or transported in and affecting interstate or foreign commerce by any means, including by computer.[3]

I will now define certain terms used in these essential elements. You are to apply these definitions as you consider the evidence. If I do not define certain concepts or words, you will assign to them their ordinary, everyday meanings.

---

[3]     3 L. Sand, *Modern Federal Jury Instructions*, Criminal § 62-02 (2019).

8

**JA38**

**COUNTS ONE AND TWO**

**18 U.S.C. § 2251(a)**
**Definition of Minor**

As used in these instructions, the term "minor" means any person under the age of eighteen years.[4] When you consider whether a person is under the age of eighteen (18), you may use your life experience in observing children.[5]

The government does not have to prove that the defendant knew that the victim was less than eighteen (18) years old.

---

[4] 18 U.S.C. § 2256(1).
[5] *United States v. Riccardi*, 405 F.3d 852, 870 (10th Cir. 2005).

9

**COUNTS ONE AND TWO**

**18 U.S.C. § 2251(a)**
**"Using a Minor"**

A person is "used" if they are photographed or videotaped.[6]

---

[6] Model Crim. Jury Instr. 8th Cir. 6.18.2251(a) (2020). *Ortiz–Graulau v. United States,* 756 F.3d 12, 18–19 (1st Cir.2014) (holding that "the statutory definition of 'use' is met when a defendant makes a minor the subject of a visual depiction by intentionally photographing the minor engaging in sexually explicit conduct") (citing *United States v. Engle,* 676 F.3d 405, 419 n. 9 (4th Cir. 2012); *United States v. McCloud,* 590 F.3d 560, 566 (8th Cir. 2009); *United States v. Sirois,* 87 F.3d 34, 42 (2d.Cir.1996), and other cases). *United States v. Wright*, 774 F.3d 1085, 1091(6th Cir. 2014).

10

**COUNTS ONE AND TWO**

**18 U.S.C. § 2251(a)**
**DEFINITION OF "PRODUCING"**

The term "producing" means producing, directing, manufacturing, issuing, publishing, or

advertising.[7]

---

[7]      18 U.S.C. § 2256(3).

11

**JA41**

## COUNTS ONE AND TWO

### 18 U.S.C. § 2251(a)
### "FOR THE PURPOSE OF"[8]

The government does not have to prove that the defendant's sole purpose or the primary purpose of engaging in such conduct was to produce a visual depiction. But the government must prove that producing a visual depiction of the sexually explicit conduct was one of the defendant's purposes for using, employing, persuading, enticing, or coercing the victim to engage in sexually explicit conduct. And that it was a significant or motivating purpose and was not merely incidental to the sexually explicit conduct.[9]

In deciding whether the government has proven that the defendant acted for the purpose of producing a visual depiction of the sexually explicit conduct, you may consider all of the evidence concerning the defendant's conduct.

---

[8] The defendant objects to the government's proposed instruction.

[9] *United States v. Thompson*, 807 Fed.Appx. 251, 252 (4th Cir. 2020); *see United States v. McCauley*, 983 F.3d 690, 697 (4th Cir. 2020) (noting that the Fourth Circuit recently affirmed a conviction under the instruction given in *Thompson* and stating "[w]hether an instruction reads 'the purpose,' 'the dominant purpose,' 'a motivating purpose'—or some other equivalent variation—may not be crucial, but the statute plainly requires something more than 'a purpose.'")

12

## COUNTS ONE AND TWO

### 18 U.S.C. § 2251(a)
### Definition of Sexually Explicit Conduct

As used in these instructions, the term "sexually explicit conduct" means actual or simulated:

(1)    sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; or

(2)    bestiality; or

(3)    masturbation; or

(4)    sadistic or masochistic abuse; or

For conduct that occurred on or before December 7, 2018:

(5)    the lascivious exhibition of the genitals or pubic area of any person.

For conduct that occurred after December 7, 2018:

(5)    the lascivious exhibition of the anus, genitals, or pubic area of any person. [10]

---

[10] 18 U.S.C. § 2256(2).

13

## COUNTS ONE AND TWO

### 18 U.S.C. § 2251(a)
### Definition of Lascivious Exhibition

The term "lascivious exhibition" means a depiction that displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer. Not every exposure of the genitals or pubic area constitutes a lascivious exhibition. In deciding whether the government has proved that a particular visual depiction constitutes a lascivious exhibition, you should consider the following factors:

(1) Whether the focal point of the visual depiction is on the minor's genitals or pubic area;

(2) Whether the setting of the visual depiction makes it appear to be sexually suggestive, for example, in a place or pose generally associated with sexual activity;

(3) Whether the minor is displayed in an unnatural pose, or in inappropriate attire, considering the age of the minor;

(4) Whether the child is fully or partially clothed, or nude;

(5) Whether the visual depiction suggests coyness or a willingness to engage in sexual activity; and

(6) Whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

A picture or image need not involve all of these factors to be a lascivious exhibition of the genitals or pubic area. It is for you to decide the weight or lack of weight to be given to any of these factors. Ultimately, you must determine whether the visual depiction is lascivious based on

14

JA44

its overall content.[11]

---

[11]    18 U.S.C. § 2256(2)(a);  3 L. Sand, *Modern Federal Jury Instructions*, Criminal, § 62-07 (2019) (modified); *United States v. Whorley*, 550 F.3d 326, 351 n.5 (4th Cir. 2008); *United States v. Russell*, 662 F.3d 831, 840 (7th Cir. 2011); *United States v. Daniels*, 653 F.3d 399, 407 (6th Cir. 2011);  *United States v. Steen*, 634 F.3d 822, 826 (5th Cir. 2011); *United States v. Overton*, 573 F.3d 679, 686 (9th Cir. 2009); *United States v. Wallenfang*, 568 F.3d 649, 657 (8th Cir. 2009);  *United States v. Rivera*, 546 F.3d 245, 249 (2d Cir. 2008);  *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986) (six factors).

15

**JA45**

### COUNTS ONE AND TWO

### 18 U.S.C. § 2251(a)

### Definition of Visual Depiction

"Visual depiction" includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.[12]

---

[12] 18 U.S.C. § 2256(5).

16

**COUNTS ONE AND TWO**

**18 U.S.C. § 2251(a)**
**Definition of Computer**

As used in these instructions, the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter, or typesetter, a portable handheld calculator, or other similar device.[13]

---

[13] 18 U.S.C. § 1030(e)(1); 18 U.S.C. § 2256(6).

17

## COUNTS ONE AND TWO

### 18 U.S.C. § 2251(a)
### Definition of Interstate and Foreign Commerce

The term "interstate commerce" includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia.[14]  Interstate commerce simply means the movement of goods, services, money and individuals between any two or more states or between one state and the District of Columbia.

"Foreign commerce" includes movement of goods, services, money, and individuals from one country to another.[15]

To satisfy this element, the government must prove that the defendant's conduct affected interstate or foreign commerce in any way, no matter how minimal.  The government is not required to prove that the defendant knew his conduct was in or affecting interstate or foreign commerce.

The local or intrastate production of visual depictions of a minor engaged in sexually explicit conduct with a computer, a cell phone, or a camera that travelled in interstate or foreign commerce is part of an economic class of activities that substantially affect interstate or foreign commerce.

---

[14] 18 U.S.C. § 10.
[15] *Id.*

18

## COUNTS ONE AND TWO

### 18 U.S.C. § 2251

### "Produced Using Materials Mailed, Shipped, or Transported In or Affecting Interstate Commerce"

A visual depiction of a minor engaging in sexually explicit conduct is "produced" using materials mailed, shipped, or transported in or affecting interstate or foreign commerce if the visual depiction is stored, created, or recorded on a device containing materials mailed, shipped, or transported in or affecting interstate or foreign commerce.[16]

---

[16]    *See United States v. Dickson*, 632 F.3d 186 (5th Cir. 2011) (analyzing the "produced using materials" jurisdictional prong in a possession case and finding images are "produced" when they are copied or downloaded onto CDs made in China); *United States v. Penton*, 380 Fed. Appx. 818, 820 (11th Cir. 2010) (analyzing the "produced using materials" jurisdictional prong stating, "[w]e have held that the Government can satisfy the interstate commerce requirement of child pornography statutes by showing that the computer equipment on which the images are stored traveled in interstate commerce, regardless of where the images themselves were originally produced."); *United States v. Caley*, 355 Fed. Appx. 760 (4th Cir. 2009) (finding the "produced using materials" jurisdictional prong met where images were copied onto a computer); *United States v. Zimmerman*, 529 F. Supp.2d 778 (S.D. Tex. 2007) (finding the "produced using materials" jurisdictional prong met in a Section 2251 case where images were stored on a hard drive, external hard drive, and CDs made out of state).

19

**COUNTS ONE AND TWO**

**18 U.S.C. § 2251(a)**
**Definition of Knowingly**

The term "knowingly" describes a defendant's state of mind, meaning that the defendant was conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake, or accident.[17]

---

[17] 1A O'Malley et al., *Federal Jury Practice and Instructions* §§ 17.04, 17.07 (6th ed. 2008); *United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988) (approving instruction in Section 2252(a)(2) case that included the following: "[a]n act is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reason. The purpose of adding the word knowingly is to insure that no one will be convicted for an act done because of mistake or accident or other innocent reason.").

20

**JA50**

**COUNTS ONE AND TWO**

**18 U.S.C. § 2251(a)**
**Consent of Minor**

I instruct you that a minor cannot legally consent to participating in illegal sexual conduct.

A person under the age of 18 lacks the capacity to consent to illegal sexual conduct. Accordingly,

any argument regarding a minor's consent must not be considered by you in reaching a verdict.[18]

---

[18] *United States v. Sibley*, 681 F. App'x 457, 461 (6th Cir. 2017) (approving district court's jury instruction in a § 2251(a) prosecution that "'[a] minor may not legally consent to being sexually exploited.'"), *and United States v. Raplinger*, 555 F.3d 687, 692 (8th Cir. 2009) (finding district court "correctly stated the law" when it instructed jury in a § 2251(a) prosecution that "'a minor may not legally consent to being sexually exploited.'").

21

**JA51**

## COUNT THREE
## POSSESSION OF CHILD PORNOGRAPHY

### 18 U.S.C. § 2252A(a)(5)(B)

Defendant MICHAEL SCOTT HOOVER is charged in Count 3 of the Superseding Bill of Indictment as follows:

**[Read Count Three]**

22

**JA52**

## COUNT THREE
### 18 U.S.C. § 2252A(a)(5)(B)

### The Statute

Title 18, United States Code, Section 2252A(a)(5)(B), provides in pertinent part as follows:

> Any person who . . . knowingly possesses, or knowingly accesses with intent to
>
> view, any book, magazine, periodical, film, videotape, computer disk, or any other
>
> material that contains an image of child pornography that has been mailed, or
>
> shipped or transported using any means or facility of interstate or foreign commerce
>
> by any means, including by computer, or that was produced using materials that
>
> have been mailed, or shipped or transported in or affecting interstate or foreign
>
> commerce by any means, including by computer

shall be guilty of an offense against the United States.

23

JA53

## COUNT THREE
### 18 U.S.C. § 2252A(a)(5)(B)

### The Essential Elements

For you to find the defendant guilty of Possession of Child Pornography, as charged in Count Three of the Superseding Bill of Indictment, the Government must prove the following essential elements beyond a reasonable doubt:

First:        That the defendant knowingly possessed, or accessed with the intent to view, any material that contained an image of child pornography, as alleged in the Superseding Bill of Indictment;

Second:     That the material had been mailed, or shipped, or transported using any means of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, or was produced using materials that had been mailed, shipped, transported in, or affecting interstate or foreign commerce by any means, including by computer; and

Third:      That when the defendant possessed (or accessed with the intent to view) the material, the defendant knew the material contained an image of child pornography.[19]

I have previously defined several of these terms, including "interstate or foreign commerce," "computer," and "knowingly." You should apply those definitions in deciding Count Three as well, except that I instruct you as follows regarding "interstate or foreign commerce":

The previous movement across state lines of a computer or cell phone that the defendant later used to *possess* visual depictions of child pornography is sufficient to establish that the child

---

[19] 18 U.S.C. § 2252A(a)(5)(B).

24

pornography *affected* interstate commerce. That is, the computer or cell phone need not have had child pornography on it when the computer or cell phone moved in interstate or foreign commerce. The previous movement through interstate or foreign commerce of a computer that later was used to possess visual depictions of child pornography is sufficient to establish that the child pornography was transported in interstate commerce.

25

**JA55**

## COUNT THREE
### 18 U.S.C. § 2252A(a)(5)(B)

### FIRST ELEMENT--POSSESSION

The first element which the Government must prove beyond a reasonable doubt is that the defendant possessed a visual depiction. To "possess" something means to have it within a person's control. This does not necessarily mean that the person must hold it physically, that is, have actual possession of it. As long as the visual depiction is within the defendant's control, he possesses it. If you find that the defendant either had actual possession of the depiction, or that he had the power and intention to exercise control over it, even though it was not in his physical possession, you may find that the Government has proven possession.

The law also recognizes that possession may be sole or joint. If one person alone possesses it, that is sole possession. However, it is possible that more than one person may have the power and intention to exercise control over the visual depiction. This is called joint possession. If you find that the defendant had such power and intention, then he possessed the depiction even if he possessed it jointly with another person.

The Government must prove that the defendant possessed the depiction knowingly. An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.[20]

---

[20]    3 L. Sand, *Modern Federal Jury Instructions*, Criminal, § 62-31 (2019).

26

**JA56**

**COUNT THREE**
**18 U.S.C. § 2252A(a)(5)(B)**

**"CHILD PORNOGRAPHY"—DEFINED**

"Child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where:

(1) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

(2) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

(3) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.[21]

I have previously defined several of these terms, including "minor," "sexually explicit conduct", and "visual depiction". You should apply those definitions in deciding Count Three as well

---

[21]    18 U.S.C. § 2256(8).

27

**JA57**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA        )        DOCKET NO. 5:20-CR-88
                                )
        vs.                     )
                                )
MICHAEL SCOTT HOOVER,           )
                                )
              Defendant.        )
_____ )


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
APRIL 22, 2021



APPEARANCES:

On Behalf of the Government:

        CORTNEY S. RANDALL, ESQ.
        STEPHANIE LABOY SPAUGH, ESQ.
        United States Attorney's Office
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina 28202

On Behalf of the Defendant:

        DAVID B. FREEDMAN, ESQ.
        Freedman Thompson Witt Ceberio & Byrd, PLLC
        860 West Fifth Street
        Winston-Salem, North Carolina 27101




                Cheryl A. Nuccio, RMR-CRR
                Official Court Reporter
                United States District Court
                Charlotte, North Carolina


**JA58**

2

1                         I N D E X

2    GOVERNMENT'S WITNESSES                         PAGE

3    JEFFREY GREGG
         Direct Examination By Ms. Spaugh          15
4        Cross Examination By Mr. Freedman          19

5    AVERY TURNER
         Direct Examination By Ms. Randall         21
6        Cross Examination By Mr. Freedman         31

7    NATHAN ANDERSON
         Direct Examination By Ms. Spaugh          35
8        Cross Examination By Mr. Freedman        104
         Redirect Examination By Ms. Spaugh       115
9
     M.C.
10       Direct Examination By Ms. Randall        116
         Cross Examination By Mr. Freedman        134
11
     A.P.
12       Direct Examination By Ms. Spaugh         138
         Cross Examination By Mr. Freedman        152
13       Redirect Examination By Ms. Spaugh       154

14

15                    E X H I B I T S

16   GOVERNMENT'S EXHIBITS

17   NUMBER                                     ADMITTED

18   1 ...............................................25
     1A .............................................25
19   2 ..............................................34
     3 ..............................................51
20   3A .............................................58
     3B .............................................65
21   3D .............................................67
     3E .............................................67
22   3C .............................................69
     4 ..............................................74
23   4A .............................................76
     4B .............................................79
24   4C .............................................81
     4D .............................................81
25   4E .............................................81

**JA59**

1                              E X H I B I T S

2    GOVERNMENT'S EXHIBITS

3    NUMBER                                              ADMITTED

4    4F ..................................................81
     4G ..................................................81
5    4H ..................................................81
     4I ..................................................81
6    4J ..................................................81
     4K ..................................................81
7    4L ..................................................89
     4M ..................................................91
8    4P ..................................................94
     4Q ..................................................94
9    4R ..................................................94
     4S ..................................................94
10   4T ..................................................94
     4O ..................................................98
11   5 .................................................101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1              P R O C E E D I N G S
 2   THURSDAY MORNING, APRIL 22, 2021
 3              (Court called to order at 9:29 AM.)
 4              (Jury not present.)
 5              THE COURT:  All right.  The first thing I want to do
 6   is clarify the Court's ruling on the 404(b) and 414 issues.
 7              With respect to minor victim 1, the Court has found
 8   that the evidence is intrinsic as to the photographs on the
 9   phone.
10              With respect to minor victim 2, the Court finds that
11   the evidence is intrinsic as to the photos on the phone and
12   that Rule 414 applies as to prior molestations.
13              Minor victim 3, the Court finds that 404(b) is
14   appropriate with respect to prior acts of the defendant to
15   show intent, motive, and to negate any allegation of mistake
16   or accident.
17              With respect to minor victim 4, the Court finds that
18   Rule 414 is applicable.
19              Minor victim 5, Rule 404(b) is applicable.
20              Minor victim 6, Rule 414 is applicable.
21              Minor victim 7, 404(b) is applicable.
22              And the same for minor victim 8.
23              The Court has considered the objection based on
24   Rule 403, considered the factors with respect to the
25   similarity between the previous offense or conduct and the
```

**JA61**

1  charged crime, the temporal proximity between the charged
2  offense and the alleged conduct, the frequency of prior acts,
3  presence or absence of the intervening acts, and the
4  reliability of the evidence and finds that Rule 403 is not
5  violated by admission of this evidence.
6        Mr. Freedman, you may have a continuing objection
7  during those witnesses.  Obviously, if you want to object at
8  any time, you can; but your record will be preserved by a
9  continuing objection.
10        MR. FREEDMAN:  Thank you, Your Honor.  I believe
11 just to be on the safe side, when they initially -- each of
12 those witnesses start to testify about the sexual activity, I
13 will just make an objection for the record.  I don't care to
14 be heard.
15        THE COURT:  All right.  That's fine.
16        MR. FREEDMAN:  Then I'll just assume all testimony
17 after that will be preserved by the continuing objection.
18        THE COURT:  That's correct.  And obviously, if you
19 think the testimony wanders afield of those rulings, object as
20 you think necessary.
21        MR. FREEDMAN:  Yes, Your Honor.  Unless I ask to be
22 heard, I don't care to be heard.
23        THE COURT:  All right.  Thank you.
24        MS. RANDALL:  Your Honor, one other thing I wanted
25 to clarify that we did talk about was our motion also

**JA62**

1  mentioned -- and I just want to make sure this is -- everyone

2  is aware that we also intend to introduce some other

3  information found on the iPhone related to web searches

4  through our forensic examiner.  We do think that also comes in

5  because it's intrinsic.  It's on the phone with all the other

6  information.  I just wanted to bring that up because we hadn't

7  talked about it.

8          THE COURT:  The Court agrees that would be intrinsic

9  evidence.  If you would, give me the first names of these

10  minor victims so I know what instruction to give at what

11  point.

12          MS. RANDALL:  Minor victim 1 is A.P.  Minor victim 2

13  is M.C.  Minor victim 3 is XXXXXXX.  Minor victim 4 is XXXXXX.

14  Minor victim 5 is XXXXXX.  Minor victim 6 is XXXXXXX.  Minor

15  victim 7 is XXXXXXX.  Minor victim 8 is XXXXXX.

16          THE COURT:  Anything else we can -- we need to

17  address before the jury is called?

18          MS. RANDALL:  No, Your Honor.

19          THE COURT:  Are they here?

20          THE CLERK:  Yes.

21          THE COURT:  Bring them up.

22          (Jury entered the courtroom.)

23          THE COURT:  All right.  Members of the jury, because

24  of the prompt response of some good folks yesterday afternoon

25  during the lunch break, we were able to find you some

**JA63**

1   reinforcements in the form of our two alternates.

2          And I trust that all of you withstood the onslaught

3   of the curious last night and refrained from discussing the

4   case or letting anyone discuss it with you.

5          Ms. Compton, if you would impanel the jury, please.

6          (All 14 jurors were duly impaneled.)

7          THE COURT:  All right.  Now that you've been sworn

8   and impaneled, I'll give you some preliminary instructions to

9   guide your participation in this trial.  It will be your duty

10  to find from the evidence what the facts are.  You and you

11  alone will be the judges of the facts.  You will then have to

12  apply to those facts the law as the Court will give it to you.

13          Nothing the Court may say or do during the course of

14  the trial is intended to indicate or should be taken by you as

15  indicating what your verdict should be.  I have no opinion on

16  what your verdict should be.

17          The evidence from which you will find the facts will

18  consist of the testimony of the witnesses, documents and other

19  things received into the record as exhibits, and any facts

20  that the lawyers agree to or stipulate to or that the Court

21  may instruct you to find.

22          Certain things are not evidence and must not be

23  considered by you.

24          Statements, arguments, and questions by lawyers are

25  not evidence.

**JA64**

8

1        Objections to questions are not evidence.  Lawyers
2    have an obligation to their clients to make objections when
3    they believe evidence being offered is improper under the
4    rules of evidence.  You should not be influenced by the
5    objection.  If the objection is sustained, ignore the
6    question.  If it is overruled, treat the answer like any
7    other.
8        If you are instructed that some item of evidence is
9    received for a limited purpose only, you must follow that
10   instruction.  And that will occur during this trial.
11       Testimony that the Court has excluded or told you to
12   disregard is not evidence and must not be considered.
13       Anything you may have seen or heard outside the
14   courtroom is not evidence and must be disregarded.  You are to
15   decide the case solely on the evidence presented in the
16   courtroom.
17       As you know, this is a criminal case.  There are
18   three basic rules about a criminal case that you should keep
19   in mind.
20       First, a defendant is presumed innocent until proven
21   guilty.  The indictment against the defendant brought by the
22   government is only an accusation; nothing more.  It is not
23   proof of guilt or anything else.  The defendant, therefore,
24   starts out with a clean slate.
25       Second, the burden of proof is on the government

**JA65**

9

1   until the very end of the case.  The defendant has no burden
2   to prove his innocence or to present any evidence or to
3   testify.  Since the defendant has the right to remain silent,
4   the law prohibits you from drawing any inference against him
5   if he does not testify.

6       And third, the government must prove the defendant's
7   guilt beyond a reasonable doubt.  I will give you further
8   instructions on this point later, but bear in mind that in
9   this respect a criminal case is different from a civil case.

10      I will give you detailed instructions on the law and
11  a copy of the indictment at the end of the case and those
12  instructions will control your deliberations.

13      The Court instructs you that you are the sole judges
14  of the credibility of the witnesses and the weight their
15  testimony deserves.  While there is no absolute or arbitrary
16  guide or measure by which you shall determine the truthfulness
17  or untruthfulness of a witness, the Court will point out to
18  you certain general principles which may assist you in
19  determining the credibility of the witnesses.

20      First, whether the witness has any motive or reason
21  for being truthful or untruthful.

22      Second, the witness's interest, if any, in the
23  outcome of this case.

24      Third, whether there has appeared from the witness's
25  attitude or conduct any bias, prejudice, or feeling which may

1   cause that person's testimony to be influenced.

2            Fourth, whether the testimony bears the earmarks of
3   truthfulness.

4            Fifth, to what extent, if any, it is corroborated or
5   confirmed by other testimony which is not questioned, or to
6   what extent, if any, it is corroborated or confirmed by known
7   or admitted facts.

8            And finally, you may also consider the intelligence
9   and mental capacity of a witness and the witness's opportunity
10  to have accurate knowledge of the matters to which that
11  witness is testifying.

12           I instruct you that you may believe all that a
13  witness says, or none, or believe part and disbelieve part.

14           Now, a few words about your conduct as jurors.

15           I instruct you that during the trial you are not to
16  discuss the case amongst yourselves or with anyone else, nor
17  should you permit anyone to discuss it with you.  Until you
18  retire to the jury room at the end of the case to deliberate
19  on your verdict, you simply are not to talk about this case.
20  If anyone should try to talk to you about it, bring it to the
21  Court's attention immediately.  After you retire to
22  deliberate, you may begin discussing the case with your fellow
23  jurors; but you cannot discuss the case with anyone else until
24  you have returned your verdict in this case at its conclusion.

25           Do not read or listen to anything touching on this

1    case in any way.  You must decide this case based solely on

2    the evidence presented here within the four walls of the

3    courtroom.  This means that during the trial you must not

4    conduct any independent research about this case, the matters

5    in the case, the individuals or groups involved in the case,

6    or any legal concepts.  Thus, do no research on your phones,

7    your computers, or anything else as we discussed yesterday.

8         Finally, do not form any opinion until all the

9    evidence is in.  Keep an open mind until you start your

10   deliberations at the end of the case.

11        If you wish, you may take notes.  But if you do,

12   remember, they serve merely as an aid to your own memory and

13   are not a substitute for your memory.  Please leave your notes

14   in the jury room when you leave at night or on your lunch

15   break.

16        Also, bear in mind that you will not have access to

17   transcripts of the witnesses' testimony.  To get a certified,

18   perfect transcript of a witness's testimony takes more than

19   just a few minutes.  So I caution you to rely on your

20   recollection.  Pay close attention to the witnesses'

21   testimony.  There will not be transcripts with you in the jury

22   room, although exhibits will be made available to you upon

23   request.  You can have the exhibits.

24        Occasionally the Court will be required to conduct a

25   sidebar conference with the lawyers about legal matters or

**JA68**

12

 1  scheduling matters that do not concern you.  A sidebar is the
 2  only way for us to deal with these issues without excusing you
 3  from the courtroom.  I'm certain you understand this.  And
 4  some of you observed it yesterday during jury selection.
 5          Sometimes if it's going to take a little longer than
 6  just a couple of minutes, we will excuse you, the jury.
 7  Rather than you sit there for 10 or 15 minutes wondering what
 8  we're doing in this back room, we might excuse you to the jury
 9  room.  We'll try to keep those as brief as possible and
10  respect your time.
11          The trial will now begin.  First, the government
12  will make an opening statement, which is simply a forecast of
13  the evidence.  It is not evidence, as I've told you before.
14  Next, the defendant's attorney may, but does not have to, make
15  an opening statement.  Opening statements are neither evidence
16  nor arguments.  The government will then present its witnesses
17  and counsel for the defendant may cross examine them.
18  Following the government's case the defendant may, if he
19  wishes, present witnesses whom the government may then cross
20  examine.  After all the evidence is in and I have given you
21  general instructions, the attorneys will present their closing
22  arguments.  The Court will then give you final instructions on
23  the law.  And after that you will retire to deliberate your
24  verdict.
25          The jury is with the prosecution.

**JA69**

13

1      MS. SPAUGH:  Family is supposed to protect each

2  other.  Two boys were entrusted to this man, Michael Scott

3  Hoover, by their parents because he XXX XXXXXX.  But he abused

4  that trust by taking pornographic pictures and videos of those

5  12- and 17-year-old boys.

6      M.C. was 12 years old in August of 2019 when the

7  defendant took him on a hiking trip to Mount Mitchell.  M.C.

8  had spent time with him before because he XXX XXXXXX so he

9  didn't think anything of it.  But the hike took a turn during

10  a bathroom break and became one that M.C. will never forget.

11  He will tell you what the defendant did and said to him in the

12  woods that day.  But the evidence will show the defendant told

13  him to masturbate as the defendant took a slow motion video of

14  it which focused on M.C.'s penis.

15      This wasn't the first time the defendant had taken a

16  video like that.  You'll hear from a XXXXXX XXXXXXXX, A.P.,

17  who remembers his family starting to visit the defendant when

18  he was a teenager.  You'll hear about visits to the

19  defendant's house that grew more inappropriate with time to

20  the point where the defendant would give him alcohol and

21  encourage him to masturbate.  During one of those visits in

22  June of 2018 the defendant secretly recorded videos and took

23  pictures of A.P. naked on the defendant's couch masturbating.

24  And again, these videos focused on the boy's penis.

25      Now, let me warn you.  You're going to have to see

**JA70**

1  these pictures and videos of both boys.  But Special Agent
2  Anderson with the FBI will tell you how he examined the
3  contents of the defendant's iPhone, and you'll hear from him
4  what he found and how he found these videos and pictures of
5  A.P. and M.C.  And when you hear from him, pay attention to
6  where these files were saved on the phone.  How they were
7  hidden and moved into different apps, and how they were
8  grouped together and kept separate from his normal pictures
9  and videos.
10        Not only did the defendant take these videos, you
11  will see evidence from his phone that will show that he was
12  searching for this type of content on the internet.
13        Instead of protecting these two boys and XXX XXXXXX,
14  the defendant used them to make sexually explicit videos
15        At the end of the evidence, Ms. Randall will come
16  before you and she will ask you to do two simple things:
17  Follow the law from the judge and hold the defendant
18  accountable for his actions, and you can do so by finding him
19  guilty of the production and possession of child pornography.
20        THE COURT:  Mr. Freedman, do you care to make an
21  opening statement?
22        MR. FREEDMAN:  Yes.  Thank you.
23        Good morning, ladies and gentlemen of the jury.
24  You're going to hear from a number of different witnesses in
25  this case.  You're going to hear from the boys that Ms. Spaugh

JEFFREY GREGG - DIRECT

1   just told you about.  You're going to hear about conduct that
2   you may find offensive.  You may see some pictures you may
3   find offensive along the way.  All I ask you is that you keep
4   an open mind throughout the case, you wait until you hear all
5   of the evidence, you wait until you hear the instructions of
6   the Court because I believe even if you hear certain evidence
7   from these boys about various activities, at the end of the
8   day the government will not prove beyond a reasonable doubt
9   that the defendant, Mr. Hoover, knowingly possessed child
10  pornography and the government will not prove beyond a
11  reasonable doubt that the different individuals were enticed,
12  coerced, or employed, or in any way used to engage in a
13  specific sexual act that resulted in the depiction of images
14  that Ms. Spaugh told you about.
15          So I ask you to keep an open mind and I'll present
16  to the Court during the process of the case and I'll come and
17  speak to you after the case, and I ask you to keep an open
18  mind until then.  Thank you very much.
19          THE COURT:  You may call your first witness.
20          MS. SPAUGH:  The government calls Jeffrey Gregg.
21          JEFFREY GREGG, GOVERNMENT WITNESS, SWORN,
22              DIRECT EXAMINATION
23  BY MS. SPAUGH:
24  Q.   Good morning.  When you get situated, please tell the
25  jury your name.

**JA72**

JEFFREY GREGG - DIRECT

1  A.   My name is Jeff Gregg.

2  Q.   Can you spell your last name for the court reporter.

3  A.   It's G-r-e-g-g.

4  Q.   What county do you live in, Mr. Gregg?

5  A.   I live in Union County.

6  Q.   Did you recently work for Wells Fargo?

7  A.   Yes.

8  Q.   How long did you work for Wells Fargo?

9  A.   A little over ten years.

10 Q.   What was your most recent role at Wells Fargo?

11 A.   Engineering manager.

12 Q.   What does that mean?

13 A.   Manages a suite of technology.  In our case it was

14 digital signage for the branches.

15 Q.   And do you know Michael Scott Hoover?

16 A.   Yes.

17 Q.   Do you see him in the courtroom?

18 A.   Yes.  He's over there (indicating).

19 Q.   Can you describe what color tie.

20 A.   Bluish green and black.

21      MS. SPAUGH:  Ask that the record reflect that the

22 witness has identified the defendant.

23      THE COURT:  The record will so reflect.

24 Q.   How do you know the defendant?

25 A.   He worked on my team.

**JA73**

JEFFREY GREGG - DIRECT

1  Q.    At Wells Fargo?

2  A.    Yes.

3  Q.    And what was -- what was your job?  Were you two on the

4  same level or...

5  A.    He -- I was his manager.  He would oversee operations on

6  my team.

7  Q.    You said he oversaw or you oversaw?

8  A.    He did.  Like our operations department.  We had

9  operations and application development and he led the

10  operations side, but he reported to me.

11  Q.    And as part of the defendant's employment with Wells

12  Fargo, was he issued a cell phone?

13  A.    Yes.

14  Q.    Do you know generally what kind of cell phone it was?

15  A.    Typically an Apple, an iPhone.

16  Q.    Do employees have to go through any type of training

17  related to the proper use of phones?

18  A.    There is an annual compliance training that every team

19  member has to take and there's a test involved with that and

20  they have to pass that test for data security, things like

21  that.

22  Q.    Are employees allowed to let others use their phones?

23  A.    No.

24  Q.    Back in August of 2019, did Wells Fargo instruct you to

25  pick up the defendant's work issued cell phone?

**JA74**

JEFFREY GREGG - DIRECT

 1  A.    Yes, they did.

 2  Q.    Did you make arrangements with someone to do that?

 3  A.    I did.

 4  Q.    Who was that?

 5  A.    I contacted Scott's wife and asked her if she could meet

 6  me to pick up the phone.  And also my manager at the time,

 7  Christy Welch, went with me to meet her.  And we met at -- I'm

 8  not sure of the town.  It's been a little while.  But it was

 9  at the local Wells Fargo branch in that town.

10  Q.    Do you know what county that was in?

11  A.    I'm not certain.

12  Q.    Do you remember when you got the phone about?

13  A.    When I picked it up?

14  Q.    Yes.

15  A.    August 22nd, if I remember correctly, 2019.

16  Q.    And you mentioned Scott.  When you say Scott, who are you

17  referring to?

18  A.    Michael Scott Hoover.

19  Q.    The defendant?

20  A.    He went by Scott.  We called him Scott.

21  Q.    And you said that you met his wife at that Wells Fargo.

22  Did she give you the phone?

23  A.    She did, and his laptop and the power cord that went with

24  the laptop.

25  Q.    And what did you do with the phone once you got it?

JEFFREY GREGG - CROSS

1  A.   I took that and the laptop and the power cord and I met
2  Brandon, I believe his last name is Reeves, with our cyber
3  security team back in Charlotte that afternoon and I handed it
4  over to him.
5  Q.   And you said cyber security team.  Was that a team within
6  Wells Fargo?
7  A.   Yes.
8  Q.   Were you able to get into the phone while it was in your
9  possession?
10 A.   No.  You can't access a phone -- another team member's
11 phone or laptop.  They're secured either with a pin code,
12 password, something like that.
13             MS. SPAUGH:  No further questions, Your Honor.
14             THE COURT:  You may cross examine.
15                   CROSS EXAMINATION
16 BY MR. FREEDMAN:
17 Q.   Mr. Gregg, you worked with Scott for about six years; is
18 that right?
19 A.   Yes.
20 Q.   And you said that he reported to you, but he was a
21 manager as well?
22 A.   He was the leader of our operations team.
23 Q.   And exactly what did he do as leader of the operations
24 team?
25 A.   Managed day-to-day affairs, operations work.  If we

JEFFREY GREGG - CROSS

1   needed to update servers or patch vulnerabilities, things like
2   that, he would help in that regard.  And there were engineers
3   that worked with Scott.
4   Q.   And all your relations with Scott were good?
5   A.   Yes.
6   Q.   And he's issued -- as part of working at Wells Fargo,
7   he's issued, I believe it was an Apple 7 or an iPhone 7?
8   A.   If I remember correctly, yes.  And that's customary for
9   engineer-type folks because they may get called after hours
10  and need to use a phone.
11  Q.   And those iPhones were issued through Wells Fargo and
12  they're the property of Wells Fargo.
13  A.   That is correct, yes.
14  Q.   And whoever -- when you get issued that phone, you know
15  that at any time Wells Fargo can get access to that phone; is
16  that correct?
17  A.   That's my understanding.
18  Q.   And you also know -- you sign some documents saying that
19  you are not to keep anything on that phone that's improper.
20  A.   That's part of the compliance training that we take each
21  year.
22  Q.   And you know not to do that because you know that the
23  phone can be reviewed by somebody other than yourself.
24  A.   That would be my understanding.
25           MR. FREEDMAN:  I've got no further questions.

**JA77**

AVERY TURNER - DIRECT

1    THE COURT:  Any redirect?

2    MS. SPAUGH:  No, Your Honor.

3    THE COURT:  All right.  Thank you, sir.  You may

4  stand down.

5    MS. SPAUGH:  Your Honor, may this witness be

6  released from his subpoena?

7    THE COURT:  Without objection, yes.

8    MR. FREEDMAN:  No objection.

9    (Witness stepped down.)

10    MS. RANDALL:  Your Honor, the government's next

11  witness is Avery Turner.

12              AVERY TURNER, GOVERNMENT WITNESS, SWORN,

13                    DIRECT EXAMINATION

14  BY MS. RANDALL:

15  Q.    Good morning.  Can you please introduce yourself to the

16  jurors.

17  A.    My name is Avery Turner.

18  Q.    And Mr. Turner, where do you live?  What county?

19  A.    I live in Cabarrus County.

20  Q.    And are you currently employed?

21  A.    I am.

22  Q.    Where do you work?

23  A.    I work for AIG.

24  Q.    And what type of work do you do for AIG?

25  A.    My position is called -- I'm a cyber investigation

AVERY TURNER - DIRECT

1  analyst.
2  Q.   And prior to working at AIG, where did you work?
3  A.   I worked at Wells Fargo.
4  Q.   And what type of work did you do for Wells Fargo?
5  A.   I was a digital forensics investigator.
6  Q.   And how long did you work for Wells Fargo?
7  A.   Two years.
8  Q.   Were you working there in August of 2019?
9  A.   I was.
10 Q.   And prior to working at Wells Fargo, what type of work
11 did you do?
12 A.   I was in law enforcement.
13 Q.   Where were you in law enforcement?
14 A.   The City of Concord Police Department.
15 Q.   And how long were you in law enforcement?
16 A.   Thirteen years.
17 Q.   And did any of that work deal with any of the digital
18 investigation you're talking about?
19 A.   Yes, ma'am.  The last five years of my employment at
20 Concord PD was -- I was in the investigation division and my
21 specialty was digital forensics.
22 Q.   And were you a member of any sort of task force at that
23 time?
24 A.   I was.  I was part of a couple task forces, one of which
25 was the North Carolina Internet Crimes Against Children Task

23

AVERY TURNER - DIRECT

1  Force.

2  Q.   And what is that?

3  A.   So essentially we receive -- one of the many functions

4  that we do, but one of the functions is we receive tips from

5  NCMEC, or the National Center for Missing and Exploited

6  Children, through cyber tips.  So what we do is we take those

7  tips that come from Facebook, Snapchat, just online

8  information that's given to NCMEC and we take that information

9  and we follow up on it, and a lot of times it involves child

10  pornography.

11  Q.   So when you were working at Wells Fargo, you said you

12  were doing digital forensics investigations?

13  A.   Yes, ma'am.

14  Q.   And what did that entail?

15  A.   So we assisted the internal investigation division with

16  any kind of investigation that relied on some type of digital

17  evidence, whether it be email, computer forensics, cell phone

18  forensics, any kind of database analysis that needed to be

19  done based off employees' actions.

20  Q.   And when you were working at Wells Fargo, did they

21  employ -- did they provide phones to their employers -- or

22  employees?

23  A.   Not every employee, but there were some -- most of the

24  corporate employees were given phones.

25  Q.   And were you familiar with the policies in place at the

AVERY TURNER - DIRECT

1  time for employees' use of their cell phones?

2  A.    Yes.

3  Q.    How were they informed about those policies?

4  A.    So when I came to work at Wells Fargo in 2018, I had to

5  take a training that essentially was telling me the phone was

6  going to be issued to me.  It was going to be used for work

7  purposes only, and that it was susceptible for review at any

8  moment.

9  Q.    When you were working at Wells Fargo in the digital

10  forensics section, were you asked to examine the cell phone

11  for an employee named Michael Scott Hoover?

12  A.    I was.

13  Q.    At that time did you know Michael Scott Hoover?

14  A.    No, I did not.

15  Q.    Today do you know who Michael Scott Hoover is?

16  A.    No, ma'am, I don't.

17  Q.    How did you receive the phone?

18  A.    So the phone was delivered to me from my manager, Brannon

19  Raines.

20  Q.    Do you remember approximately when that occurred?

21  A.    It was on the 23rd which was a Friday morning.

22            MS. RANDALL:  Your Honor, can I approach the

23  witness?

24            THE COURT:  You may.

25  Q.    If you could look at what's been marked as Government's

25

AVERY TURNER - DIRECT

1  Exhibit 1 and 1A.  Do you recognize those items?

2  A.    I do.

3  Q.    What are they?  Actually, first let me ask generally what

4  are they?

5  A.    It's just an Apple iPhone.  I believe this is a 7 Plus.

6  Q.    And then Exhibit 1A, what is that?

7  A.    Just a cell phone case, the Lifeproof case that the phone

8  goes in to protect it from the elements.

9  Q.    And do you recognize Government's Exhibits 1 and 1A?

10  A.    I do.

11  Q.    And what do you recognize those from?

12  A.    These are the -- this is the phone and the phone case

13  that I examined.

14  Q.    And did you take --

15          MS. RANDALL:  Actually, at this time, Your Honor,

16  the government would move to introduce Exhibits 1 and 1A into

17  evidence.

18          THE COURT:  They're admitted.

19          (Government's Exhibits Nos. 1 and 1A were received

20  into evidence.)

21  Q.    Did you take any steps to verify that Government's

22  Exhibit 1A was actually the phone of Michael Scott Hoover?

23  A.    Yes.  So Wells Fargo tracks all of their assets and one

24  of the ways that -- one of the assets that's tracked is our

25  mobile devices.  They have a two-year lifespan on how long

**JA82**

AVERY TURNER - DIRECT

1   you're supposed to keep your phone.  And there's a system in

2   which it shows you prior devices and current devices that are

3   assigned to an employee based off of an employee number.  I

4   verified that this device was the phone that Michael Hoover

5   was using and it was currently assigned to him.

6   Q.    When you received the phone, was it password protected?

7   A.    It was.

8   Q.    And did you have to do anything to be able to access the

9   phone?

10  A.    Yes.  So part of the -- part of the process when you get

11  a phone at Wells Fargo is they install what's called a mobile

12  device management system on the phone.  What that does is that

13  allows Wells Fargo to do certain things.  In our case it

14  didn't -- we didn't prevent a lot of things on this, but we

15  were able to see certain things like that it had a pass code.

16  It would force you to change your pass code after 60 days or

17  90 days, I'm not sure.  Don't quote me on that, I apologize.

18  And it allowed us to scan what apps were installed on the

19  device.  We couldn't see text messages.  We couldn't see the

20  content on the devices.  We merely could see what apps were

21  installed and that it was being used for, you know, cell phone

22  phone service.

23  Q.    And so how did you -- how were you able to get into the

24  phone if it was password protected?

25  A.    Part of the mobile device management system in the

AVERY TURNER - DIRECT

1  password change requirements, it allows mobility to require
2  you to change the pass code.  So what it does is it will take
3  the current pass code off and it will prompt you to
4  immediately change the pass code.  So it gives you -- you have
5  to do it through a process where we had to contact the
6  mobility division and we said, "We have a phone in our
7  possession.  We need you to push the password reset to it."
8  And they did.  And you have to change the pass code within,
9  like, 60 seconds.  It's not a lot of time.  So whenever I did
10 that, I changed the pass code to Mr. Hoover's employee ID.
11 Q.   And can anyone in the -- at Wells Fargo make that request
12 of the company to change the pass code?
13 A.   No.  No, they cannot.  I actually had to get permission
14 from human resources to be able to do that.  Mobility required
15 the second authentication.  I had to get my manager to send an
16 email to the human resources to get permission to change the
17 pass code.  Or I just copied them on the email.
18 Q.   When you received the phone, was it on?
19 A.   I don't remember if it was on.  I know that I had been
20 told that it had been placed in airplane mode which would
21 prevent it from being changed at all.  You know, that's kind
22 of standard in the digital forensics world on a cell phone.
23 Apple gives you the ability to wipe your phone remotely.  And
24 so if there's any fear of evidence being on a phone in the law
25 enforcement world, we always put the phones in airplane mode.

**JA84**

AVERY TURNER - DIRECT

1  That just prevented that forced reset to happen while we
2  couldn't, you know, get the evidence.  So we knew it was in
3  airplane mode.  We did have to take it off airplane mode to
4  push the password reset.  I changed the password and then I
5  put it back in airplane mode.
6  Q.    And after you changed the password, what did you do with
7  the phone?
8  A.    We examined it through a software called Cellebrite UFED
9  4PC.
10  Q.    And is that a type of software that Wells Fargo used to
11  examine phones?
12  A.    It is.
13  Q.    And is it commonly used in your field to examine phones?
14  A.    Yes.  It's an industry standard cell phone examination
15  software.
16  Q.    And after -- when you say you were -- did Cellebrite
17  extract the data from the phone for you to review?
18  A.    Yes.
19  Q.    So after the data was extracted, what did you do?
20  A.    So I was actually -- my division doesn't have its own
21  Cellebrite so I had to take it to a gentleman within Wells
22  Fargo named Kevin Brown.  I witnessed the extraction of the
23  software.  I've been trained in Cellebrite.  In 2014 I
24  traveled to Salt Lake City, Utah, to be trained in the
25  extraction process.  I'm a Cellebrite certified logical

AVERY TURNER - DIRECT

1  analyst and a physical analyzer.

2       So I witnessed the extraction of the device.  And his

3  role in it was I witnessed him -- I gave him the hard drive.

4  I gave him the cell phone.  We plugged it into the computer.

5  It extracted the evidence -- or the content of the phone on to

6  an external hard drive.  I took both items back and then I

7  plugged them into my PC and was able to review the data there.

8  Q.   And while you were reviewing the data, did you see any

9  pictures or videos on the phone?

10 A.   Yeah.  After we verified that the extraction process was

11 for this phone based off the IMEI, or the International Mobile

12 Equipment Identifier, we -- I went through and we -- we knew

13 that Mr. Hoover had been arrested for a certain type of

14 offense so we were just looking for one certain thing and so I

15 went to the photos and videos.  And as I was reviewing it in

16 thumbnail, a preview -- a thumbnail is merely -- it's a simple

17 snapshot of whatever the video is.  I can't tell you exactly

18 what portion of the video it was that the thumbnail presented,

19 but I could see it -- it was a -- it looked like it was in the

20 woods and you could see somebody standing in the picture.  You

21 know, you're talking about a two inch by two inch thumbnail so

22 you can't really tell anything off of that.

23      I did note that the file path because you can see the

24 file path of the video and it was from Calculator Plus.  And

25 from my experience in the law enforcement world, I knew that

AVERY TURNER - DIRECT

1  Calculator Plus was an application on mobile devices that

2  allows you to hide videos and photos and stuff that you don't

3  want seen by everybody.  It presents itself on an iPhone as

4  though it is actually a calculator.  It looks almost identical

5  to the native Apple iPhone calculator.  You really have to

6  inspect it very closely to know that it was different.

7       But my experience, I knew that that was in a file path

8  that was used to hide videos so it kind of drew my attention

9  to it a little more.  I clicked on it.

10      Do I need to describe what was in the video?

11 Q.   Yeah, just briefly describe what you saw when you clicked

12 on it.

13 A.   Okay.  So whenever I started playing it, what I saw

14 was -- background was -- it was in a forest.  It was in the

15 woods.  And you could see a boy probably between 9 and 10 --

16 or 12 years of age.  I don't know exactly what his age was.

17 Had his back turned to the camera.  Whenever the video started

18 playing, you could see the camera move forward, turn, and you

19 could see the boy was masturbating in the woods.

20 Q.   And at the time you saw that video, what did you do?

21 A.   I shut the system down.

22 Q.   And what did you do after you shut the system down?

23 A.   I removed all the evidence and I started contacting -- or

24 tried to determine who the detective was that originally made

25 the arrest so I could give him the information.

**JA87**

AVERY TURNER - CROSS

1  Q.    And so you stopped your review and contacted law
2  enforcement.
3  A.    Yes.
4  Q.    And did you inform them what you had found?
5  A.    I did.
6  Q.    And what did you do with the phone at that point?
7  A.    So we -- I was trying to make arrangements with the
8  detective to bring it -- or to have them come and pick it up;
9  and I knew that they couldn't come and pick it up, so I
10 volunteered to drive it to their office.
11 Q.    And why did you do that?
12 A.    Because I wanted it out of my possession.
13         MS. RANDALL:  No further questions, Your Honor.
14         THE COURT:  You may cross examine.
15                 CROSS EXAMINATION
16 BY MR. FREEDMAN:
17 Q.    Mr. Turner, you're familiar with the iPhone 7 Plus; is
18 that correct?
19 A.    Yes.
20 Q.    And in this case you found that there was a password that
21 protected being able to get into there?
22 A.    It was, yes.
23 Q.    Are you also aware that iPhone 7 Plus has the ability to
24 be protected or accessed by fingerprints?
25 A.    Yes.  After a certain period of time, that function is

32

AVERY TURNER - CROSS

1  turned off.

2  Q.    All right.  Can you sort of explain to me how that works.

3  Explain to me how it works that the phone can recognize

4  someone's fingerprint to get access to the phone.

5  A.    Okay.  So you can preprogram different fingerprints that

6  allows access to the phone.  I don't know the exact number of

7  fingerprints.  There is a limit.  But let's just say there's

8  ten fingerprints allowed because you have ten fingers.  So

9  anybody that preprograms their fingerprint on it would have

10 access to the device.

11 Q.    So up to ten different people could have access to the

12 device; is that correct?

13 A.    In theory, yes.

14 Q.    You didn't do an examination about what fingerprints, if

15 any, were allowed access; is that correct?

16 A.    No.  No.

17 Q.    Could you do that?

18 A.    I don't -- I don't know that I could, no.

19 Q.    Do you know whether that process -- in addition to being

20 able to use fingerprints to get access to the phone, you said

21 that you have to sort of continue to renew that; that just

22 doesn't stay.

23 A.    No, it doesn't stay.  And at the time of this exam, there

24 was some changes going on to where it would actually reset

25 after a certain number of hours of not being used where it

AVERY TURNER - CROSS

1  would turn off the touch ID.
2  Q.   And you said you had prior law enforcement experience --
3  A.   Yes.
4  Q.   -- with child pornography?
5  A.   I do, yes.
6  Q.   And did that include Cellebrite extraction?
7  A.   Yes.
8  Q.   And Cellebrite extraction, can you explain to the jury
9  exactly what Cellebrite extraction is.
10  A.   Yes.  Cellebrite extraction is -- you have to consider a
11  phone is merely a small computer.  There's data on it and it's
12  in certain formats that only a computer can read, right?  So
13  what Cellebrite does is it takes all of that data, it removes
14  it from the phone and puts it in your computer and then
15  essentially decodes what it sees into some viewable format.
16  I'm not sure how far you want me to go into the detail on
17  that.
18  Q.   I think that's probably sufficient.
19  A.   Okay.
20  Q.   And so you were involved in the arrest of other people
21  involving child pornography; is that correct?
22  A.   Yes, sir.
23  Q.   And it was not unusual in those cases sometimes you would
24  find thousands of images.
25            MS. RANDALL:  Objection; relevance.

NATHAN ANDERSON - DIRECT

1        THE COURT:  Overruled.

2   Q.   You can answer.

3   A.   Okay.  Yes, sir, that's correct.

4        MR. FREEDMAN:  I've got no further questions.

5        THE COURT:  Any redirect?

6        MS. RANDALL:  No, Your Honor.

7        THE COURT:  You may stand down.  Thank you.

8        (Witness stepped down.)

9        THE COURT:  You may call your next witness.

10       MS. SPAUGH:  Your Honor, before the next witness

11  comes in, the government would move to admit Government's

12  Exhibit 2, an Apple business record, by 902(11), which would

13  be Government's Exhibit 7, and would ask to publish

14  Government's Exhibit 2 with the next witness.  They have been

15  shown to Mr. Freedman.

16       THE COURT:  Government's Exhibit 2?

17       MS. SPAUGH:  Yes, Your Honor.

18       THE COURT:  No objection, Mr. Freedman?

19       MR. FREEDMAN:  No objection.

20       THE COURT:  It's admitted.

21       (Government's Exhibit Number 2 was received into

22  evidence.)

23       MS. SPAUGH:  The government calls Nathan Anderson.

24       NATHAN ANDERSON, GOVERNMENT WITNESS, SWORN,

25                 DIRECT EXAMINATION

**JA91**

NATHAN ANDERSON - DIRECT

1  BY MS. SPAUGH:
2  Q.   Please introduce yourself to the jury.
3  A.   I am Nathan Anderson, Assistant Special Agent in Charge
4  with the North Carolina State Bureau of Investigation.
5  Q.   How long have you been with the SBI?
6  A.   August will be 13 years.
7  Q.   And what's your educational background?
8  A.   I have an undergraduate degree in criminal justice from
9  Appalachian State University and a graduate degree and Master
10 of Public Administration from Norwich University.
11 Q.   What did you do before you became an SBI agent?
12 A.   I was a patrol officer for the City of Asheville, the
13 Asheville Police Department, from 2005 until 2008.
14 Q.   And so in 2008 you moved to the SBI?
15 A.   That is correct.
16 Q.   And you said that you are an assistant special agent in
17 charge?
18 A.   Yes, that's correct.
19 Q.   What does that mean?
20 A.   I am essentially group supervisor assigned to the
21 computer crimes unit and I supervise agents in the Greensboro,
22 Charlotte, Hickory, and Asheville district offices for my
23 agency.
24 Q.   What did you do within the SBI before you become an
25 assistant special agent in charge?

**JA92**

NATHAN ANDERSON - DIRECT

1  A.    2008 until 2013 I was a criminal agent assigned to Surry
2  and Alleghany Counties as a criminal agent investigating
3  homicides and serious crimes against persons.
4  Q.    Have you received training related to child exploitation
5  offenses?
6  A.    Yes, I have.
7  Q.    Can you just briefly describe that training for the jury.
8  A.    In 2013 I transferred into the computer crimes unit where
9  all we investigate are internet crimes against children.
10  Since 2013 I have been receiving numerous trainings associated
11  with those types of investigations, including digital forensic
12  examinations.
13  Q.    And so as part of your job, do you perform forensic
14  examinations of digital evidence?
15  A.    Yes, I do.
16  Q.    What are forensic examinations?
17  A.    It is examining mobile devices and computers, hard
18  drives, micro SD cards, thumb drives, et cetera, in a
19  forensically sound manner which keeps the integrity of the
20  data intact where we do not override it or manipulate it in
21  any fashion.
22  Q.    And what is digital evidence?
23  A.    Digital evidence can be anything from an image, a video,
24  text messages, location data associated with devices, email,
25  internet search histories, things along those lines.

**JA93**

NATHAN ANDERSON - DIRECT

1  Q.   Do you also perform mobile device data extractions?

2  A.   Yes, I do.

3  Q.   What are mobile devices?

4  A.   Essentially a mobile device is anything you can hold in

5  your hand that can have access to a Wi-Fi network or to a

6  cellular network such as a cell phone or a tablet.

7  Q.   What's a data extraction?

8  A.   A data extraction is simply connecting to a device in a

9  forensically sound manner with a known tool or software that

10 can extract the data -- a copy of the data from that device.

11 Q.   What specialized training have you had to become a

12 forensic examiner?

13 A.   I have attended numerous courses through the Federal Law

14 Enforcement Training Center known as FLETC in Glynco, Georgia.

15 I've also attended various vendor specific training associated

16 with their specific tool such as Cellebrite, their mobile

17 device extraction tool; MSAB Technologies, their XRY, which is

18 a mobile device extraction tool.  I've also went to various

19 computer digital forensics training that collectively is in

20 excess of several hundred hours of training.

21 Q.   And this training that you just described, does that

22 include training on mobile device data extractions?

23 A.   Yes, it does.

24 Q.   How many hours would you say that you've had of training

25 in digital evidence?

**JA94**

NATHAN ANDERSON - DIRECT

1   A.    In digital evidence, a few hundred hours of training.
2   Q.    And what about -- how many hours specific to mobile
3   devices?
4   A.    Around 200 hours, thereabout.
5   Q.    Have you continued your training and studies to keep up
6   to date with new techniques?
7   A.    Yes, I have.
8   Q.    Do you have any certifications in this field?
9   A.    I do.
10  Q.    What are those?
11  A.    I'm a Cellebrite certified operator and a Cellebrite
12  certified physical analyst used specifically for their tool.
13  Q.    Once you're certified does your training stop?
14  A.    It does not.
15  Q.    Do you do any teaching?
16  A.    I do.
17  Q.    What is that?
18  A.    I am an adjunct instructor for the Wilkes Community
19  College in Wilkesboro, North Carolina, where I facilitate
20  three online courses throughout the course of the year that
21  focus on computer -- cyber crimes involving the internet and
22  data recovery.
23  Q.    Approximately how many mobile devices would you say that
24  you've examined in your law enforcement career?
25  A.    In excess of a hundred.

**JA95**

NATHAN ANDERSON - DIRECT

1  Q.    What percentage of your workload involves processing
2  evidence in child pornography or child exploitation cases?
3  A.    Since 2013 my sole work has been dedicated to
4  investigating internet crimes against children and conducting
5  digital forensic examinations associated with those crimes.
6  Q.    What's the process for conducting a data extraction of a
7  cell phone?
8  A.    The process involves obtaining the -- a request from the
9  agency, obtaining -- meeting with them, obtaining the device,
10  the legal authority, and then using various tools to access
11  the data in a forensically sound manner.
12  Q.    Why do you conduct examinations that way?
13  A.    We want to maintain the integrity of the data to make
14  sure that we're not writing to the device.  We don't want
15  to -- one of the other steps we do is make sure the phone or
16  mobile device is not connected to a network so it's in
17  airplane mode.  We don't allow data coming into the device
18  because while we're extracting the data, we don't want stuff
19  to update.  We want it in a natural state without any
20  interference.
21  Q.    And do you conduct examinations in the same manner in
22  every case?
23  A.    Yes.
24  Q.    And why do you do that?  Is that the way you were trained
25  to do it?

**JA96**

NATHAN ANDERSON - DIRECT

1  A.    It's how we're trained to do it and it kind of gets you

2  in the habit of doing each step the same way every time you go

3  to a new investigation, yes.

4  Q.    And you mentioned airplane mode.  What does that mean?

5  A.    Airplane mode essentially disconnects the phone from

6  connecting to a cell phone tower to update to get new

7  information.

8  Q.    So if it's in airplane mode, how does that help you?

9  A.    It keeps phone calls and other data from coming into the

10  device.

11  Q.    What tools do you use to conduct extractions of cell

12  phones?

13  A.    I primarily use Cellebrite.

14  Q.    What's Cellebrite?

15  A.    Cellebrite is just a company that is known throughout the

16  world and is heavily used in law enforcement agencies across

17  the United States and globally that is specifically designated

18  or designed to conduct mobile device data extractions in a

19  forensically sound manner.

20  Q.    So is that a tool you use?

21  A.    Yes.

22  Q.    And you call it Cellebrite?

23  A.    Cellebrite, yes.

24  Q.    And I take it you're familiar with Cellebrite?

25  A.    I am.

NATHAN ANDERSON - DIRECT

1   Q.   And you said it's commonly used in this field?

2   A.   It is.

3   Q.   Have you attended training that was specific to the use

4   of Cellebrite?

5   A.   Yes, I have.

6   Q.   Are you a certified Cellebrite analyst?

7   A.   I am.

8   Q.   How long have you been certified?

9   A.   Since 2014.

10  Q.   And you said that's primarily what you use.

11  A.   It is.

12  Q.   When you look at data through Cellebrite, do you alter

13  it?

14  A.   I do not.

15  Q.   Have you testified as an expert in this field in court

16  before?

17  A.   I have.

18  Q.   And have you testified in this field as an expert in

19  federal court before?

20  A.   Yes, on two occasions.

21       MS. SPAUGH:  At this time the government would

22  tender this witness as an expert in the extraction and

23  forensic examination of digital evidence.

24       MR. FREEDMAN:  No objection.

25       THE COURT:  All right.  Ladies and gentlemen, that

NATHAN ANDERSON - DIRECT

1  motion is granted.  You're about to hear testimony of what we
2  call an expert witness in the field that was just described by
3  the prosecutor.  If scientific, technical, or other
4  specialized knowledge might assist the jury in understanding
5  the evidence or determining a relevant fact, the law permits
6  an expert to testify and state an opinion concerning those
7  matters.  Normally witnesses aren't allowed to give opinions,
8  but in this case they are.
9          However, merely because someone is qualified as an
10 expert and offers an expert opinion does not require you to
11 accept that opinion.  Just as with any other witness, it is
12 solely within your responsibility as jurors to decide whether
13 or to what extent an expert's testimony is credible.  In
14 assessing the credibility of expert testimony, you should
15 consider whether the witness's training and experience are
16 sufficient to support the testimony that he is about to give.
17 You should also consider whether his opinions were based on
18 adequate information, sound reasoning, and good judgment.
19          You may proceed.
20          MS. SPAUGH:  Thank you, Your Honor.
21 BY MS. SPAUGH:
22 Q.   Special Agent Anderson, did you perform a cellular phone
23 data extraction in a case against Michael Scott Hoover?
24 A.   Yes, I did.
25 Q.   Did you apply the steps and techniques that you just

NATHAN ANDERSON - DIRECT

1  described to the jury in this case?

2  A.   Yes, I did.

3  Q.   How did you get involved?

4  A.   Sometime during the week of August 31st I received a

5  phone call from the investigators investigating this matter

6  with Mr. Hoover requesting specifically a cell phone data

7  extraction on a device that belonged to Mr. Hoover.

8  Q.   And when you say investigators, what agency was that?

9  A.   It was the Wilkes County Sheriff's Office and the State

10 Bureau of Investigation in Wilkes County.

11 Q.   And you said that was around August 31st?

12 A.   Yes.

13 Q.   What year was that?

14 A.   2019.

15 Q.   And what did you do once you got that call?

16 A.   I made arrangements to travel to the Wilkes County

17 Sheriff's Office where I was going to conduct a cell phone

18 data extraction there.

19 Q.   What was the first thing you did when you went there to

20 do this extraction?

21 A.   When I got to the sheriff's office, I obtained the legal

22 authority to search the device, a search warrant or consent.

23 In this matter they had a search warrant.

24 Q.   What was the purpose of the search warrant?

25 A.   To examine the cell phone belonging to Mr. Hoover.

**JA100**

44

NATHAN ANDERSON - DIRECT

1  Q.   And what type of cell phone did you examine?

2  A.   An Apple iPhone 7 Plus.

3          MS. SPAUGH:  Your Honor, may I approach the witness?

4          THE COURT:  You may.

5  Q.   I've handed you what's been marked as Government's

6  Exhibits 1 and 1A.  Do you recognize those?

7  A.   Yes, I do.

8  Q.   What are those?

9  A.   It is the Apple iPhone 7 Plus with its case.

10 Q.   And what is Government's Exhibit 1A?

11 A.   It is the case that went with the cell phone.

12 Q.   And you said that was an Apple iPhone 7 Plus?

13 A.   Yes.

14 Q.   Is that the phone that you performed an extraction on in

15 this case?

16 A.   Yes.

17 Q.   Are you familiar with iPhones of this type?

18 A.   I am.

19 Q.   Are there any trade inscriptions on the phone related to

20 where it comes from or where it came from?

21 A.   Yes, there is.

22 Q.   Where would that be on the phone?

23 A.   On the back side of the cell phone.

24          MS. SPAUGH:  The government would ask to publish

25 Government's Exhibit 1 on the ELMO.

**JA101**

NATHAN ANDERSON - DIRECT

1    THE COURT:  Permitted.

2  Q.   Can you describe what part of the phone we're looking at

3  on the screen.

4  A.   We are looking at the back of the cell phone.

5  Q.   Can you read to the jury what that says regarding where

6  the phone came from.

7  A.   It states the iPhone was designed by Apple in California,

8  assembled in China.

9  Q.   Are you familiar with Apple's manufacturing and shipping

10  records?

11  A.   I am.

12    MS. SPAUGH:  Your Honor, the government would ask to

13  publish Exhibit 2.

14    THE COURT:  Permitted.

15  Q.   All right.  I'm showing you what's been admitted as

16  Government's Exhibit 2.  Does this type of record look

17  familiar to you?

18  A.   Yes, it does.

19  Q.   And can you tell the jury what we're looking at.

20  A.   The information provided by Apple, Incorporated,

21  specifically associated with this Apple iPhone 7 Plus.

22  Q.   And does it have a serial number listed on this record?

23  A.   It does.

24  Q.   Can you read that to the jury.

25  A.   F, as in Frank; C, Charles; J, John; T, Tom; C, Charles;

NATHAN ANDERSON - DIRECT

1   1; U, union; L, Lincoln; H, Henry; F, Frank; X, X-ray; W,
2   William.
3   Q.   And do you recognize that serial number?
4   A.   I do.
5   Q.   How do you recognize it?
6   A.   It's the same serial number that I obtained from the
7   device during the data extraction.
8   Q.   And so is that the serial number that belongs to the
9   phone you just looked at in Government's Exhibit 1?
10  A.   Yes, it is.
11  Q.   Is that serial number unique to that particular phone?
12  A.   Yes, it is.
13  Q.   I'm going to ask you to read to the jury, about the
14  middle of this record, what the country of manufacture is
15  listed as.
16  A.   It is China.
17  Q.   And can you tell the jury what date is listed -- or I'm
18  sorry, can you tell the jury where it's listed that the phone
19  was shipped to?
20  A.   It was shipped to a Verizon Wireless store, it appears,
21  in Memphis, Tennessee.
22  Q.   And can you read to the jury the shipping date.
23  A.   March 14th, 2017.
24  Q.   In the course of your examination, did you identify the
25  Apple ID for this phone?

**JA103**

NATHAN ANDERSON - DIRECT

1  A.   Yes, I did.

2  Q.   Can you tell the jury what an Apple ID is.

3  A.   Apple requires when you first turn on the phone, after

4  you turn it on and the screen says hello and you start to set

5  it up, you have to enter an Apple ID or an account for Apple

6  to activate that device.

7  Q.   Who puts in or chooses the Apple ID for a phone?

8  A.   The user of that device.

9  Q.   How did you identify the Apple ID for this phone?

10  A.   Once the data extraction was complete, Cellebrite

11  provided me device information.  In that device information

12  for this particular phone the Apple ID was generated because

13  that information was available in the phone.

14  Q.   And what was the Apple ID for this phone?

15  A.   M2hoover@charter.net.

16  Q.   Was the phone password protected?

17  A.   It was.

18  Q.   How did you get into the phone?

19  A.   I was provided the pass code by the investigators

20  conducting the investigation in this matter.

21  Q.   How did you perform the extraction of this iPhone?

22  A.   Once I was provided the legal authority, the search

23  warrant, provided the device, I turned on the device.  Made

24  sure airplane mode was activated.  And the pass code -- I was

25  provided the pass code so then I could enter it in order to

NATHAN ANDERSON - DIRECT

1  make sure I could access it and the content within.

2  Q.   And was the phone in airplane mode when you turned it on?

3  A.   Yes, it was.

4  Q.   You said you put in the password that you were given?

5  A.   I did.

6  Q.   What did you do after that?

7  A.   Once I unlocked the phone, I went to settings to make

8  sure the device would not auto lock.  There's an auto lock

9  feature within Apple devices from -- anywhere from one second

10 to never, and I ensured that the device would never lock

11 because if it locked during my process, it would stop the data

12 extraction and I would have to start over.

13 Q.   And so what did you do after that?

14 A.   Once I completed that, I launched Cellebrite Universal

15 Forensic Extraction Device, UFED 4PC, on my State Bureau of

16 Investigation issued Apple MacBook Pro computer to start

17 conducting the extraction.

18 Q.   So when you conduct the extraction, do you do that -- how

19 is that Cellebrite connected to the phone?

20 A.   So once I have Cellebrite launched on my work machine, I

21 connect the device via a cable from Cellebrite, which in this

22 matter is a cable 210, which is essentially an Apple

23 lightening cable, that I connect to the device and to my

24 computer via USB adapter.

25 Q.   And then do you look at the data on your computer?

49

NATHAN ANDERSON - DIRECT

1  A.    I will do the extraction.  Once the extraction is
2  complete, I use my work machine to review the data, yes.
3  Q.    So would you say Cellebrite is a software program?
4  A.    Yes, it is.
5  Q.    And you said that you extracted the data in this case.
6  A.    I did.
7  Q.    And then how does Cellebrite -- what does Cellebrite do
8  with the data?
9  A.    Once Cellebrite -- once you launch the extraction,
10  Cellebrite will extract the data you requested.  And once it's
11  done, there's another program Cellebrite uses called Physical
12  Analyzer which will then populate the data to where I can
13  review it and read it in a legible fashion.
14  Q.    Would you say Cellebrite organizes it for you?
15  A.    It does.
16  Q.    And when you're looking at the data through Cellebrite,
17  are you looking at an exact copy of the data from the phone?
18  A.    Yes, you are.
19  Q.    And why do you look at a copy instead of the phone
20  itself?
21  A.    You want to ensure the integrity of the data.  I don't
22  want to -- I want to get the data first and then look.  If I
23  need to compare it to what I found, we look at the phone
24  manually after that.  But we want to try to get the data in a
25  clean, full fashion without having been touched before you do

**JA106**

NATHAN ANDERSON - DIRECT

1  the extraction.

2  Q.   Were you looking for anything in particular in this case?

3  A.   I was advised that there was a video that I needed to

4  direct my attention to.  So once the extraction was done, I

5  started looking for that file.

6  Q.   Who did you talk to to know about that video?

7  A.   I talked to the investigators in this matter.

8  Q.   Did you talk to anyone from Wells Fargo?

9  A.   I did.  I also talked to Mr. Avery Turner.

10 Q.   And what operating system was on the phone at the time

11 you examined it?

12 A.   I believe it was 12.3.1.

13 Q.   Is the operating system something that changes?

14 A.   It does, yes.

15 Q.   How often does that change?

16 A.   However often Apple feels like you need to have a new

17 operating system.

18 Q.   And so did you find any sexually explicit images or

19 videos on the cell phone?

20 A.   Yes, I did.

21 Q.   Did you create extraction reports relating to those

22 images and videos?

23 A.   Yes, I did.

24 Q.   Can you just tell the jury what a report is.

25 A.   Essentially once the data is extracted, we can go through

NATHAN ANDERSON - DIRECT

1   and review the data through Cellebrite Physical Analyzer.  And

2   once done -- once we find the files that we want, we can

3   collect those files by bookmarking them and generate reports

4   associated to those specific files.

5   Q.   I'm going to show you what has been marked as

6   Government's Exhibit 3, page 1, page 2, page 3, page 4.

7   A.   Okay.

8   Q.   Do you recognize that document?

9   A.   Yes, I do.

10  Q.   What is Government's Exhibit 3?

11  A.   It is a Cellebrite report with the device information

12  from the phone that I examined and information specifically

13  related to a series of images or videos associated with some

14  child exploitation.

15  Q.   And so this report is about some of the things you found

16  on that phone?

17  A.   Correct.

18  Q.   And so this data came from the defendant's iPhone?

19  A.   Yes, it did.

20        MS. SPAUGH:  The government would move to admit and

21  publish Government's Exhibit 3.

22        THE COURT:  It's admitted.

23        (Government's Exhibit Number 3 was received into

24  evidence.)

25        THE COURT:  Ladies and gentlemen of the jury, I've

NATHAN ANDERSON - DIRECT

1   been looking for an opportunity to tell you how this exhibit

2   system works.  And every trial I have works like this.

3          Everybody in the courtroom is looking at their

4   screen and seeing something except for the jurors.  That's

5   because the way it works is the party offering an exhibit asks

6   the witness to identify it and then asks that it be admitted,

7   as you've heard.  And if the Court admits it into evidence and

8   the party asks to publish it to the jury, then the jury sees

9   it.  But you're not allowed to see exhibits until they are

10  admitted into evidence.  That's why your screens are blank

11  sometimes when ours are not.

12         You may proceed.

13         MS. SPAUGH:  Thank you, Your Honor.

14  BY MS. SPAUGH:

15  Q.   I'm going to direct your attention to the bottom of page

16  2 of Government's Exhibit 3, the section titled "Notes."  Can

17  you explain to the jury what the notes section is.

18  A.   The notes section is a notes application that is

19  preloaded on all Apple devices when you get them.

20  Q.   So is this information in the notes section on your

21  report pulled from the notes application on the defendant's

22  iPhone?

23  A.   Yes, it is.

24  Q.   And what's the meaning of this information in this row?

25  A.   In the column "Note"?

NATHAN ANDERSON - DIRECT

1  Q.    Yes, I'm sorry.  Starting with number 1 on the left.

2  A.    Okay.  Number 1 on the left.  Okay.  So the cell phone

3  data extraction -- Cellebrite, when it grabs information, it

4  will grab any and all information associated with the file in

5  that application that is pertinent that we need to review.

6  Q.    And can you tell the jury what the notes app is.  I know

7  you said it was on the phone.

8  A.    The notes app is for iPhone -- Apple developed the notes

9  application so that way you can make a note for yourself to go

10  back and review it.  You can take pictures with it, videos

11  with it, or you can just store information in there to review

12  at a later time.

13  Q.    And what does the notes app look like on an iPhone?

14  A.    It's a notepad.

15  Q.    And what can you do with the notes app?  You said you can

16  write information.  Can you do anything else?

17  A.    Yes.  You can type the information.  You can actually do

18  a pencil where you can draw your information in there and it

19  will translate it into typed letters.  You can store images.

20  You can store videos.  You can actually take images and take

21  videos through the notes application as well.

22  Q.    How do you get access to the notes app?

23  A.    On your phone?

24  Q.    Yes.

25  A.    You go to it.

NATHAN ANDERSON - DIRECT

1  Q.    You just scroll over to it?

2  A.    You can just -- wherever you put it because you can

3  manipulate your home screen however you want.  And you can

4  just -- when you find it, you press on it and it will open up

5  and it will have a list of notes if you already have some in

6  there.  Or if you don't, you can do a new note to create brand

7  new notes each time.

8  Q.    Can you tell the jury about the first note you found on

9  the defendant's iPhone.

10 A.    In this one here it is a note titled "Hupe," H-u-p-e.

11 Q.    How is the title of the note generated?

12 A.    The user inputs it.  They will type it in.

13 Q.    And can you tell the jury when this note was created?

14 A.    Yes.  This note was created on August 4, 2019, at 3:11:28

15 PM.

16 Q.    And it looks like next to the time in the time column

17 there's a UTC minus 4.  Can you tell the jury what that means.

18 A.    So most devices are set up to do UTC or Greenwich

19 Meantime which is plus or minus 4 hours depending on the time

20 of year with daylight savings.

21       In this instance the data extraction when it pulled the

22 data, the phone was already established in UTC minus 4, which

23 is our East Coast time at that particular time.  So UTC, it's

24 already done the calculation for us so we don't have to do the

25 math.

**JA111**

55

NATHAN ANDERSON - DIRECT

1   Q.   So you're saying that when you said August 4th, 2019, at
2   3:11 PM, you're saying that date and time is Eastern Standard
3   Time.
4   A.   Correct.
5   Q.   And can you explain to the jury what modified means under
6   that.
7   A.   So modified time in the forensic world is a time that we
8   don't put a lot of stock into because modifications of files
9   can occur at various points in time.  So the times we look at
10  are created and accessed.  Modified time is just a time that
11  can sometimes be there; most of the time it's not.
12  Q.   And so what is the modified time on this note?
13  A.   Modified time is August 4, 2019, at 3:14:32 PM East Coast
14  time.
15  Q.   And does that mean anything to you that that's different
16  from the created time?
17  A.   It's a time that's just there three minutes after it was
18  created.  The file could have been accessed.  The file could
19  have been updated in some fashion.  It's a time that is
20  just -- we take note of it, but not anything we necessarily
21  pay attention to.
22  Q.   So would it be fair to say that that means something
23  happened at that time?
24  A.   That's correct.
25  Q.   And can you tell the jury what was in the note titled

**JA112**

56

NATHAN ANDERSON - DIRECT

1   "Hupe."

2   A.   There is some video files and image files.

3   Q.   And what does that mean?

4   A.   The image and video files were placed into this note

5   section titled "Hupe."

6   Q.   And so those image and video files were saved to that

7   note?

8   A.   Yes.

9   Q.   How do you take a video with an iPhone?

10  A.   You primarily access the camera on the iPhone.  It looks

11  like a camera icon.  And when you go into it, you can take

12  either image or video files.

13  Q.   And where are videos or pictures normally saved on an

14  iPhone when they're taken?

15  A.   They're normally saved in the gallery in an iPhone.

16  Q.   And you said someone could save a video or picture to a

17  note?

18  A.   Yes, they could.

19  Q.   Can you tell if this Hupe note was deleted?

20  A.   Yes.

21  Q.   Was it deleted?

22  A.   It was.  On the far right-hand column Cellebrite in the

23  data extraction will grab deleted files.  But if it is

24  deleted, it will indicate -- give us an indication of a yes or

25  a check -- or a red X.

**JA113**

57

NATHAN ANDERSON - DIRECT

1  Q.   Can you tell when it was deleted from that?

2  A.   No, you cannot.

3  Q.   If the note was deleted, how can you still access this

4  information?

5  A.   The way cell phones work, they work primarily like a

6  computer, just a lot smaller.  And when a file is deleted off

7  a phone or a computer, it is still available until the program

8  or the device actually rewrites over it.  So you take another

9  image and it says, hey, here's an open area where this file

10  was at and it can write over it.  So until that process has

11  happened on the cell phone, that file could still be present.

12  Q.   And you mentioned that you looked at videos from this

13  phone.  Can you tell the jury about the first video that you

14  found on the iPhone that caught your attention.

15  A.   The first video that I found was a prepubescent male or

16  pubescent male wearing a green shirt and black gym shorts

17  standing in the woods and he was masturbating.

18  Q.   How long was that video?

19  A.   It was 1 minute and 52 seconds, I believe.

20  Q.   I'm going to show you what has been marked as

21  Government's Exhibit 3A.  Do you recognize that video?

22  A.   Yes, I do.

23  Q.   Have you reviewed that video in its entirety?

24  A.   Yes, I have.

25  Q.   What do you recognize that video to be?

58

NATHAN ANDERSON - DIRECT

1  A.   That is the video that I found of a young man wearing a
2  green shirt, black gym shorts using both hands to masturbate.
3  Q.   Is that the video you were just describing to the jury?
4  A.   Yes, it is.
5  Q.   And did you find this on the defendant's iPhone you
6  examined?
7  A.   Yes.
8        MS. SPAUGH:  The government would move to admit and
9  publish Government's Exhibit 3A.
10        THE COURT:  It's admitted.  You may publish.
11        (Government's Exhibit Number 3A was received into
12  evidence.)
13        (Government's Exhibit Number 3A was published to the
14  jury.)
15        MS. SPAUGH:  For the record, we've stopped that
16  video at 10 seconds.
17  Q.   Can you tell the jury what happens in the rest of that
18  video.
19  A.   Essentially the focus is the young man masturbating.  And
20  the video is a minute and 52 seconds long; and during it it
21  appears to have a slow motion attribution to it, meaning it
22  starts out normal and then slows down and at the end speeds
23  back up.
24  Q.   Now I'm going to direct your attention back to
25  Government's Exhibit 3.  I'm going to ask you to take a look

NATHAN ANDERSON - DIRECT

1  at the top of page 4 of this report, the section titled
2  "Videos," and there appears to be two rows.
3  A.  Yes.
4  Q.  I'm going to ask you to look at row number 2.  Can you
5  explain to the jury what we're looking at in this video
6  section.
7  A.  In number 2 you have the file information, then
8  additional file information.  The file information is the name
9  of the file that was generated producing the file, the video,
10  and then the path of where it was at.
11  Q.  And how does this information relate to the video we just
12  watched?
13  A.  It is IMG_0789.mov is the video that was produced at the
14  time with that item.
15  Q.  So this is the data related to that video --
16  A.  Yes.
17  Q.  -- the jury just saw?
18  A.  Yes.
19  Q.  And when you take a video with an iPhone, is the data
20  saved?
21  A.  It is data that is generated by the iPhone itself.  So
22  yes, it is information associated with that particular file.
23  Q.  And you said that file was named IMG0789?
24  A.  _0789.mov, yes.
25  Q.  All right.  And where was this video saved on the phone?

NATHAN ANDERSON - DIRECT

1  A.    The path ultimately is going to be apple.notes.

2  Q.    What does that mean to you?

3  A.    It means that it was located and saved in the notes

4  application on the device.

5  Q.    Which note was this file saved in?

6  A.    I believe it was the Hupe note.

7  Q.    The one that you were just talking about to the jury?

8  A.    Yes.

9  Q.    And when you say "path," what does that mean?

10 A.    Every file on a device, computer or phone, specifically

11 this phone, has a folder structure that files are stored in.

12 So wherever that folder structure resolves to, where that file

13 is at, it gives you all the information how you can backtrack

14 it from the beginning of the device and you can go each step

15 down to it.

16 Q.    So when we see path on your report, does that mean where

17 the file was saved?

18 A.    Yes.

19 Q.    And when was the video in Government's Exhibit 3A

20 created?

21 A.    So if you look at the additional file information, the

22 column to the right, all the way down at the bottom under the

23 line that says "Meta data," at the very bottom the creation

24 date is when that video was actually created.

25 Q.    And what date was that?

NATHAN ANDERSON - DIRECT

1  A.    August 4, 2019, at 2:54:17 PM East Coast time.

2  Q.    What device took this video?

3  A.    An Apple IPhone 7 Plus.

4  Q.    And what software on that phone was used?

5  A.    12.3.1.

6  Q.    And when you said "meta data," can you just give an

7  overview of what that means to the jury.

8  A.    It's data on a file.  It's data about data.  It just

9  basically captures information:  creation time, make, model of

10  the camera, GPS location if it's activated, lens aperture,

11  just information about that specific file that was there.

12  Q.    Were you able to determine where this video was made?

13  A.    Yes.

14  Q.    How did you do that?

15  A.    The GPS location; I accessed Google Earth and plotted

16  those coordinates.

17  Q.    And so you're saying that you used the location shown in

18  your report --

19  A.    Yes.

20  Q.    -- to plot it?

21  A.    Yes.

22  Q.    And what did you determine?

23  A.    On the location?

24  Q.    Yes.

25  A.    That it was -- it came back to an area in and around

62

NATHAN ANDERSON - DIRECT

1  Mount Mitchell State Park in Yancey County, North Carolina.

2  Q.    Are you familiar with that location?

3  A.    I am.

4  Q.    And when was this video saved to that note?

5  A.    So the video -- the note was created -- if you look right

6  above meta data, you see created date and that's when the note

7  was actually created, August 4, 2019, at 3:09:36 PM East Coast

8  time.

9  Q.    And just so I understand, you said there's a creation

10  date at the bottom of this row showing 2:54 PM and then a

11  different creation date of 3:09 PM at the top?

12  A.    Yes.

13  Q.    And so what's the difference mean?

14  A.    The earlier created date, 8/04/2019 at 2:54 is when the

15  phone camera application was used to create that video.  The

16  created date above it, the 8/4/2019 at 3:09 PM was when that

17  file was moved into a note and therefore subsequently was

18  created.  That note was created for that video.

19  Q.    So that video was saved to that note at the time that's

20  above.

21  A.    That's correct.

22  Q.    And did you find any other videos on the phone that

23  appeared to be related to that video we just watched?

24  A.    I did.

25  Q.    What did you find?

63

NATHAN ANDERSON - DIRECT

1  A.   An exact copy of that file in another location.

2  Q.   And what was that location?

3  A.   That location was going to be an application used to hide

4  information, images, videos or files, known as a secret

5  calculator.

6  Q.   Is that an app?

7  A.   It is an application.

8  Q.   And can you explain to the jury how that app works.

9  A.   So once you download the application through the app

10 store, you create a path -- it looks like a calculator but

11 it's not a calculator.  But you set a prescribed number that

12 you want to use.  And when you go to the -- so if you look at

13 a phone, you'll have -- on an Apple iPhone you'll have the

14 normal calculator that comes with the device and then you'll

15 have one that says Calculator Plus and that Calculator Plus is

16 the secret application.  So when you click -- when you select

17 it and you enter your code, it won't -- you won't be able to

18 add numbers.  You actually open up -- you open the vault.  It

19 opens the door and you can see the files that have been stored

20 in that application.

21 Q.   I'm going to ask you to look back at Government's Exhibit

22 3, row 1, under videos this time.

23 A.   Yes.

24 Q.   Can you explain to the jury what we're looking at in row

25 1.

**JA120**

64

NATHAN ANDERSON - DIRECT

1  A.   So number 1 you have the file info, the video, the path

2  of the video, and the created date of that said video in that

3  path.

4  Q.   And so what was the path in row number 1?

5  A.   So the path is iPhone's

6  4/MobileContainersDataApplicationXYZ.Hypertornado.Calculator,

7  was the path.

8  Q.   And what does that path mean?

9  A.   It means that it was located in another application which

10 is this calculator, and Hypertornado.Calculator is an

11 application that hides files.

12 Q.   And does the information in row 1 relate to that second

13 video you said you found in the secret calculator app?

14 A.   Yes.

15 Q.   And why is the file name different?

16 A.   So a lot of times programs that are meant to hide your

17 data will go and actually manipulate the file name of that

18 file.  So below in number 2 you have IMG_0789.  When you move

19 into the secret calculator to another encryption type program,

20 it takes that file name out and will generate a whole nother

21 name on its own so that way it helps hide that file.

22 Q.   And when was the video created in that app?

23 A.   So that file, that video, was created in that application

24 on August 5th, 2019, at 7:53:24 AM East Coast time.

25 Q.   And when you say created in that app, what does that

**JA121**

NATHAN ANDERSON - DIRECT

1  mean?

2  A.    It means that's when that file was moved or saved in that

3  secret calculator to hide it.

4  Q.    Is that secret calculator app still on the defendant's

5  iPhone?

6  A.    Yes, it is.

7  Q.    I'm going to show you what has been marked as

8  Government's Exhibit 3B.  Do you recognize this video?

9  A.    I do.

10 Q.    Have you reviewed that entire video?

11 A.    I have.

12 Q.    What do you recognize this video to be?

13 A.    It's the same video that was found.  It's the IMG video.

14 Q.    Is this the video that was in the secret calculator app

15 you described?

16 A.    Yes.

17       MS. SPAUGH:  The government would move to admit and

18 publish Government's Exhibit 3B.

19       THE COURT:  It's admitted.  You may publish.

20       (Government's Exhibit Number 3B was received into

21 evidence.)

22       (Government's Exhibit Number 3B was published to the

23 jury.)

24       MS. SPAUGH:  For the record, we've stopped the video

25 at 1 second.

NATHAN ANDERSON - DIRECT

1  Q.   Did you find anything else saved in that secret

2  calculator app?

3  A.   Yes.

4  Q.   What did you find?

5  A.   We found -- I found some images.

6  Q.   You said you found some images in the secret calculator

7  app?

8  A.   Yes.

9  Q.   Did you find any other videos?

10 A.   I don't recall.

11 Q.   Can you describe what image or images you found in the

12 app.

13 A.   I found another image which was an anime image which is a

14 computer-generated image.  It's not real.

15 Q.   And what was that image of?

16 A.   A female masturbating a prepubescent male.

17 Q.   Do you know whether that image was added to that

18 application?

19 A.   I believe it was a few days after August 11th, 2019.

20 Q.   Were you able to tell from the videos you found that we

21 just watched who the person shown in the video was?

22 A.   I'm sorry, can you repeat that.

23 Q.   When you found those videos that we just watched on the

24 phone, were you able to tell who the person was shown in

25 those?

**JA123**

NATHAN ANDERSON - DIRECT

1  A.    Eventually, yes.

2  Q.    Did you find any pictures on the phone to help identify

3  who was in that video?

4  A.    Yes, I did.

5  Q.    Are those included in your report?

6  A.    They are.

7  Q.    I'm going to show you what has been marked as

8  Government's Exhibits 3D and 3E.

9       Showing you 3D.  And now we'll see 3E.

10  A.    Yes.

11  Q.    Our technology is a little slow.

12       Do you recognize these photos in Government's Exhibits 3D

13  and 3E?

14  A.    Yes, I do.

15  Q.    What do you recognize them to be?

16  A.    They're images that I found in the photo gallery of the

17  iPhone to try and identify who the young man was.

18  Q.    You found these two photos on the iPhone you examined?

19  A.    I did.

20       MS. SPAUGH:  The government would move to admit and

21  publish Government's Exhibits 3D and 3E.

22       THE COURT:  They're admitted and you may publish.

23       (Government's Exhibits Numbers 3D and 3E were

24  received into evidence.)

25  Q.    What did you notice about those two pictures?

**JA124**

NATHAN ANDERSON - DIRECT

1  A.   The young man wearing the green shirt and black shorts
2  appeared to be the same young man in the video.
3  Q.   And did you notice when those pictures were taken?
4  A.   They were taken on the same day as that video was
5  produced.
6  Q.   And did you notice the location?
7  A.   I did.
8  Q.   And what was that?
9  A.   In and around Mount Mitchell State Park in Yancey County,
10 North Carolina.
11 Q.   Did you also find pictures that appeared to be related to
12 the video?
13 A.   Yes.
14 Q.   I'm going to show you what has been marked as
15 Government's Exhibit 3C.  Do you recognize this photograph?
16 A.   I do.
17 Q.   What do you recognize it to be?
18 A.   It's just a still image of the young man wearing the
19 green shirt, black shorts masturbating.
20 Q.   Did you find this image on the defendant's iPhone you
21 examined?
22 A.   I did.
23      MS. SPAUGH:  The government would move to admit and
24 publish Government's Exhibit 3C.
25          THE COURT:  It's admitted.  You may publish.

**JA125**

NATHAN ANDERSON - DIRECT

1        (Government's Exhibit Number 3C was received into
2   evidence.)
3   Q.   Now I'm going to ask you to look back at your report in
4   Government's Exhibit 3.  I'm going to ask you about the top of
5   page 3, the subsection titled "Images."
6   A.   Uh-huh.
7   Q.   And we're just going to look at row 1.
8        Is this the data related to the photo in Government's
9   Exhibit 3D?
10  A.   Yes, it is.
11  Q.   Can you explain the information you gathered about this
12  picture to the jury.
13  A.   The image -- we gathered the image name, the file path
14  location, and the make/model of the device used to create it,
15  the latitude/longitude where it was taken, and when it was --
16  the actual creation date.
17  Q.   Where was this photo saved?
18  A.   This was actually saved in the gallery or the Media
19  application on the device.
20  Q.   Is that the default photo location you described?
21  A.   Yes, it is.
22  Q.   And so this photo was not saved in that Hupe note?
23  A.   Correct.
24  Q.   When was this picture taken?
25  A.   This picture was taken on August 4, 2019, at 2:05:29 PM

NATHAN ANDERSON - DIRECT

1  East Coast time.

2  Q.    What camera was used to take this picture?

3  A.    An Apple iPhone 7 Plus.

4  Q.    Where was this picture taken?

5  A.    In and around Mount Mitchell State Park in Yancey County,

6  North Carolina.

7  Q.    Now I'm going to show you row 3 of this same images

8  section.  Is this information in this row related to

9  Government's Exhibit 3E?

10  A.    Yes.

11  Q.    What was the file name for that picture?

12  A.    IMG_0790.heic.

13  Q.    Where was that picture saved on the phone?

14  A.    The photo gallery of the phone.

15  Q.    And that's the default photo place?

16  A.    That's correct.

17  Q.    What camera was used to take this picture?

18  A.    An Apple IPhone 7 Plus.

19  Q.    And what time was this picture taken?

20  A.    8/4/2019 at 3:39 PM East Coast time.

21  Q.    August 4th, 2019, you said?

22  A.    Yes, sorry.

23  Q.    And then I'm going to show you row 2 of this same

24  section.  Is the information in row 2 related to the photo in

25  Government's Exhibit 3C?

**JA127**

NATHAN ANDERSON - DIRECT

1  A.    Yes.

2  Q.    And what was the file name for that picture?

3  A.    IMG_0788.jpg.

4  Q.    Where was that picture saved?

5  A.    That was saved in the notes section or notes application

6  of the device.

7  Q.    And which note was it saved in?

8  A.    The Hupe, Hupe note.

9  Q.    What camera was used to take that picture?

10 A.    Apple iPhone 7 Plus.

11 Q.    And when was that picture taken?

12 A.    That was taken on August 4, 2019, at 2:54:13 PM East

13 Coast time.

14 Q.    And when was that picture saved to the note?

15 A.    August 4, 2019, at 3:14:23 PM East Coast time.

16 Q.    And so you said this, I think, related to a video, but

17 can you explain again why there's two -- two different times

18 here.

19 A.    The device, the Apple iPhone 7 Plus, created the image

20 through the camera application on August 4th at 2:54 PM, and

21 then was moved and created in that notes section titled Hupe

22 several minutes later, same date, at 3:14.

23 Q.    And so these file names seem to be going up in numbers.

24 You said one was IMG_0784, one was 0788, and one was 0790.

25 Can you explain to the jury what numbers mean in relation to

NATHAN ANDERSON - DIRECT

1  pictures.

2  A.    The default functionality of the Apple iPhone camera when

3  it -- when you take a picture or create a video will go in

4  sequential order from the previous.  So it's a number system

5  of when -- of where that file falls.  So number one was 0784

6  so that was taken before 0788.

7  Q.    And so the fact that we go from 0788 to 0790, does that

8  indicate anything to you?

9  A.    That means there were either additional images taken or

10  videos created, yes, before that one.

11  Q.    Did you find any other sexually explicit images or videos

12  on the defendant's iPhone?

13        THE COURT:  Ms. Spaugh, is this a convenient enough

14  time to take our morning break?

15        MS. SPAUGH:  Yes, Your Honor.

16        THE COURT:  Members of the jury, we're going to take

17  our morning break now as you can guess from what I just said.

18  As always -- you're going to get tired of me saying this, but

19  as always, do not discuss this case among yourselves while

20  we're in recess.  Don't do any independent research.  Form no

21  opinions.  Keep an open mind throughout the end of the case.

22  And we'll see you in about 15 minutes, about 20 after.

23        Again, it would be a lot more convenient to let you

24  go to the real jury room, but since we've got so many of you

25  and we want to make sure you're distant, we're going to ask

NATHAN ANDERSON - DIRECT

1  you to go downstairs to sort of your temporary jury room.

2  　　　　(Jury exited the courtroom.)

3  　　　　THE COURT:  We'll be in recess until 11:20.

4  　　　　(Brief recess at 11:05 AM.)

5  　　　　(Court back in session at 11:18 AM.)

6  　　　　THE COURT:  Please call the jury.

7  　　　　(Jury entered the courtroom.)

8  　　　　THE COURT:  You may resume.

9  　　　　　　　NATHAN ANDERSON

10  　　　　DIRECT EXAMINATION (Cont'd.)

11  BY MS. SPAUGH:

12  Q.  Agent Anderson, I believe when we left you were telling

13  the jury you found other sexually explicit images or videos on

14  the phone?

15  A.  Yes, I did.

16  Q.  Did you create a report related to those images and

17  videos?

18  A.  Yes, I did.

19  Q.  I'm going to show you what has been marked as

20  Government's Exhibit 4.  And we're just going to scroll

21  through page 1, page 2, page 3, page 4, page 5, page 6, page

22  7, page 8, page 9.

23  　　Do you recognize this document?

24  A.  Yes, I do.

25  Q.  And what is it?

74

NATHAN ANDERSON - DIRECT

1  A.   It's a Cellebrite-generated report dealing specifically
2  with a second victim.
3  Q.   And is everything in this report related to data that
4  came from the defendant's iPhone you examined?
5  A.   Yes, it is.
6       MS. SPAUGH:  The government would move to admit and
7  publish Government's Exhibit 4.
8       THE COURT:  It's admitted.  You may publish.
9       (Government's Exhibit Number 4 was received into
10 evidence.)
11 Q.   I'm going to direct your attention to the bottom of page
12 2, the section titled "Notes" of this report.
13      Can you explain to the jury what they're looking at in
14 row 1 under notes.
15 A.   Under row 1 you're seeing the note titled "New Note" and
16 when it was created.
17 Q.   When was that note created?
18 A.   June 19, 2018, at 11:58:50 PM East Coast time.
19 Q.   And when was that note modified?
20 A.   September 24, 2018, at 3:17:05 PM East Coast time.
21 Q.   What does that mean to you?
22 A.   Which part?
23 Q.   That modification date of September 24.
24 A.   Again, the modification date, something occurred with
25 that specific note, new note, on that device on that date and

**JA131**

NATHAN ANDERSON - DIRECT

1  time.  What that was I don't know.

2  Q.   Can you tell the jury what was saved in that note.

3  A.   There were various images and videos.

4  Q.   Did you determine if this note had been deleted?

5  A.   Yes.

6  Q.   Can you tell when?

7  A.   No, I cannot.

8  Q.   And if the note was deleted, how could you still access

9  this information?

10 A.   Again, it's the same as the previous.  It's there until

11 it's potentially overwritten.

12 Q.   I'm going to show you what has been marked as

13 Government's Exhibit 4A.  Do you recognize that video?

14 A.   Yes, I do.

15 Q.   Have you watched the entire video?

16 A.   I have.

17 Q.   What do you recognize this video to be?

18 A.   It is a video of a young man laying on a couch with pants

19 or his underwear around his ankles, no shirt on, masturbating

20 on a couch.

21 Q.   Did you find this video on the defendant's iPhone you

22 examined?

23 A.   I did.

24      MS. SPAUGH:  The government moves to admit and

25 publish Government's Exhibit 4A.

**JA132**

NATHAN ANDERSON - DIRECT

1    THE COURT:  It's admitted.  You may publish.

2    (Government's Exhibit Number 4A was received into

3  evidence.)

4  Q.   Now I'm going to direct your attention back to your

5  second report in Government's Exhibit 4, and I'm going to ask

6  you to look at page 8.  I'm going to ask you about row 1 on

7  page 8 of the video section.  Can you tell the jury how this

8  information is related to the video that we just watched.

9  A.   It is titled IMG_7954.mov, and it is where the

10  location -- or the path in which it was located and the

11  information associated when it was created by the phone using

12  the camera application and then when it was created in the

13  note.

14  Q.   And so that video that we just watched in Government's

15  Exhibit 4A, was that video titled IMG_7954?

16  A.   Yes.

17  Q.   And so is it fair to say that the information in this row

18  is the information about that video in Government's Exhibit

19  4A?

20  A.   Yes.

21  Q.   And where was that video saved on the phone?

22  A.   The notes application.

23  Q.   And which note was that saved in?

24  A.   That new note.

25  Q.   What camera was used to create that video?

NATHAN ANDERSON - DIRECT

1  A.    An Apple iPhone 7 Plus.

2  Q.    When was that video created?

3  A.    It was created on June 19th, 2018, at 10:47:09 PM East

4  Coast time.

5  Q.    And when was that video saved to that note?

6  A.    It was saved to the note on June 19, 2018, at 11:59:54 PM

7  East Coast time.

8  Q.    11:59...

9  A.    44.

10  Q.    44.  PM?

11  A.    Uh-huh.

12  Q.    Okay.  And so would you say it was moved to that note

13  about an hour later?

14  A.    Yes.

15  Q.    And where was that video taken?

16  A.    The location, the latitude and longitude that was

17  provided, I placed it -- I populated that into Google Earth

18  again and it gave me an address somewhere in the 300 to 372

19  block of a road in Wilkesboro or Wilkes County, North

20  Carolina.  I forget the name of the actual road.

21  Q.    So you're saying that you used the latitude and longitude

22  GPS to determine that information?

23  A.    Yes, I did.

24  Q.    And now I'm going to direct your attention to line 2 of

25  the video section.  And it appears that the information in

**JA134**

NATHAN ANDERSON - DIRECT

1  line 2 starts with the same file name.  Can you explain this
2  to the jury.
3  A.   It is a copy of that same file.
4  Q.   Where was this copy saved?
5  A.   In the Apple notes application.
6  Q.   What note was that saved in?
7  A.   The new note.
8  Q.   So that video was saved in that new note twice?
9  A.   Correct.
10 Q.   When was this video saved to the note the second time?
11 A.   July 4th, 2018, at 7:24:59 PM East Coast time.
12 Q.   So based on your training and experience, what's that
13 mean?
14 A.   It means that when the video was created, it was moved
15 not only once, but two times into that new note section.
16 Q.   Did you find any other videos that appeared to be related
17 to that video in the notes?
18 A.   Yes.
19 Q.   I'm going to ask you one more question about row 2 of the
20 video section.  What device was used to create that video?
21 A.   An Apple iPhone 7 Plus.
22 Q.   And what software was on the device?
23 A.   11.4.
24 Q.   Does that mean anything to you?
25 A.   Regarding the software?

**JA135**

79

NATHAN ANDERSON - DIRECT

1  Q.   Yes.
2  A.   It simply means that it was an older version of the
3  operating system that Apple had released at the time.
4  Q.   And then now I'm going to ask you to look at what has
5  been marked as Government's Exhibit 4B.  Do you recognize this
6  video in Exhibit 4B?
7  A.   I do.
8  Q.   Have you reviewed this entire video?
9  A.   I have.
10 Q.   What do you recognize this video to be?
11 A.   It is a video of the same young man laying on the couch
12 in the same state:  shorts or underwear around his ankles, no
13 other clothing on, masturbating with one hand off the couch.
14 But in this particular video there is the zooming in of a
15 camera lens to get closer to his exposed penis and then his
16 face and then it zooms back out.
17 Q.   Did you find this video on the defendant's iPhone you
18 examined?
19 A.   I did.
20      MS. SPAUGH:  The government moves to admit Exhibit
21 4B and would ask to publish to the jury.
22      THE COURT:  It's admitted and may be published.
23      (Government's Exhibit Number 4B was received into
24 evidence.)
25 Q.   How long is that video?

**JA136**

NATHAN ANDERSON - DIRECT

1  A.   I believe it's just under a minute.

2  Q.   Now I'm going to ask you to look back at your report in

3  Government's Exhibit 4 and I'm going to ask you to look at

4  page 9.

5       Focusing on row 3 of page 9, can you tell the jury how

6  this information relates to that video we just watched.

7  A.   It's all the same information:  title, file path, created

8  date, and model, when it was created by the phone and created

9  in the note section.

10  Q.   Is this the data related to the video in Government's

11  Exhibit 4B?

12  A.   That's correct.

13  Q.   And can you tell the jury what the name of that video

14  was.

15  A.   IMG_7958.mov.

16  Q.   Where was that video saved on the phone?

17  A.   In the app -- in the notes application on the device.

18  Q.   When was that video created?

19  A.   June 19, 2018, at 10:55:05 PM East Coast time.

20  Q.   And when was that video saved to the notes?

21  A.   It was saved in the notes application on June 20th, 2018,

22  at 12:04:17 AM East Coast time.

23  Q.   What note was that video saved in?

24  A.   The note titled "New Note."

25  Q.   What type of phone was used to create this video?

NATHAN ANDERSON - DIRECT

1    A.    An Apple iPhone 7 Plus.

2    Q.    Where was this video taken?

3    A.    The same location, that 300 to 372 block, I want to say

4    Forest Road, in Wilkes County, in Wilkesboro.

5    Q.    In Wilkes County, North Carolina?

6    A.    Yes.

7    Q.    Did you find any photos on the phone that appeared to be

8    related to those videos you watched in Government's Exhibit 4A

9    and 4B?

10   A.    Yes, I did.

11   Q.    I'm going to show you a series of photos marked as

12   Government's Exhibits 4C, 4D, 4E, 4F, 4G, 4H, 4I, 4J, and

13   lastly 4K.  Do you recognize those photographs?

14   A.    Yes, I do.

15   Q.    How do you recognize them?

16   A.    They are still images of the young man seen on the couch

17   masturbating.

18   Q.    And were these photographs saved on the defendant's

19   iPhone you examined?

20   A.    Yes, they were.

21            MS. SPAUGH:  The government moves to admit and

22   publish Government's Exhibits 4C, 4D, 4E, 4F, 4G, 4H, 4I, 4J,

23   and 4K.

24            THE COURT:  They're admitted and may be published.

25            (Government's Exhibits Nos. 4C, 4D, 4E, 4F, 4G, 4H,

NATHAN ANDERSON - DIRECT

1    4I, 4J, and 4K were received into evidence.)

2    Q.   First I'm going to show you Government's Exhibit 4C.

3         Now we're going to go back to Government's Exhibit 4.

4         I'm going to ask you to look at row number 12 under the

5    images section of Government's Exhibit 4.

6    A.   Uh-huh.

7    Q.   How does this information relate to the photo we looked

8    at in Government's Exhibit 4C?

9    A.   It's the data about that image that was located after it

10   was produced.

11   Q.   Where was this photo saved?

12   A.   The notes application on the iPhone.

13   Q.   And what note was it in?

14   A.   New note.

15   Q.   When was this photo taken?

16   A.   June 19, 2018, at 10:47:06 PM East Coast time.

17   Q.   And when was this photo saved to that new note?

18   A.   June 19, 2018, at 11:58:44 PM East Coast time.

19   Q.   Now I'm going to show the jury Government's Exhibit 4D.

20        Now we're going to go back to your report in Government's

21   Exhibit 4 and I'm going to ask you about row number 13 under

22   the images section.

23        Can you tell the jury what this has to do with that

24   picture in Government's Exhibit 4D.

25   A.   The title of the image, the file path where it's located,

83

NATHAN ANDERSON - DIRECT

1  and when it was created on the phone and created in the note.

2  Q.   Where was this picture saved?

3  A.   It was saved under the notes application on the iPhone

4  titled "New Note."

5  Q.   When was this picture taken?

6  A.   It was taken on June 19, 2018, at 10:51:14 PM East Coast

7  time.

8  Q.   And when was it saved to that new note?

9  A.   June 20, 2018, at 12:00:36 AM East Coast time

10 Q.   Now we're going to look at Government's Exhibit 4E.

11       And we're going to go back to your report in Government's

12 Exhibit 4 and I'm going to ask you to look at row number 14

13 under the images section.

14       Can you tell the jury what this has to do with that

15 picture in Government's Exhibit 4E.

16 A.   File name, file path, when it was created by the phone,

17 and when it was created in the notes application under new

18 note.

19 Q.   Row 13 is all the information about that picture we just

20 looked at.

21 A.   Correct.

22 Q.   And where was this picture saved?

23 A.   New -- under the notes application in new note.

24 Q.   When was it taken?

25 A.   It was taken on June 19, 2018, at 10:51:16 PM.

84

NATHAN ANDERSON - DIRECT

1  Q.   When was this picture saved to that note?

2  A.   June 20, 2018, at 12:03:19 AM East Coast time.

3  Q.   We're going to now look at Government's Exhibit 4F.

4       And now we're going to go back to your report in

5  Government's Exhibit 4 and I'm going to ask you to look at row

6  number 15 in the images section.

7       What are we looking at in row 15?

8  A.   All the information associated with that image:  the file

9  name, file path, when it was created by the device, when it

10  was created in the notes application.

11  Q.   Where was this picture saved?

12  A.   The notes application.

13  Q.   Which note?

14  A.   Under new note.

15  Q.   And when was the picture taken?

16  A.   It was taken on June 19, 2018, at 10:51:23 PM.

17  Q.   And when was it saved to that new note?

18  A.   On June 20, 2018, at 12:02:13 AM East Coast time.

19  Q.   Now we're going to look at Government's Exhibit 4G.

20       Then we're going to go back to your report in

21  Government's Exhibit 4 and I'm going to ask you about row

22  number 2 under the images section.

23       Is the information in row 2 related to the picture you

24  just saw in Government's Exhibit 4G?

25  A.   It is.

**JA141**

NATHAN ANDERSON - DIRECT

1  Q.   Where was this picture saved on the phone?

2  A.   The notes application on the iPhone.

3  Q.   Which note was it saved in?

4  A.   The new note.

5  Q.   When was this picture taken?

6  A.   It was created with the camera on the phone on June 19,

7  2018, at 10:51:14 PM.

8  Q.   And when was it saved to that note?

9  A.   On July 4, 2018, at 7:26:17 PM East Coast time.

10  Q.   Now we're going to look at Government's Exhibit 4H.

11       And then I'm going to ask you to go back to your report

12  in Government's Exhibit 4 and look at row number 7 under

13  images.

14       Is the information in row number 7 related to that

15  picture in Government's Exhibit 4H?

16  A.   It is.

17  Q.   Where was this picture saved on the phone?

18  A.   Saved under the notes application on the device.

19  Q.   Which note was it saved under?

20  A.   New note.

21  Q.   When was this picture taken?

22  A.   It was created on June 19, 2018, at 10:51:16 PM.

23  Q.   And when was this picture saved to that note?

24  A.   July 4, 2018, at 7:26:17 PM East Coast time.

25  Q.   Now I'm going to ask you to look at Government's Exhibit

NATHAN ANDERSON - DIRECT

1  4I.

2      And then we'll go back to your report in Government's

3  Exhibit 4 and I'll ask you to look at row number 8 under the

4  images section.

5      How does the information in row number 8 relate to that

6  picture?

7  A.   It is an image that -- it is the information about the

8  image:  file path, created date and time on the phone -- by

9  the phone and when it was created in the note.

10  Q.   When you say "the image," are you referring to

11  Government's Exhibit 4I that we just saw?

12  A.   Yes.

13  Q.   When was this picture taken?

14  A.   It was created on the phone on June 19, 2018, at 10:19:53

15  PM.

16  Q.   And when was it saved to the new note?

17  A.   It was saved to the new note on July 4, 2018, at 7:21:53

18  PM East Coast time.

19  Q.   Now I'm going to ask you to look at Government's Exhibit

20  4J.

21      And then look again at your report in Government's

22  Exhibit 4, specifically row number 9 under the images section.

23      And tell the jury what we're looking at in row 9.

24  A.   Same information:  file path, where it was stored, when

25  it was created on the phone and created in the note.

**JA143**

NATHAN ANDERSON - DIRECT

1   Q.   Does the information in row number 9 relate to that
2   picture in Government's Exhibit 4J?
3   A.   Correct.
4   Q.   Where was that picture saved on the phone?
5   A.   The notes application.
6   Q.   Under which note?
7   A.   New note.
8   Q.   When was this picture taken?
9   A.   It was taken on June 19, 2018, at 10:51:23 PM.
10  Q.   And when was this picture saved to the new note?
11  A.   On July 4, 2018, at 7:26:17 PM East Coast time.
12  Q.   Ask you to look at one more picture, Government's Exhibit
13  4K.
14       And then look back at your report one more time in
15  Government's Exhibit 4, specifically row number 10 under the
16  images section.
17       Does the information in row number 10 relate to that
18  picture you just saw in Government's Exhibit 4K?
19  A.   Yes, it does.
20  Q.   Can you tell the jury where this picture was saved on the
21  phone.
22  A.   The notes application under new note.
23  Q.   When was this picture taken?
24  A.   It was taken on -- by the phone on June 19, 2018, at
25  10:47:06 PM.

**JA144**

NATHAN ANDERSON - DIRECT

1  Q.   And when was this picture saved to the new note?

2  A.   July 4, 2018, at 7:21:04 PM East Coast time.

3  Q.   And you said that the five pictures in Government's

4  Exhibits 4G, 4H, 4I, 4J, and 4K were all taken on June 19th,

5  2018?

6  A.   Yes.

7  Q.   And you also said that they were all saved in the note on

8  July 4th of 2018; is that right?

9  A.   That's correct.

10 Q.   What does that mean to you?

11 A.   Just means that there was a gap in time of when the image

12 was created and when it was placed into the new note.

13 Q.   So those images were created and then later moved into

14 the note.

15 A.   Correct.

16 Q.   Did you know who the person was in those couch videos and

17 pictures we just looked at when you found them on the phone?

18 A.   No, I did not.

19 Q.   Did you find any pictures that appeared to be taken on

20 the same day of the same person shown in those pictures and

21 videos?

22 A.   Yes.

23 Q.   I'm going to show you what's been marked as Government's

24 Exhibit 4L.  Do you recognize this photograph?

25 A.   I do.

89

NATHAN ANDERSON - DIRECT

1  Q.   How do you recognize it?

2  A.   It was an image that was located on the device of what

3  appeared to be the young man on the couch in another location.

4  Q.   Did you find this picture on the defendant's iPhone you

5  examined?

6  A.   I did.

7        MS. SPAUGH:  The government moves to admit Exhibit

8  4L and ask to publish to the jury.

9        THE COURT:  It's admitted.  You may publish.

10       (Government's Exhibit Number 4L was received into

11  evidence.)

12  Q.   What did you notice about this picture when you saw it?

13  A.   The facial features of the young man appeared to be the

14  same of what you could see in the video.

15  Q.   Now I'm going to ask you to look back at your report in

16  Government's Exhibit 4, and specifically at row 11 under the

17  images section.

18       Can you tell the jury what we're looking at in row 11.

19  A.   We're looking at the file name, file path, when it was

20  created -- information about the file.  When it was created,

21  what was used to create it, and where the file was -- where it

22  was stored.

23  Q.   And so does the information in row 11 relate to that

24  picture that we just looked at in Government's Exhibit 4L?

25  A.   It does.

**JA146**

NATHAN ANDERSON - DIRECT

1  Q.  Where was this picture saved?

2  A.  Under the gallery application on the device.

3  Q.  Is that the default for pictures?

4  A.  It is.

5  Q.  So are you saying that this picture was not in that new

6  note?

7  A.  That is correct.

8  Q.  When was this picture taken?

9  A.  It was taken on June 19, 2018, at 7:09:27 PM East Coast

10  time.

11  Q.  Did that date stand out to you?

12  A.  It did.

13  Q.  Why was that?

14  A.  It was the same date earlier in the day when those videos

15  were created.

16  Q.  Did you find any other videos on the defendant's phone

17  that stood out to you?

18  A.  I did.

19  Q.  I'm going to show you what's been marked as Government's

20  Exhibit 4M.  Do you recognize this video?

21  A.  I do.

22  Q.  Have you reviewed this entire video?

23  A.  I have.

24  Q.  How do you recognize this video?

25  A.  It is a video of an individual in a hammock or a hammock

NATHAN ANDERSON - DIRECT

1  style contraption and it would appear making motions as though

2  they are masturbating.

3  Q.   Where did you find this video?

4  A.   On the Apple iPhone 7 Plus.

5  Q.   Is that the defendant's iPhone that you identified in

6  Exhibit 1?

7  A.   Yes, it is.

8        MS. SPAUGH:  The government moves to admit and then

9  publish Government's Exhibit 4M.

10        THE COURT:  It's admitted.  You may publish.

11        (Government's Exhibit Number 4M was received into

12  evidence.)

13  Q.   Now I'm going to ask you to look again at Government's

14  Exhibit 4, and specifically at page 9 in the section titled

15  "Videos."

16      Now, we're looking at row 5 here.  Can you explain to the

17  jury what this information has to do with that video we just

18  watched.

19  A.   It's the file name, file path, location of the file, and

20  subsequent information associated with when it was made, what

21  was used to make it, and when it was stored.

22  Q.   So is the information in row 5 the information about that

23  video that we just saw in Government's Exhibit 4M?

24  A.   Yes, it is.

25  Q.   Can you tell the jury where this video was saved.

92

NATHAN ANDERSON - DIRECT

1  A.   It was saved under -- or in the notes application on the
2  Apple iPhone 7 Plus.
3  Q.   And which note was this video saved in?
4  A.   I believe it was saved under the new note.
5  Q.   When was this video taken?
6  A.   So the video was taken on September 22nd, 2018, at
7  1:41:29 PM East Coast time.
8  Q.   What device was used to create that video?
9  A.   An Apple iPhone 7 Plus.
10 Q.   And where was this video taken?
11 A.   I took the latitude/longitude GPS coordinates and put it
12 into Google and it came back to a location off the -- or
13 around the Appalachian Trail off the Nolichucky River in
14 Tennessee.
15 Q.   And you mentioned you followed that process for all the
16 videos you found; is that fair to say?
17 A.   Yes, it is.
18 Q.   So is it your opinion that those locations you described
19 are where these videos were taken?
20 A.   Yes.
21 Q.   And can you tell the jury when this video was saved to
22 that new note.
23 A.   On September 24, 2018, at 3:03:59 PM East Coast time.
24 Q.   And can you tell the jury when it was modified.
25 A.   It was modified on September 24, 2018, at 3:04:24 PM East

**JA149**

93

NATHAN ANDERSON - DIRECT

1  Coast time.

2  Q.    Does that mean anything to you?

3  A.    Modified time, again, would mean that it was opened, it

4  was looked at; something when the application touched that

5  file to do something to it.

6  Q.    And here you said the creation date was September 22nd,

7  2018, and it was saved to the note September 24th, 2018.  Does

8  that mean anything to you?

9  A.    It means that when it was created it was left alone in

10 the gallery, but it was later moved from the gallery

11 application on the phone into the new note under the notes

12 application.

13 Q.    Did you find any pictures on the phone that appeared to

14 be related to this video?

15 A.    Yes.

16 Q.    I'm going to show you what has been marked as

17 Government's Exhibits 4P, 4Q, 4R, 4S, and 4T.  Do you

18 recognize those photographs?

19 A.    I do.

20 Q.    How do you recognize them?

21 A.    They were images that were found on the Apple iPhone 7

22 Plus.

23 Q.    Is that the iPhone that you've identified in Government's

24 Exhibit 1?

25 A.    It is.

**JA150**

NATHAN ANDERSON - DIRECT

1      MS. SPAUGH:  The government moves to admit and would
2  ask to publish Government's Exhibits 4P, 4Q, 4R, 4S, and 4T.
3      THE COURT:  They're admitted and may be published.
4      (Government's Exhibits Nos. 4P, 4Q, 4R, 4S, and 4T
5  were received into evidence.)
6  Q.   We're looking at Government's Exhibit 4P.
7      I'm going to look back at your report in Government's
8  Exhibit 4, specifically row 3 under the images section.
9      Can you tell the jury what we're looking at in row 3.
10 A.   It is the information associated with that image.
11 Q.   And where was this image saved?
12 A.   Under the notes application on the Apple iPhone 7 Plus.
13 Q.   Which note was this picture saved in?
14 A.   New note.
15 Q.   When was this picture taken?
16 A.   It was taken on September 22nd, 2018, at 1:38:58 PM.
17 Q.   And when was this picture saved to that new note?
18 A.   On September 24, 2018, at 2:58:04 PM East Coast time.
19 Q.   And what camera was used to take this picture?
20 A.   An Apple iPhone 7 Plus.
21 Q.   Now I'm going to show you Government's Exhibit 4Q.
22      And I'm going to ask you to look again at your report in
23 Government's Exhibit 4 at row 5 under the images section.
24      Can you tell the jury what we are looking at in row 5.
25 A.   The information about that image.

NATHAN ANDERSON - DIRECT

1  Q.   About the image in Government's Exhibit 4Q that you just
2  saw?
3  A.   Yes.
4  Q.   Where was this picture saved?
5  A.   Notes application on the Apple iPhone.
6  Q.   And what note?
7  A.   Under new note.
8  Q.   When was this picture taken?
9  A.   On September 22nd, 2018, at 1:38:56 PM.
10 Q.   And when was this picture saved to the note?
11 A.   On September 24, 2018, at 2:57:40 PM East Coast time.
12 Q.   I'm now going to show you Government's Exhibit 4R.
13      And I'm going to ask you to look back at your report in
14 Government's Exhibit 4 at row 4 under the images section.
15      What are we looking at in row 4?
16 A.   The information about the image:  where it was stored and
17 when it was created.
18 Q.   So this is the information about Government's Exhibit 4R?
19 A.   Yes, it is.
20 Q.   Where was this picture saved?
21 A.   In the notes application of the Apple iPhone.
22 Q.   Which note was this saved in?
23 A.   The new note.
24 Q.   When was this picture taken?
25 A.   It was taken on September 22nd, 2018, at 12:13:00 PM.

**JA152**

96

NATHAN ANDERSON - DIRECT

1  Q.   When was this picture saved to the new note?

2  A.   On September 24, 2018, at 3:06:17 PM East Coast time.

3  Q.   And I'm going to show you Government's Exhibit 4S.

4       Then I'm going to ask you to again look at your report in

5  Government's Exhibit 4 at image number 6.

6       Tell the jury what is in row 6 under images.

7  A.   It's the information about the image.

8  Q.   The image in Government's Exhibit 4S?

9  A.   Yes.

10  Q.   Where was this picture saved on the iPhone?

11  A.   The notes application.

12  Q.   Which note was this saved to?

13  A.   New note.

14  Q.   When was this picture taken?

15  A.   It was taken on September 22nd, 2018, at 12:13:11 PM.

16  Q.   And when was this picture saved to the new note?

17  A.   On September 24, 2018, at 3:05:46 PM East Coast time.

18  Q.   Now I'm going to show you Government's Exhibit 4T.

19       I'm going to ask you to look back at your report in

20  Government's Exhibit 4 under image number 1.

21       Can you tell the jury what information is in row 1.

22  A.   It's the information about that image.

23  Q.   And when you say "that image," are you referring to

24  Government's Exhibit 4T?

25  A.   Yes.

**JA153**

NATHAN ANDERSON - DIRECT

1  Q.   Where was this picture saved on the defendant's iPhone?

2  A.   The notes application.

3  Q.   Which note was it saved to?

4  A.   New note.

5  Q.   And when was this picture taken?

6  A.   The taken information didn't get captured on the meta

7  data, but the created data when it was moved into the notes

8  section is present.

9  Q.   And what date was that?

10  A.   September 24, 2018, at 3:17:05 PM East Coast time.

11  Q.   So is that the date that that picture was saved to the

12  new note?

13  A.   Yes.

14  Q.   Did you know who the person was in the hammock video when

15  you found it?

16  A.   No.

17  Q.   Did you find any pictures taken on the same day as the

18  hammock video aside from these that we've looked at?

19  A.   Yes.

20  Q.   I'm going to show you what has been marked as

21  Government's Exhibit 40.  Do you recognize this picture?

22  A.   I do.

23  Q.   How do you recognize it?

24  A.   It was an image that was located on the Apple iPhone 7

25  Plus that I examined.

NATHAN ANDERSON - DIRECT

1  Q.   So when you say "iPhone," are you talking about the
2  iPhone in Government's Exhibit 1?
3  A.   Yes.
4        MS. SPAUGH:  The government moves to admit and would
5  ask to publish Government's Exhibit 40.
6        THE COURT:  It's admitted.  It may be published.
7        (Government's Exhibit Number 40 was received into
8  evidence.)
9  Q.   Now I'm going to ask you to look back at your report in
10  Government's Exhibit 4 and specifically at row 16 under the
11  images section.
12       Is the information in row 16 related to the picture we
13  just looked at in Government's Exhibit 40?
14  A.   Yes, it is.
15  Q.   Where was that picture saved on the phone?
16  A.   In the standard gallery section of the device.
17  Q.   Is that the default saving place?
18  A.   Yes, it is.
19  Q.   When was this picture taken?
20  A.   It was taken on September 22nd, 2018, at 9:55:48 AM East
21  Coast time.
22  Q.   And so this picture was not saved with those other
23  hammock videos and pictures we looked at.
24  A.   That's correct.
25  Q.   I'm going to ask you to go to the video section of

**JA155**

NATHAN ANDERSON - DIRECT

1  Government's Exhibit 4 on page 9 and look at the row number 4.
2      Does the video in this row have any relation to that
3  picture we just looked at?
4  A.   Yes, it does.
5  Q.   What is that?
6  A.   It is essentially the same file taken at the same time.
7  Q.   Why is that?
8  A.   So Apple has created a feature on their camera that when
9  you take a picture, you have a choice of taking what's known
10  as a live photo.  That live photo is a feature that it
11  captures up to a second of that image just before and right
12  after that image is taken.
13      So the image was taken using the live feature which
14  generated not only an image file but also a movie file because
15  it's one second long.
16  Q.   And when was this video file image taken?
17  A.   It was taken on September 22nd, 2018, at 9:55:48 AM East
18  Coast time.
19  Q.   And where was that saved on the phone?
20  A.   In the gallery table or application on the device.
21  Q.   What device was used to create it?
22  A.   An Apple iPhone 7 Plus.
23  Q.   With what software?
24  A.   11.4.1.
25  Q.   And so this live picture or video is not saved in the new

**JA156**

NATHAN ANDERSON - DIRECT

1  notes.

2  A.    That's correct.

3  Q.    Did you examine the searched items on the defendant's

4  iPhone?

5  A.    I did.

6  Q.    What are searched items?

7  A.    Searched items are essentially various applications,

8  Safari, social media like Twitter, Facebook, Instagram,

9  wherever, to -- you go in and type certain terms, whatever it

10 may be, to see what results you can get.

11 Q.    So are searched items user-generated?

12 A.    Yes, they are.

13 Q.    And so are you telling the jury that when you do a search

14 on your iPhone, that information is saved to the phone?

15 A.    Yes, it can be.

16 Q.    Did you generate a report related to some of the searched

17 items you found on the defendant's iPhone?

18 A.    Yes, I did.

19 Q.    I'm going to show you what's been marked as Government's

20 Exhibit 5.  I'm going to show you page 1 and page 2.

21       Do you recognize this document?

22 A.    I do.

23 Q.    What do you recognize it to be?

24 A.    It is the specific report that I made through Cellebrite

25 focusing solely on various search terms that I located during

NATHAN ANDERSON - DIRECT

1    my examination of the device.

2    Q.    And did the information contained in this report come

3    from the defendant's iPhone that you examined?

4    A.    Yes, it did.

5            MS. SPAUGH:   The government moves to admit and

6    publish Government's Exhibit 5.

7            THE COURT:   Admitted.  It may be published.

8            (Government's Exhibit Number 5 was received into

9    evidence.)

10   Q.    I'm going to ask you to look at page 2 under the searched

11   items section at the end of your report.

12       Can you explain the searched items section to the jury.

13   A.    It's essentially some of the items that were located that

14   would have been of interest to the investigators in this

15   matter.

16   Q.    And can you explain the meaning of the columns.

17   A.    So you have time stamp of if the data was collected -- if

18   the phone recorded and still had the data associated when it

19   was searched, the date and time.  And you have the source,

20   meaning where the individual conducted the search at; in this

21   case Safari and Twitter.  Then the value is actually the

22   search term itself.  It's the string of characters that they

23   put together that the phone saw that an individual put in to

24   Safari or Twitter to look for.

25   Q.    And so can you explain the search in row 1 to the jury.

NATHAN ANDERSON - DIRECT

1  A.    So number 1, the search was conducted on May 20, 2017, at
2  23:08 East Coast time utilizing Safari, and the search was
3  "selfies boy oh boy."
4  Q.    What is Safari?
5  A.    Safari is the default web browser for Apple mobile
6  devices, on iPhones and their iPads.
7  Q.    Can you explain row 2 under the searched items.
8  A.    Row 2 was collected -- the search was collected on
9  May 20, 2017, at the same time; and it was just a duplicate
10 copy of "selfies boy oh boy."
11 Q.    Can you explain row 3 to the jury.
12 A.    It was another search for "selfies boy oh boy" on May 20,
13 2017, at 23:07 East Coast time.
14 Q.    And that was also on Safari?
15 A.    It was.
16 Q.    An can you explain row 4 to the jury.
17 A.    Row 4 was a search that was conducted via Twitter for
18 "NAMBLA."
19 Q.    Are you familiar with what NAMBLA stands for?
20 A.    I am.
21 Q.    What is that?
22        MR. FREEDMAN:  Objection.
23        THE COURT:  Overruled.
24        THE WITNESS:  North American Man Boy Love
25 Association.

**JA159**

NATHAN ANDERSON - DIRECT

1  Q.    Can you explain row 5 to the jury.

2  A.    Row 5 is another search that was conducted via Safari for

3  "selfies boy."

4  Q.    Can you explain row 6.

5  A.    It was another Safari search searching for the term

6  "selfies boy masterbating."

7  Q.    Can you explain row 7.

8  A.    A Safari search for "selfies boy oh bot."

9  Q.    And can you explain row 8.

10 A.    It's another Safari internet search for "selfies boy oh

11 boy."

12 Q.    And it looks as though row 4 says the search was on

13 Twitter --

14 A.    Yes.

15 Q.    -- is that correct?

16 A.    That's correct.

17 Q.    What does that mean?

18 A.    The individual utilized Twitter to conduct a search for

19 "NAMBLA."

20 Q.    What did you do with these images and videos after you

21 found them?

22 A.    So once I was done with locating them, I bookmarked them

23 and I generated a report that I then put on a disk or USB

24 drive and transferred it to the Wilkes County Sheriff's

25 Office.

NATHAN ANDERSON - CROSS

1  Q.   Why did you give them this information?

2  A.   It's evidence.  It's contraband.  It's child sexual abuse

3  material.  It's information related to their investigation

4  they called me about, so it was evidence that I maintained as

5  evidence on to another device so they could have to look at as

6  needed during the course of their investigation.

7  Q.   Did you want to help them find out who were in those

8  videos and pictures you saw?

9  A.   Yes, I did.

10            MS. SPAUGH:  If I could have one moment, Your Honor?

11            THE COURT:  Yes.

12            (Government counsel conferred.)

13            MS. SPAUGH:  I have no further questions.

14            THE COURT:  You may cross examine.

15                     CROSS EXAMINATION

16  BY MR. FREEDMAN:

17  Q.   Agent Anderson, going back to Government's Exhibit Number

18  5, searched items.

19  A.   Yes.

20  Q.   You went through the entire phone looking for any

21  searched items of interest to you; is that correct?

22  A.   So Cellebrite will populate -- if there are search terms

23  that are collected, it will grab it and put it all in one

24  section known as searched items, yes.

25  Q.   In each of those searched items I believe it showed that

NATHAN ANDERSON - CROSS

1  they were deleted.

2  A.    Yes, sir.

3  Q.    But you explained -- and if something is deleted, is that

4  still accessible to the individual who has deleted them from

5  their phone?

6  A.    No, sir.

7  Q.    Without --

8  A.    Sometimes.

9  Q.    Without the assistance of something like Cellebrite.

10  A.    It depends on what we're searching for that could have

11  been deleted.  So images and videos can still be accessed for

12  an extended period of time based on the Apple operating

13  system.  It will be pushed into a recently deleted folder

14  category within the gallery itself.  So those files can at

15  times be viewed for a certain period of time once they have

16  been deleted.

17       Searched terms, it depends how often they're searching it

18  in Safari.  So Safari a lot of times will do -- you can use

19  Safari but still Google.  And Google, if you type it in enough

20  times, like selfies boy oh boy, it could repopulate because

21  it's a term you've used numerous times in a search.

22  Q.    Let me make sure.  Whoever deleted those -- the person

23  who had the phone and deleted those items, could they then go

24  still view those items after they deleted them without the use

25  of something -- some sort of extraction device?

NATHAN ANDERSON - CROSS

1  A.   Again, it depends on what is being searched that has been
2  deleted.  So if it's an image, the image is still readily
3  available in a recently deleted for a period of time,
4  typically 30 days, and then the iPhone operating system will
5  delete it and then you can't -- correct, then at that point
6  you cannot retrieve it.
7  Q.   But you can still -- as you did, you can still retrieve
8  it through an extraction device.
9  A.   Yes, sir, that's correct.
10 Q.   The amount of -- the items -- the eight items that were
11 just testified to in Government's Exhibit Number 5, that was
12 the sole extent of searched items of interest that extraction
13 device found; is that correct?
14 A.   We're talking about the searched items -- I just want to
15 make sure I understand.
16 Q.   I'm talking about the searched items.
17          MR. FREEDMAN:  Could you put up page 2 of
18 Government's Exhibit Number 5 for me.
19 Q.   So these searched items that are here that are
20 highlighted, that was the sole extent of searched items of
21 interest that the Cellebrite extraction found, correct?
22 A.   Those are the sole items of interest that upon reviewing
23 said searched items were of interest to the investigation.
24 Q.   And it appears as if there's a time stamp for the first
25 three and all those were from May 20, 2017.

NATHAN ANDERSON - CROSS

1  A.   Yes, sir, that's correct.

2  Q.   And you didn't do your extraction until sometime August,

3  September of 2019; is that correct?

4  A.   August 31st of 2019, yes, sir.

5  Q.   And you did some follow-up on September 4th; is that

6  right?

7  A.   Yes, sir.

8  Q.   So even though they were deleted, they were still

9  available for you to detect some two years later.

10  A.   Yes, sir.

11  Q.   And you don't have -- but it doesn't reflect what dates 4

12  through 8 were in terms of when they were time stamped.

13  A.   Yes, sir, that's correct.

14  Q.   Additionally, other than the photographs you've testified

15  to and the videos you've testified to, you didn't find any

16  photographs or video of any -- photographs of interest.

17  A.   Correct.

18  Q.   So if there had been downloaded photographs that were

19  deleted, the Cellebrite extraction still could have found

20  them.

21  A.   Can you clarify the downloaded videos or pictures of

22  interest.  I don't think I understand.

23  Q.   Videos -- there would -- you investigate child

24  pornography.

25  A.   Yes, sir.

**JA164**

NATHAN ANDERSON - CROSS

1  Q.    So if there were videos of child pornography --
2  A.    Yes, sir.
3  Q.    -- that had been downloaded and deleted, say, on
4  May 20th, 2017 --
5  A.    Yes, sir.
6  Q.    -- when those searched items came up, the Cellebrite
7  extraction could still find those photographs.
8  A.    Yes, sir.  I did not locate any additional deleted images
9  of that nature.
10 Q.    Or videos.
11 A.    Yes, sir, that's correct.
12 Q.    And you were looking for that.
13 A.    Yes, sir, I was.
14 Q.    And clearly we know that even though things were deleted
15 some two years before, that was still capable of being
16 discovered by the Cellebrite extraction.
17 A.    Yes, sir, that's correct.
18 Q.    You keep talking about -- well, strike that.
19       During your testimony you said that the videos and
20 pictures were taken by an iPhone 7 Plus.
21 A.    Yes.
22 Q.    Are you saying you're able to identify that this phone
23 was the one that took the videos and pictures?
24 A.    Yes, sir.
25 Q.    You can identify that.

NATHAN ANDERSON - CROSS

1   A.   That phone generated these images and videos, yes, sir.

2   Q.   And you can tell that through the meta data that you

3   downloaded.

4   A.   That's correct.

5   Q.   You can also tell from the meta data that you downloaded

6   when the photographs, I believe, were saved in notes.

7   A.   Yes, sir.

8   Q.   And when some of those videos were deleted.

9   A.   Yes, sir.

10  Q.   Is that correct?

11  A.   Yes, sir.

12  Q.   But you can't tell the date of when they were deleted.

13  A.   That's correct.

14  Q.   And you can also tell when they were accessed.

15  A.   Yes, that's correct.

16  Q.   So in each of these instances -- can you tell the amount

17  of times the photos were accessed?

18  A.   No, I cannot.

19  Q.   There's nothing in the meta data that would indicate

20  whether the photographs were accessed beyond the time they

21  were shifted into the notes.

22  A.   So each time a file -- like an image or video is

23  accessed, you have those three categories:  created, modified,

24  accessed.  So modified is the outlier that we can't put a lot

25  of stock into, well, what caused it to be modified.  But

**JA166**

NATHAN ANDERSON - CROSS

1  created and accessed is consistent.  Created is when it was
2  generated in that area, that application or on the phone.  And
3  then the accessed, whenever it's accessed, that access time
4  updates to the newest.  So we can't go back and see how many
5  times it was accessed.  It's just when it was accessed the
6  most recent time.
7  Q.   Right.  So when you went through the accessed dates for
8  the jury, that would be the most recent time the photo was
9  accessed; is that correct?
10  A.   When that file was accessed, yes, sir.
11  Q.   You couldn't tell between when it was created and when it
12  was accessed how many times it may have been viewed, but you
13  can tell when it was not viewed from the time that it was --
14  from the last date of access.
15  A.   That would be correct.  The access time is repopulated or
16  it's refreshed.  So if the accessed date and time is
17  different, it will show the most recent time it was accessed
18  Q.   So for example -- so if you could go to Government's
19  Exhibit Number 3, page 3.
20       So in there, if we go to the -- if we go to the first
21  video -- no, let's go down to number 2, row 2.
22       In that case you can tell the video was -- the picture
23  was created -- the captured time was August 4, 2019, at
24  24:54:13; is that correct?
25  A.   At 2:54:13 PM, yes, sir.

NATHAN ANDERSON - CROSS

1  Q.   And then in the note application, it was created on
2  3:14:23; is that correct?  The same day.
3  A.   Yes, sir, that's correct.
4  Q.   And it was modified 3:14:23 on the same day?
5  A.   Yes, sir.
6  Q.   And then it was accessed 3:14:23 on the same day,
7  correct?
8  A.   Yes, sir.
9  Q.   So that would have been the last time that was accessed.
10  A.   Yes, sir.
11  Q.   And that would be true for Government's Exhibits 3 and 4,
12  that each of the access dates would have been the only time --
13  would have been the most recent time it was accessed.
14  A.   Based on the report, if I saw it, I could verify that,
15  yes, sir.
16  Q.   I believe you also had in Government's Exhibit Number 3
17  that the video -- this is the video of the child in the woods.
18  That was -- I don't need it up, but I appreciate it.
19       That video was deleted.
20  A.   It was deleted, yes.  Deleted from the notes, yes, sir.
21  Q.   Was it present anywhere -- when you got it, was it
22  present anywhere on the phone that could be obtained without
23  the use of an extraction device?
24  A.   The video of the young man in the green shirt, black
25  shorts in the woods, yes, sir.  It was in the secret

NATHAN ANDERSON - CROSS

1  calculator that was still on the phone.

2  Q.   Okay.  So you did not need -- you did not need the

3  extraction device for that video.

4  A.   That is correct.

5  Q.   Could you tell when that had been accessed most recently?

6  A.   Without seeing it I could not.

7  Q.   And the video of the boy on the sofa, that was deleted as

8  well.

9  A.   Out of notes, yes, sir.

10  Q.   And that was not in the calculator app; is that correct?

11  A.   That's correct.

12  Q.   Now, you are -- it also had -- when a picture is created,

13  it also shows the latitude and longitude of where the picture

14  was taken; is that correct?

15  A.   In this instance, yes.

16  Q.   In this instance.

17  A.   Because the geolocation services were turned on on his

18  device.  There were thousands upon thousands of location data

19  collected from this device.  So location services or his GPS

20  was turned on for almost every aspect of this device.

21  Q.   Let me ask you, when the GPS is turned on, does that

22  actually track an individual when they're not utilizing some

23  portion of the phone at that time?

24  A.   From my experience that, yes, your applications are -- if

25  the phone is on and stuff is running, GPS could be grabbing

NATHAN ANDERSON - CROSS

1  your location, yes.

2  Q.   So the longitude and latitude, does that go to the

3  photograph or does that go to the phone?

4  A.   That will go to where the phone was at at the time that

5  image was created.

6        MR. FREEDMAN:  Can I have a minute, Your Honor?

7        (Pause.)

8  BY MR. FREEDMAN:

9  Q.   You said the shipping date for this phone was March 14,

10 2017?

11 A.   I believe that's correct.

12 Q.   Do you know any reason why the phone does not -- do you

13 know any reason why you can't determine when an item is

14 deleted from the phone?

15 A.   I'm sorry, can you repeat that.

16 Q.   I mean, the phone seems to have -- you know, can tell you

17 when it's created, whether it's accessed, when it's modified,

18 when it's moved, when it's done anything else.  Do you know

19 why the phone can't tell you when an item is deleted?

20 A.   No.  And the same thing with computers.  When a file is

21 deleted, the deletion time is not typically collected.  The

22 difference is in the process between a computer and a phone,

23 though, you have a recycle bin on a computer where it can grab

24 some of that data when it's moved to the recycle bin.  But the

25 way a cell phone works is this process called wear leveling,

NATHAN ANDERSON - CROSS

1  meaning it's always moving up and down and trying to figure
2  out where to place stuff.  So in order to do that efficiently
3  and effectively, it's not going to grab deletion dates and
4  times because it's just not needed for the phone.  The phone
5  doesn't -- Androids and iPhones do not collect deletion times
6  upon a file being deleted.
7  Q.   And you're also aware with iPhone 7 Pluses that you can
8  get a -- it's password protected.
9  A.   The iPhones are password protected.
10 Q.   And you can also utilize technology of having
11 fingerprints to access the phone.
12 A.   Yes, that's correct.
13 Q.   Do you know how many fingerprints -- how many different
14 fingerprints can access a phone?
15 A.   I think the standard you can put is three, three to five.
16 Q.   And obviously -- so you can tell all this stuff about the
17 phone itself, but you can't tell who actually was operating
18 the phone at that time.
19 A.   As far as who's operating the phone, the -- the phone
20 would appear to be Mr. Hoover's device, and who's using that
21 device is -- at that specific time I do not know 100 percent.
22       MR. FREEDMAN:  Thank you very much.  I have no
23 further questions.
24       THE COURT:  Redirect.
25       MS. SPAUGH:  Can I have one moment, Your Honor?

NATHAN ANDERSON - REDIRECT

1          (Government counsel conferred.)
2                    REDIRECT EXAMINATION
3    BY MS. SPAUGH:
4    Q.   Special Agent Anderson, you were talking about
5    overwriting and deletion.  Is deleted information on a phone
6    sometimes overwritten?
7    A.   Yes, it is.
8    Q.   And so is it possible that Cellebrite doesn't pull every
9    single deleted item from a phone?
10   A.   That is correct.
11             MS. SPAUGH:  I have no further questions.
12             THE COURT:  Thank you, Agent.  You may stand down.
13             MR. FREEDMAN:  It was able to pull deleted items
14   from the phone from back in 2017.
15             THE COURT:  No, Mr. Freedman, we don't usually do
16   recross.
17             MR. FREEDMAN:  I apologize, Your Honor.
18             THE COURT:  That's fine.
19             You may stand down.
20             (Witness stepped down.)
21             THE COURT:  Can you forecast how long the direct
22   examination of your next witness will take?
23             MS. RANDALL:  Your Honor, I would guess probably
24   approximately 30 to 40 minutes.
25             THE COURT:  All right.  Please call your next

M.C. - DIRECT

 1  witness.  The reason I say that is lunch isn't here yet.

 2              MS. RANDALL:  Your Honor, the government will call

 3  M.C.

 4              M.C., GOVERNMENT WITNESS, SWORN,

 5                   DIRECT EXAMINATION

 6  BY MS. RANDALL:

 7  Q.   Hi.  Can you tell the jurors your first name.

 8  A.   M.C.

 9  Q.   And how do you spell that?

10  A.   X-X-X-X-X-X-X.

11  Q.   And how old are you, M.C.?

12  A.   Fourteen.

13  Q.   When is your birthday?

14  A.   XXXXXXX XX.

15  Q.   And what year were you born in?

16  A.   2006.

17  Q.   And what grade are you currently in?

18  A.   Eighth.

19  Q.   And can you tell us what county you live in.

20  A.   Burnsville.

21  Q.   You live in Burnsville.  Okay.  And have you always lived

22  there?

23  A.   Yes.

24  Q.   And is that in Yancey County?

25  A.   Yes, ma'am.

M.C. - DIRECT

1  Q.    I want to talk to you a little bit about someone named
2  Michael Scott Hoover.  Do you know who that is?
3  A.    Yes, ma'am.
4  Q.    How do you know him?
5  A.    It's XX XXX XXXXXXXX XXXXXXXX, XXXX, XXXXXXX.
6  Q.    Okay.  So at some point your XXX XXX XXXXXX XX X XXX XXX
7  XXX XXX XXXXXXXX XXXXXX.
8  A.    Yes.
9  Q.    Would that be correct?
10        And so how long was your XXX XXXXXXX XX XXX
11  XXXXXXXXXXXXXX?
12  A.    Probably five or six years.
13  Q.    And do you remember about how old you were about that
14  time?
15  A.    Six or seven when they first got together.
16  Q.    And at that time you said you knew Michael Scott Hoover
17  through your XXXXXX XXXXXXX.
18  A.    Yes, ma'am.
19  Q.    And what did you call him back then?
20  A.    XXXXX Scott.
21  Q.    And do you see the person you knew as XXXXX Scott here in
22  the courtroom today?
23  A.    Yes, ma'am.
24  Q.    And can you just tell us maybe what he's wearing, what
25  color tie.

M.C. - DIRECT

1 A.   He's wearing a white shirt, like, under his suit with a
2 blue and white, like, gray tie on.
3        MS. RANDALL:  Your Honor, if the record could
4 reflect he's identified the defendant.
5        THE COURT:  The record will so reflect.
6 Q.   So you said your mom first XXX XXXXXXXX XXXX XXXXX and
7 that you called him XXXXX Scott, correct --
8 A.   Yes.
9 Q.   -- with his XXXXXXXXXXXXXX when you were about five or
10 six years old.
11 A.   Yes, ma'am.
12 Q.   Would you see him sometimes at family events or anything
13 like that?
14 A.   Yes, ma'am.
15 Q.   What type of family events would you see him at?
16 A.   Like, going away parties, birthday parties, Christmas,
17 Thanksgiving.
18 Q.   Did he ever celebrate your birthday with you?
19 A.   Yes.
20 Q.   How often would you say you saw him?
21 A.   Probably a few times a year.
22 Q.   And did you ever stay over at his house?
23 A.   Yes, ma'am.
24 Q.   And was that in Wilkes County?
25 A.   Yes, ma'am.

M.C. - DIRECT

1  Q.  During the time you knew Scott, did he move at some
2  point?
3  A.  Yes, ma'am.
4  Q.  Did you visit him at both houses?
5  A.  Yes.
6  Q.  Did anything ever happen with Scott at his house that
7  made you uncomfortable?
8  A.  Yes.
9           MR. FREEDMAN:  Objection.
10          THE COURT:  Overruled.
11          Are we going to get into subject matter beyond that
12  which has been charged in the indictment?
13          MS. RANDALL:  Yes, Your Honor.  We're going to start
14  with some 414 evidence at this time.
15          THE COURT:  Members of the jury, you're about to
16  hear evidence that the defendant engaged in conduct other than
17  what is specifically charged in the indictment.  In a criminal
18  case in which the defendant is accused of sexual exploitation
19  of a minor or possession of child pornography, evidence of the
20  defendant's commission of another offense or offenses of child
21  molestation is admissible and may be considered for its
22  bearing on whether the defendant committed the offense for
23  which he is charged in this indictment.  However, evidence of
24  another offense on its own is not sufficient to prove the
25  defendant guilty of the crimes charged in the indictment.

M.C. - DIRECT

1    As you consider this evidence, bear in mind at all
2 times that the government has the burden of proving that the
3 defendant committed each of the elements of the offense in the
4 indictment.  And I remind you that the defendant is not on
5 trial for any act, conduct, or offense not charged in the
6 indictment.
7    MS. RANDALL:  Thank you, Your Honor.
8 BY MS. RANDALL:
9 Q.  So when you said that Scott had done something that made
10 you feel uncomfortable, was that at his old house?
11 A.  Yes.
12 Q.  And can you tell us about what happened that made you
13 feel uncomfortable.
14 A.  So I was in his daughter's bedroom.  We were, like --
15 that night we fell asleep in her bed.  And I woke up with him
16 between us, like, all close to me and he had his penis out
17 right beside me.
18 Q.  And when you say "he," you're talking about Scott?
19 A.  Yes, ma'am.
20 Q.  And what did you see him do after you realized he was
21 laying in bed next to you?
22 A.  He had his hand on his penis.
23 Q.  And was he moving his hand?
24 A.  Yes, ma'am.
25 Q.  And did he do anything after that?

M.C. - DIRECT

1  A.   He was telling me to look at it.

2  Q.   And did you look at it?

3  A.   Yes, ma'am.

4  Q.   And what happened next?

5  A.   He was -- started to grab mine and I was trying to turn

6  over.

7  Q.   When you say he was trying to grab yours, what are you

8  talking about?

9  A.   My penis.

10 Q.   Were you wearing clothes at the time?

11 A.   Yes, ma'am.

12 Q.   Was he trying to grab you over or under your clothes?

13 A.   Over.

14 Q.   And was he able to actually touch your penis?

15 A.   No, ma'am.

16 Q.   And how was he not able to do that?

17 A.   Because I kept my pants up.

18 Q.   Did you have to do anything to try to keep your pants up?

19 A.   I just held them.

20 Q.   And why did you do that?

21 A.   So he couldn't get inside -- like, under my underwear and

22 shorts.

23 Q.   Was he trying to do that?

24 A.   Yes, ma'am.

25 Q.   Did you say anything at the time?

M.C. - DIRECT

1  A.   I told him to please stop.

2  Q.   And so after -- you said you rolled over at one point; is

3  that correct?

4  A.   Yes, ma'am.

5  Q.   Was he ever able to get his hands in your pants?

6  A.   No.

7  Q.   Was he able to touch you on the outside of your pants

8  though?

9  A.   Yes.

10 Q.   And where did he touch you on the outside of your pants?

11 A.   He just, like, barely got my penis.

12 Q.   And after you rolled over, what happened next?

13 A.   He got up and left, went out of the room.

14 Q.   He got up and left, is that what you said?

15 A.   Yes, ma'am.

16 Q.   Did you get up and leave at some point too?

17 A.   The next morning when we got up, that's when I got up.

18 Q.   And did you have any conversation with Scott about it the

19 next day?

20 A.   No.

21 Q.   Did he say anything to you about it?

22 A.   No.

23 Q.   Did anything else happen at that old house that you

24 remember that made you feel uncomfortable?

25 A.   No.

**JA179**

123

M.C. - DIRECT

1   Q.   At some point you said he moved to a new house?

2   A.   Yes, ma'am.

3   Q.   And you visited him at the new house?

4   A.   Yes, ma'am.

5   Q.   And was there a weekend that you went to his house where

6   you had a baseball tournament?

7   A.   Yes.

8              MR. FREEDMAN:  Objection.

9              THE COURT:  Overruled.

10  Q.   And do you remember who was with you at his house at that

11  time?

12  A.   It was me, my old stepdad, my mom, and my sister, my

13  little sister, and Scott, his wife, and his daughter and son.

14  Q.   And did Scott go watch you play baseball that weekend?

15  A.   Yes.

16  Q.   At some point did you end up alone in a car with him?

17  A.   Yes.

18  Q.   And did anything happen in the car that made you feel

19  uncomfortable?

20  A.   Yes.

21  Q.   Can you tell us about that.

22  A.   So I was -- we were on our way back home.  I was wanting

23  to vape and he said the only way that I could get it was if I

24  showed him my penis.

25  Q.   And can you just explain to us what a vape is.

**JA180**

M.C. - DIRECT

1  A.   It's, like -- it was, like, a device that has nicotine in
2  it and it just, like -- smoke comes out after you hit it or
3  whatever.
4  Q.   And do you have to be a certain age to buy that?
5  A.   Yes.
6  Q.   So you couldn't buy it for yourself?
7  A.   Yes.
8  Q.   So he said if you wanted one you needed to show your
9  penis?
10 A.   Yes.
11 Q.   And it was just the two of you in the car?
12 A.   Yes.
13 Q.   And what did you do at that point?
14 A.   I showed him my penis.
15 Q.   And what did he do when you showed him your penis?
16 A.   He went in the gas station and bought the vape for me.
17 Q.   Did he say anything to you while you were showing your
18 penis or do anything with his hands?
19 A.   No.
20 Q.   After -- when you were at his house, were you ever alone
21 with Scott?
22 A.   No -- yes.
23 Q.   Were you alone in the house or outside the house with
24 him?
25 A.   Outside the house.

M.C. - DIRECT

1  Q.   Where were you alone outside the house with Scott?

2  A.   He took me to visit his ponds below his house.

3  Q.   And how did you get to the pond?

4  A.   On a four wheeler.

5  Q.   And who all went to see the pond that time?

6  A.   Just me and him.

7  Q.   And when you got to the pond, what did you guys do?

8  A.   We got off the four wheeler and he was just showing me,

9  like, the creek, the pond, and then the woods.  And then he

10  whipped out his penis to take a pee and then started rubbing

11  his hand all over his penis.

12  Q.   So the defendant was masturbating in front of you, is

13  that what you're saying?

14  A.   Yes, ma'am.

15  Q.   Did he say anything to you while he was doing it?

16  A.   No.

17  Q.   At some point did he ask you about your penis?

18  A.   Yes.

19  Q.   What did he ask you about your penis?

20  A.   To pull it out so he could see it.

21  Q.   And what did you say?

22  A.   I said no.

23  Q.   Did he tell you why he wanted to see it?

24  A.   To see if it had got any bigger.

25  Q.   He wanted to know if it got bigger?

126

M.C. - DIRECT

1   A.   Yes.

2   Q.   And you said no?

3   A.   Yes, ma'am.

4   Q.   So then what happened?

5   A.   Then he just kept asking and asking me.

6   Q.   And did you keep saying no or did something different

7   happen?

8   A.   I kept saying no.

9   Q.   And then what happened?

10  A.   He just asked me again and I just did because I was

11  getting pressured and I did it.  And then he came over there

12  and put his mouth on my penis.

13  Q.   And this was all done while you were next to the pond?

14  A.   Yes.

15  Q.   Was his penis still exposed at the time?

16  A.   No, ma'am.

17  Q.   So he had masturbated, pulled his pants up and then asked

18  you if he could see your penis repeatedly?

19  A.   Yes.

20  Q.   And at some point you did show him your penis?

21  A.   Yes.

22  Q.   And you said that he walked over to you and put his mouth

23  on your penis?

24  A.   Yes.

25  Q.   For how long did he touch your penis with his mouth?

127

M.C. - DIRECT

1  A.   Probably two or three minutes.

2  Q.   And did he tell you anything about what he was doing?

3  A.   Yes.  He asked me if it felt good.

4  Q.   And what did you say?

5  A.   I said, "I don't know."

6  Q.   And did he tell you about anything that would happen if

7  he kept doing it or if other people did anything to your

8  penis?

9  A.   No.

10 Q.   And at some point did he stop?

11 A.   Yes.

12 Q.   And what made him stop?

13 A.   I told him I was done and I pulled my pants up.

14 Q.   And were you able to return to the house after that --

15 A.   Yes.

16 Q.   -- and be with your family?

17      When you knew Scott did he have a phone?

18 A.   Yes.

19 Q.   Do you remember what kind of phone it was?

20 A.   It was, like, an iPhone 8 or up.  Like, an 8 through an

21 X, or one of those.

22 Q.   Did he show you the phone?

23 A.   Yes.

24 Q.   Did you -- did he ever show you any kind of unusual apps

25 he may have had on the phone?

**JA184**

128

M.C. - DIRECT

1  A.    Yes.

2  Q.    What kind of app did he show you that was kind of unusual

3  to you?

4  A.    There was a calculator app that you could punch in, like,

5  a certain number and it would take him to, like, hidden

6  photos.

7  Q.    And so he showed you that app on his phone?

8  A.    Yes.

9  Q.    And did he show you how it worked?

10  A.    Yeah.

11  Q.    And did he show you -- did you see him typing a number

12  into the calculator?

13  A.    Yes.

14  Q.    And what happened when he typed that number in?

15  A.    It would take him to, like, these photos that he was

16  hiding from -- like, instead of them being in the regular

17  camera roll, he'd have them in that.

18  Q.    And did he tell you what kind of pictures he would put

19  inside this app?

20  A.    No.  He just said they were, like, bad pictures and I

21  couldn't see them at the time.

22  Q.    That they were bad pictures you couldn't see?

23  A.    Yes.

24  Q.    Did you ever go hiking with Scott?

25  A.    Yes, ma'am.

**JA185**

129

M.C. - DIRECT

1  Q.    And was there a time that you went hiking on Mount
2  Mitchell?
3  A.    Yes.
4  Q.    And is that near where you live in Yancey County?
5  A.    It's probably, like, 30 minutes away from me.
6  Q.    And who was with you when you went hiking?
7  A.    Me, Scott, his daughter Maddie, Will and his girlfriend,
8  and my XXXXXXXXXX XXXXXX.
9  Q.    Who's Will?
10  A.    His son.
11  Q.    I'm going to show you a picture that the government has
12  previously introduced as Government's Exhibit 3D.  Do you
13  recognize that picture?
14  A.    Yes, ma'am.
15  Q.    Who is in this picture?
16  A.    Scott and me.
17  Q.    And this may be obvious, but which one is you?  What are
18  you wearing?
19  A.    The Columbia PHG shirt, the green one.
20  Q.    And was this picture taken on that hiking trip?
21  A.    Yes.
22  Q.    I'm now going to show you a picture we previously looked
23  at identified as Government's Exhibit 3E.  Do you recognize
24  that picture?
25  A.    Yes.

**JA186**

M.C. - DIRECT

1  Q.    And can you tell us who is in this picture.
2  A.    The tallest one is my XXXXXXXXXX XXXXXX, the one in the
3  middle is Maddie, his daughter, and the other one is me.
4  Q.    And you were wearing this green shirt and black shorts?
5  A.    Yes.
6  Q.    At some point on the hike, did you find yourself alone
7  with Scott?
8  A.    Yes.
9  Q.    And how did that happen?
10 A.    So I had to use the bathroom and I told him that, so I
11 was going to step to the side.  And then, like, the girls and
12 Will and his girlfriend kept walking and he just stayed behind
13 and came up behind me.
14 Q.    So at that time you were alone with the defendant?
15 A.    Yes.
16 Q.    And when he approached you, what did he say to you?
17 A.    He didn't say anything.
18 Q.    Did -- so you were going to the bathroom?
19 A.    Yes.
20 Q.    And then what happened after you were done going to the
21 bathroom?
22 A.    So he came over there and I saw he had his phone out and
23 I asked him what he was doing.  And I saw that he took a video
24 and I told him to delete it, and he said he did.
25 Q.    Okay.  So what was the video of?

131

M.C. - DIRECT

1   A.   He was telling me to masturbate.

2   Q.   Okay.

3   A.   And he kept telling me and I didn't really feel like

4   doing it.  And then he told me that if I told anybody about

5   what was happening, that he could get in big trouble and I

6   could get in big trouble.

7   Q.   Okay.  So -- and all this happened off the side of the

8   hiking trail where you had gone to the bathroom?

9   A.   Yes.

10  Q.   Was him telling you to masturbate and the video, did that

11  occur before or after you went to the bathroom?

12  A.   Like, during.  Like, after the bathroom.

13  Q.   After the bathroom.

14  A.   Yeah.

15  Q.   Okay.  So you went to the bathroom and then he told you

16  to start masturbating?

17  A.   Yes.

18  Q.   And what did you say the first time he told you to do

19  that?

20  A.   "I don't feel like it."

21  Q.   And did he do anything to try and make you masturbate?

22  A.   No.

23  Q.   How did you -- how did you start masturbating?

24  A.   With my -- he just asked me and I was, like, whatever,

25  and I just started.

**JA188**

M.C. - DIRECT

1  Q.   And you said at some point you realized he had his phone
2  out.  Was that after you had already started masturbating?
3  A.   Yes.
4  Q.   And do you know, was he standing in a place where you
5  could see him when you first started masturbating?
6  A.   No.  He was, like, behind me and I wasn't really looking
7  behind me.
8  Q.   And you said at some point you saw he had his phone out
9  and you realized he was making a recording?
10 A.   Yes.
11 Q.   And did you -- when you realized he was recording, what
12 did you say?
13 A.   I said, "Why are you doing that?"
14 Q.   And did he say anything?
15 A.   He said, "I just was."  And then I told him to delete it
16 and he said he would.
17 Q.   He said he would delete it?
18 A.   Yes.
19 Q.   Would you have let him record you if you knew he was
20 doing that?
21 A.   No, ma'am.
22 Q.   Would you have masturbated in the woods at that time if
23 you knew he was going to be recording it?
24 A.   No.
25 Q.   And did he ever show you whether or not he actually

M.C. - DIRECT

1  recorded the video?

2  A.   Yes.  At the end he showed me and that's when I told him

3  to delete it.

4  Q.   After he had already finished recording it, he showed it

5  to you?

6  A.   Yes.

7  Q.   And what do you remember about seeing that video?  What

8  did it show?

9  A.   It was me in, like, slow motion doing it.

10 Q.   I'm going to just show you for a few seconds a video

11 that's previously been introduced as Government's Exhibit 3A.

12      Is that the video that Scott showed you?

13 A.   Yes, ma'am.

14 Q.   And I'm just going to move it a little bit forward so you

15 can confirm that this is the full video that you saw.

16      And that's the video that he showed you that he took.

17 And is that you in the video?

18 A.   Yes, ma'am.

19 Q.   And I'm going to show you again one more picture.  It's

20 been introduced as Government's Exhibit 3C.  Do you recognize

21 that picture?

22 A.   Yes, ma'am.

23 Q.   And who is that in that picture?

24 A.   Me.

25 Q.   And are you masturbating in that picture?

134

M.C. - CROSS

1   A.   Yes.

2   Q.   And you said that he said he was going to delete it?

3   A.   Yes, ma'am.

4   Q.   And he told you not to say anything to anybody?

5   A.   Yes.  He told me if I said anything, that he could get in

6   big trouble.

7          MS. RANDALL:  Those will be our questions, Your

8   Honor.

9          THE COURT:  You may cross examine.

10          MR. FREEDMAN:  Yes, Your Honor.

11                    CROSS EXAMINATION

12   BY MR. FREEDMAN:

13   Q.   M.C., you said that the first incident occurred at the

14   old house that Scott lived in?

15   A.   Yes, sir.

16   Q.   And that you were sleeping with -- you were in the bed

17   with his daughter sleeping?

18   A.   Yes.

19   Q.   Did she ever wake up when this went on?

20   A.   No, sir.

21   Q.   Did you ever try to wake her up?

22   A.   No, sir.

23   Q.   Did this go on just for a few minutes?

24   A.   Yes.

25   Q.   And did you tell anybody about it the next day?

**JA191**

135

M.C. - CROSS

1   A.    Yeah, I told my parents.

2   Q.    But they continued to send you over to his house?

3   A.    Yes, because my stepdad didn't believe that it was

4   actually true.

5   Q.    And then how many times a year did you say you'd go over

6   to Scott's house?

7   A.    We went to visit him, like, two or three times that year.

8   Q.    And did you -- when you went for the baseball trip you're

9   talking about, did you stay with him as well?

10  A.    Yes.  We all had to because our hotel was fully booked.

11  Q.    And you said that's when he asked you -- he wanted you to

12  show him your penis; is that right?

13  A.    Can you repeat that.

14  Q.    When you were down by the pond; is that right?

15  A.    Yes, sir.

16  Q.    He asked you to -- he asked to see your penis; is that

17  right?

18  A.    Yes, sir.

19  Q.    Did you tell your parents about that then?

20  A.    Yes.

21  Q.    And then this incident in the woods, you talked about --

22  you just -- you said that he -- you just -- he asked you to do

23  it and you -- weren't you hiking with other people at that

24  time?

25  A.    Yes.

**JA192**

M.C. - CROSS

Q.   You were hiking with your stepsister and then his
daughter.  And who else was up there?
A.    It was me, my stepsister, his daughter, his son and his
girlfriend.
Q.    Were you all camping out in the woods or were you all
just hiking?
A.    No, we just went for a quick hike.
Q.    Okay.  Is that close to where you live?
A.    Yes.
Q.    And do you know how long you were out hiking?
A.    Probably, like, half an hour or an hour or more.
Q.    And somehow the two of you just -- do you know what
happened to everybody else?
A.    I told them to keep walking; that I had to use the
bathroom, and he was behind me.
Q.    And he's never asked -- he's never asked you to do
anything to him; is that correct?
A.    Yes.
Q.    And you know about his iPhone, correct?
A.    Yes.
Q.    He let you have access to his iPhone?
A.    No.
Q.    You've never played or used his iPhone at any time?
A.    I used it once and he was right beside me.
Q.    He was right beside you?

M.C. - CROSS

1  A.    Yes.
2  Q.    And did you use it to play games?
3  A.    Yeah, I used it to play a game.
4  Q.    Do you know about how long a period of time you utilized
5  his phone?
6  A.    Probably, like, five to ten minutes.
7  Q.    He showed you -- you testified he showed you the phone
8  and told you about the calculator app.
9  A.    Yes.
10  Q.    Did he show you other things about his phone?
11  A.    No.
12  Q.    He just showed you that.
13  A.    The app, yes.
14          MR. FREEDMAN:  I've got no further questions.
15          THE COURT:  Redirect?
16          MS. RANDALL:  No, Your Honor.
17          THE COURT:  M.C., you may stand down.  Thank you.
18          (Witness stepped down.)
19          THE COURT:  All right.  Members of the jury, I'm
20  told lunch is here.  And at the end of a witness is a good
21  time to break anyway.  We have lunch brought in for you.  It
22  doesn't mean you have to eat it.  You're free to go out if you
23  want to.  You're not under quarantine.
24          But as always, do not discuss this case among
25  yourselves.  Don't discuss it with anybody else.  Don't let

138

A.P. - DIRECT

1  anyone discuss it with you.  Keep an open mind.  Form no

2  opinions.  Do no independent research.  And we'll reconvene at

3  a quarter till 2:00.  Enjoy your lunch.

4              (Jury exited the courtroom.)

5              THE COURT:  We'll be in recess until 1:45.

6              (Lunch recess at 12:45 PM.)

7  THURSDAY AFTERNOON, APRIL 22, 2021

8              (Court back in session at 1:47 PM.)

9              THE COURT:  Are we ready for the jury?

10             MS. SPAUGH:  Yes, Your Honor.  We're just trying to

11 work out the technology.

12             THE COURT:  Call the jury.

13             (Jury entered the courtroom.)

14             THE COURT:  Please call your next witness.

15             MS. SPAUGH:  Thank you, Your Honor.

16             The government calls A.P.

17               A.P., GOVERNMENT WITNESS, SWORN,

18                    DIRECT EXAMINATION

19 BY MS. SPAUGH:

20 Q.   Can you tell the jury just your first name.

21 A.   A.P.

22 Q.   Can you spell that, please.

23 A.   X-X-X-X-X.

24 Q.   And how old are you, A.P.?

25 A.   I am 19, but I'm about to be 20 next week.

**JA195**

139

A.P. - DIRECT

1  Q.   When's your birthday?

2  A.   XXXXX XX, 2001.

3  Q.   Okay.  Are you working?  Are you in school?

4  A.   I'm both.  I'm working and I'm in school.

5  Q.   What level of school are you in?

6  A.   I'm finishing my second year at the school I started when

7  I was living in Georgia and I plan on transferring somewhere

8  in the fall.

9  Q.   Are you living in North Carolina now?

10  A.   Yes.

11  Q.   What part of North Carolina?

12  A.   We just moved to Rural Hall.

13  Q.   And have you always lived in Rural Hall?

14  A.   No.  We just moved a couple days ago, actually.

15  Q.   Oh, okay.  Where did you live before Rural Hall?

16  A.   We were living in Mount Airy.  We came back up here from

17  Georgia back around Christmas, so we were living there in a

18  rental house for a little while searching for a place.

19  Q.   And where did you live before Georgia?

20  A.   Before I went to Georgia, I was living in Winston-Salem,

21  the Walkertown and Kernersville area.  Born and raised here.

22  Q.   I want to talk to you today about somebody named Michael

23  Scott Hoover.  Do you know him?

24  A.   Yes.

25  Q.   How do you know him?

**JA196**

A.P. - DIRECT

1  A.    He was a XXXXXX XXXXXX.  XX XXXXX XXXXX XXXXXX, XXX
2  XXXXXXX.
3  Q.    What did you call him?
4  A.    I always saw him as, like, XX XXXXX.  I just called him
5  Scott, but I saw him as XX XXXXX.
6  Q.    Do you see Scott in the courtroom today?
7  A.    I do.
8  Q.    Can you describe where he's sitting and what he's
9  wearing.
10  A.    He's wearing a suit and plaid tie, blue plaid tie,
11  sitting diagonally from me.
12        MS. SPAUGH:  Your Honor, we'd ask that the record
13  reflect the witness identified the defendant.
14        THE COURT:  The record will so reflect.
15  Q.    A.P., how old were you when you first remember seeing the
16  defendant?
17  A.    First time I don't know.  I was younger.  But I do
18  remember the first time I actually initially met him.  I was
19  about 14, 15 years old.
20  Q.    Where would you see him?  What kind of places?
21  A.    Either at family events usually.  Sometimes birthday
22  parties.  It just depends.
23  Q.    Did you ever see him at your birthday?
24  A.    No.
25  Q.    How often would you see him would you say?

141

A.P. - DIRECT

1  A.    Not often.

2  Q.    Did you ever go visit the defendant?

3  A.    When I was younger, no.

4  Q.    Once you -- once you turned, like, 14 or 15, did you

5  start visiting him?

6  A.    Oh, yeah.

7  Q.    Where would you visit?

8  A.    Usually it was at his house.

9  Q.    Where was his house?

10  A.    Wilkesboro.

11  Q.    In Wilkes County?

12  A.    Yes.

13  Q.    Where would you stay when you visited?

14  A.    At his house.  It just -- usually it was on the couch.

15  That's where I would usually sleep at.  If not, sometimes I

16  would sleep in a bedroom.

17  Q.    Can you tell us who else lived with him.

18  A.    His wife, Misty, and then his two children, Will and

19  Maddie.

20  Q.    How old are they compared to how old you are?

21  A.    Will is only, like, a year younger than I am.  And then

22  Maddie is about four or five years younger than me.

23  Q.    Did Scott always live in that same house?

24  A.    I'm not sure.

25  Q.    And you said your first memory was about when you were 14

**JA198**

A.P. - DIRECT

1  or 15 seeing him?

2  A.    Yeah.

3  Q.    What's your first memory?

4  A.    We had met them after doing a Color Run.  We ran with

5  them and we did -- we just did that Color Run and we -- I

6  remember just going somewhere to eat afterwards.  Initially we

7  talked about going hiking and doing stuff.

8  Q.    Did there come a time when he began to make you

9  uncomfortable?

10  A.    At the start, no.  But after I started going up there and

11  going hiking, it became -- there's some times where I was very

12  uncomfortable.

13  Q.    Can you tell the jury about the first time you remember

14  Scott making you feel uncomfortable.

15          MR. FREEDMAN:  Objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  I remember once we were driving in a

18  pickup truck and he put his hand on my thigh and he would talk

19  to me in a sexual way, saying, "Oh, baby," and stuff like

20  that.  And I thought it was a joke at first, but I didn't

21  really regard it.

22          There was a time when -- on my first hiking trip

23  with him he had made a joke about me wanting to get my weight

24  for the Packs and told me to take off my clothes.  And again,

25  I thought that was just a joke because I was present in front

A.P. - DIRECT

1  of his son and another friend.

2  Q.   Did it seem like he was joking?

3  A.   I mean, it did seem like he was joking because I wouldn't

4  think he would say that in front of his own son or a friend

5  that was there, so I thought -- took that as a joke.

6  Q.   But you felt like it was odd?

7  A.   I felt like it definitely was odd.

8  Q.   Let me ask you about the car ride that you mentioned.

9  Whose car were you riding in?

10 A.   It was his Ranger he had.

11 Q.   Scott was driving?

12 A.   Yes.

13 Q.   And who else was in the car?

14 A.   It was just me and him.

15 Q.   Where were you sitting?

16 A.   I was sitting in the passenger side seat.

17 Q.   Do you remember what you were doing or where you were

18 going?

19 A.   I know we were eventually going to be going to just meet

20 up with some family that day, but wasn't really anything

21 special.  I wasn't doing nothing.  I was just sitting in the

22 car.

23 Q.   And you said he started rubbing your thigh?

24 A.   Yes.

25 Q.   What part of your thigh was he rubbing?

A.P. - DIRECT

1  A.   I mean, he had his hand on the inner portion of my left

2  thigh.  Sometimes it was getting closer and closer to my

3  crotch area, so it was -- it was very uncomfortable.

4  Q.   How close would you say that he got to your penis?

5  A.   Not far.  I'd say within 6 inches.

6  Q.   And what -- this is going to sound silly, but what part

7  of his body was he using to touch your thigh?

8  A.   His hand.

9  Q.   And you said he was saying, "Oh, baby"?

10 A.   Yeah.  That happened often using that type of voice and

11 saying that.

12 Q.   When you say "that type of voice," what do you mean?

13 A.   A very soft, feminine-like voice.  It was very strange.

14 Q.   Do you remember him saying anything else as he was

15 touching your thigh?

16 A.   Honestly, no.  I just remember him making that -- that

17 comment, but that's it.

18 Q.   How did you react?

19 A.   I was very -- it was uncomfortable.  I even said that it

20 was and I told him to stop, and he did stop.

21 Q.   Do you remember how old you were?

22 A.   I was about 15.

23 Q.   And where did you usually sleep when you would visit?

24 You mentioned a pull-out bed.

25 A.   Yeah.  The couch that I slept on was a pull-out bed and I

A.P. - DIRECT

1  slept on that most of the time.  If not, I usually slept
2  sometimes in his son's room, but that was only if Will was
3  never there.  If he was out doing something, I usually slept
4  in Will's bed.
5  Q.   Was there ever a time you visited that Scott asked you to
6  sleep anywhere else?
7  A.   Yes.
8  Q.   Where is that?
9  A.   I remember there was a time where he asked me to sleep in
10  the same bed as him.
11  Q.   Did you sleep in his bed like he asked?
12  A.   Yes.
13  Q.   Where did he sleep?
14  A.   In the same bed in there with me.
15  Q.   Do you remember how old you were?
16  A.   I was at least 16.
17  Q.   Did you ever start to visit him alone without your
18  family?
19  A.   Yes.
20  Q.   Why was that?
21  A.   Mainly because since I was -- I had that sense of wanting
22  to do things on my own because I had just got my license and
23  he had promised me that he would give me stuff like beer and
24  other types of hard liquor, and I thought this would be a good
25  way of wanting to go up there.  I can just get something like

**JA202**

A.P. - DIRECT

1 that, something to drink.

2 Q.    So he would give you alcohol?

3 A.    Yes.

4 Q.    Do you remember how old you were when he first gave you

5 alcohol?

6 A.    The first time was -- the first time I went up there he

7 gave me a beer.  I was about -- I had just recently turned 15.

8 Q.    Did he drink alcohol with you?

9 A.    Yes.

10 Q.    How often would you say that you would go visit alone?

11 A.    Alone?  I'd say definitely at least once a month.

12 Q.    Did he ever talk to you about masturbation?

13 A.    Several times.

14 Q.    What would he say about it?

15 A.    The first conversation he talked to me because I had no

16 knowledge of it.  I grew up in a home where that wasn't really

17 talked about or practiced.  And he brought it up to me if I

18 was doing it, and I told him no.  And he initially got me on

19 to that topic or subject, and then eventually grew on to worse

20 conversations about doing it and telling me that he would

21 watch me and that he would always compliment me doing it, and

22 it just was really uncomfortable.

23 Q.    How often would he bring up masturbation?

24 A.    If it was just me and him, it was pretty often.

25 Q.    And you said that made you feel uncomfortable?

A.P. - DIRECT

1  A.    Very uncomfortable.

2  Q.    Did he ever show you pornography when you visited?

3  A.    Yes.

4  Q.    Where would you be when that happened?

5  A.    Sometimes I would just be on the couch and he would show

6  me.  It was most of the time.

7  Q.    Would he watch with you?

8  A.    A couple times he did.

9  Q.    Would he encourage you to do anything while you watched?

10 A.    Yes.

11 Q.    What was that?

12 A.    He would encourage me to start masturbating to it.

13 Q.    Did you do it?

14 A.    Not when he was in the room, no.

15 Q.    Did he ever make comments to you indicating that he had

16 seen you masturbate?

17 A.    Oh, yes.  Frequently.  He would always say, "Dude, you

18 were going at it, bro.  You were really getting it."  It was

19 very uncomfortable comments.  I thought he was just joking.

20 Like, he just -- like, he knew I was doing it, but he didn't

21 actually see me.  He just wanted to see my reaction.

22 Q.    Did you ever notice him around when you thought you were

23 alone?

24 A.    A couple times I thought I was alone.  It was very quiet

25 and I didn't see anybody, and I kind of just looked out of the

A.P. - DIRECT

1  corner of my eye and he was there around the corner hiding.

2  Q.   And can you describe his house that you mentioned you'd

3  stay at.

4  A.   So it was a two-story house.  Had the main level and then

5  the basement.  You would walk into the kitchen from the door

6  we would go in, and right to the left was the -- was the

7  living room with the couch where I slept at.  And then if you

8  walked down the hallway was the other bedrooms:  his bedroom,

9  his son's bedroom, and his daughter's bedroom.

10 Q.   And can you describe how the living room was set up that

11 you would stay in.

12 A.   So walking into the living room from the kitchen, the

13 couch was right at the front of the house where the front door

14 was, the TV was right here, and then another couch where

15 people would sit on was right there (indicating).

16 Q.   And which couch would you sleep on?

17 A.   I would sleep on the one that was next to the front

18 because that was the one with the futon, the pull-out bed.

19 Q.   I'm going to show you what has previously been admitted

20 as Government's Exhibit 4A.

21      I'm going to show you really quick what's already been

22 admitted as Government's Exhibit 4B.

23      Do you recognize the person in those videos?

24 A.   Yes.  That's me.

25 Q.   Where were you?

A.P. - DIRECT

1   A.    I was on that couch that I would sleep on at his house.
2   Q.    The house in Wilkes County you mentioned?
3   A.    Uh-huh.
4   Q.    Do you remember who else was in the room?
5   A.    No.  Obviously -- obviously not because I would never do
6   that in front of somebody if I knew.
7   Q.    How old were you?
8   A.    I'd say about 16.
9   Q.    Did you know that you were being recorded?
10  A.    No.
11  Q.    Would you have let him record you if you had known you
12  were being recorded?
13  A.    No, not at all.
14  Q.    Now I'm going to show you Government's Exhibits 4C, 4D,
15  4E, 4F, and 4G.
16        Now I'm going to show you Government's Exhibits 4H, 4I,
17  4J, 4K, and 4L.
18        Do you recognize the person in all of those pictures?
19  A.    That's me.
20  Q.    Did you know those pictures were being taken?
21  A.    No.
22  Q.    Would you have let Scott take any of those pictures?
23  A.    Not at all.
24  Q.    Did you ever go on a hiking trip where it was just you
25  and the defendant?

A.P. - DIRECT

1   A.    Yes.

2   Q.    Where did you sleep during that trip?

3   A.    When we initially started we stayed at, like, this little

4   campground place that had different, like, cabin type places

5   where you could sleep in, and that was the first night.  We

6   slept in the cabin together.  And then the next night we slept

7   in hammocks.

8   Q.    Do you remember where you went hiking?

9   A.    Somewhere along the Appalachian Trail in North Carolina.

10  I don't remember exactly what part.

11  Q.    I'm going to show you what's been admitted as

12  Government's Exhibit 4O.  Do you recognize the people in that

13  picture?

14  A.    Yeah.  That's me and Mr. Hoover.

15  Q.    And which one are you?

16  A.    I'm the one in the hat.

17  Q.    Is this picture from that trip that you were just talking

18  about?

19  A.    It might have been.

20  Q.    Is it a picture from a hiking trip?

21  A.    It's definitely from a hiking trip, but I don't know if

22  it's from the one where we just went together.

23  Q.    And now I'm going to show you what's been admitted as

24  Government's Exhibit 4M.  Do you recognize the person in that

25  video?

A.P. - CROSS

1   A.   Yes.

2   Q.   Who is that?

3   A.   That's me.

4   Q.   Who were you camping with?

5   A.   I was camping with Mr. Hoover.

6   Q.   The defendant?

7   A.   Yes.

8   Q.   Do you remember how old you were?

9   A.   I'd say by the time then I was probably around 17.

10  Q.   Did you know that you were being recorded in that video?

11  A.   No.

12  Q.   Do you know what you were doing in that video?

13  A.   Masturbating.

14  Q.   I'm going to show you Government's Exhibits 4P, 4Q, 4R,

15  4S, and 4T.

16       Do you recognize the person in those pictures?

17  A.   Yeah, those are all me.

18  Q.   Did you know any of those pictures were being taken?

19  A.   No.

20           MS. SPAUGH:  If I could have one moment, Your Honor?

21           (Government counsel conferred.)

22           MS. SPAUGH:  No further questions.

23           THE COURT:  You may cross examine.

24           MR. FREEDMAN:  Thank you, Your Honor.

25                    CROSS EXAMINATION

**JA208**

A.P. - CROSS

1  BY MR. FREEDMAN:

2  Q.   So you started going up there by yourself about the time

3  you were 16?

4  A.   Yes.

5  Q.   You had your drivers license --

6  A.   Yes.

7  Q.   -- and you could drive up there.

8       And you'd go up there once a month?

9  A.   At least once a month.

10  Q.   And that was to sort of show your independence?

11  A.   Yes.

12  Q.   And also because Mr. Hoover would allow you to drink when

13  you were there.

14  A.   Yes.

15  Q.   And you were asked a question about whether -- about

16  camping trips.  How many camping trips did you take with

17  Mr. Hoover?

18  A.   I'd say at least five.

19  Q.   And you say he would say things that would make you

20  uncomfortable, correct?

21  A.   Yes.

22  Q.   You said on at least one occasion he had his hand on your

23  thigh.

24  A.   Yes.

25  Q.   That was the only occasion he had his hand on your thigh

A.P. - CROSS

 1  like that?
 2  A.   The only thing -- only time I recall.
 3  Q.   And then for what -- what period of -- and you were still
 4  going up there when you were 17?
 5  A.   Yes.
 6  Q.   Were you still going up there sort of until the time you
 7  moved to Georgia?
 8  A.   Yeah.
 9  Q.   And how often would you -- and generally when you were up
10  there, like you said, you'd sleep on the sofa.
11  A.   Most of the time, yeah.
12  Q.   And in the video of you that was taken on the sofa --
13  well, strike that question.  I don't have any -- did you ever
14  have access to Mr. Hoover's phone?
15  A.   His phone sometimes, but mainly he would give me his
16  iPad.
17  Q.   He would let you have his iPad?
18  A.   Uh-huh.
19  Q.   And he'd give you his password to get in the iPad?
20  A.   Yes.
21  Q.   And then he would -- but occasionally he would let you
22  use his phone as well?
23  A.   Yes, sometimes.
24  Q.   And he would give you the password to get on the phone?
25  A.   Yes.

AARON - REDIRECT

1   Q.   Would you get on the phone to play games?

2   A.   If I was bored, yeah.  He had a couple games on it that I

3   would play.

4   Q.   And he never told you not to look at anything on his

5   phone; is that correct?

6   A.   Not that I recall.

7   Q.   Or on his iPad.

8   A.   He would give -- sometimes he would give me the iPad so I

9   could look up things like pornography and stuff like that.

10  Q.   So you looked up pornography on his iPad?

11  A.   Yes.

12  Q.   But you didn't download anything.

13  A.   No.

14  Q.   How about on his phone; did you look up pornography on

15  his phone?

16  A.   I don't remember.

17  Q.   But you could have?

18  A.   I could have if I wanted to.

19          MR. FREEDMAN:  I've got no further questions.

20          THE COURT:  Redirect?

21          MS. SPAUGH:  Yes, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MS. SPAUGH:

24  Q.   Do you know what NAMBLA is?

25  A.   I'm sorry?

155

AARON - REDIRECT

1   Q.   Do you know what NAMBLA is?

2         MR. FREEDMAN:  Objection.

3         THE COURT:  Overruled.

4         THE WITNESS:  I'm not aware, no.

5   Q.   And when you would look up pornography, was that adult

6   pornography?

7   A.   Yes.

8   Q.   Would you have looked up boys masturbating?

9   A.   No.

10        MS. SPAUGH:  Nothing further.

11        THE COURT:  Thank you, A.P.  You can stand down.

12        THE WITNESS:  Thank you.

13        (Witness stepped down.)

14        MS. RANDALL:  Your Honor, the government rests at

15  this time.

16        THE COURT:  Ladies and gentlemen of the jury, I know

17  it's quick since we had lunch, but I need to take up some

18  matters with the lawyers and some scheduling issues and things

19  like that, so I'm going to ask you to return to the jury

20  assembly room downstairs and we'll get back to you as soon as

21  we can.  Again, don't discuss the case.  Don't make up your

22  mind.  Don't do any research.

23        (Jury exited the courtroom.)

24        THE COURT:  Mr. Freedman.

25        MR. FREEDMAN:  Your Honor, I'd make a Rule -- motion

**JA212**

156

1   pursuant to Rule 29 to dismiss all three counts.  I'd
2   specifically like to be heard as to the counts regarding A.P.
3         Your Honor, as you know, the elements are that the
4   defendant used or employed or persuaded or induced or enticed
5   or coerced the minor named in counts one or two, count one in
6   this case, to engage in sexually explicit conduct for the
7   purpose of producing a visual depiction of that conduct.  I
8   believe we've heard no evidence about that as to A.P.
9         THE COURT:  What -- how do you read the words employ
10  or use?
11        MR. FREEDMAN:  The way I would read the words
12  employed or used, he actually utilized or asked that
13  individual to engage in that conduct for the purpose -- there
14  was some affirmative act on the part of the defendant in some
15  fashion to get the minor to engage in the conduct for the
16  purpose of getting the visual depiction.  And there was no
17  evidence -- we don't know what -- I obviously know the date
18  that occurred from the meta data, but we don't know the
19  context of that.  As far as he knew, he was not doing that for
20  that purpose at all.  He didn't even know he was being filmed.
21  He didn't know he was being watched.  So I just don't see any
22  evidence at all to say he -- that there was any affirmative
23  act on the part of Mr. Hoover to get him to do that for the
24  purpose of taking that video.
25        THE COURT:  Ms. Randall.

**JA213**

1          MS. RANDALL:  Your Honor, multiple courts have held

2    that for the purpose of 2251, a minor is used simply by being

3    photographed or videoed.  So by the fact that the victim

4    appeared in the video, particularly A.P. in this instance, he

5    was being used under multiple circuits' definition of the word

6    use.  Trying to say the defendant had a more active role in

7    it, I think, is putting a higher standard.  I think the fact

8    the defendant chose to pick up a camera, hit record and zoom

9    in on the genitals repeatedly is him using the defendant --

10   the victim in the act of masturbation to create the child

11   pornography.

12          And so for all those reasons, Your Honor, you should

13   overrule the motion, especially when you look at the evidence

14   in the light most favorable to the government.

15          THE COURT:  All right.  The Court will deny the

16   motion and find that there is sufficient evidence from which a

17   reasonable jury could find the defendant guilty beyond a

18   reasonable doubt as to each count.

19          Do you anticipate evidence, Mr. Freedman?

20          MR. FREEDMAN:  No, Your Honor.

21          THE COURT:  Let me explore that issue with

22   Mr. Hoover.

23          Stand up, please, sir.

24          Sir, you have a constitutional right not to testify.

25   The burden of proof is on the government to prove the elements

158

1  of the offenses charged against you beyond a reasonable doubt
2  and you are presumed innocent.  Do you understand that you
3  have a constitutional right not to testify if you don't want
4  to?
5              THE DEFENDANT:  Yes, Your Honor.
6              THE COURT:  You also have a right to testify if you
7  would like to.  Do you understand that you may choose to
8  testify?
9              THE DEFENDANT:  Yes, Your Honor.
10             THE COURT:  And if you chose to testify, you'd be
11 subject to cross examination by the assistant United States
12 attorney.  Do you understand that?
13             THE DEFENDANT:  Yes, Your Honor.
14             THE COURT:  Do you understand that it is your
15 decision, your decision alone, whether or not to testify?
16             THE DEFENDANT:  Yes, Your Honor.
17             THE COURT:  Have you discussed whether or not you
18 will testify with your attorney and the consequences of that
19 decision?  I just want a yes or no, not what you said to each
20 other.
21             THE DEFENDANT:  Yes.
22             THE COURT:  Is there anything you don't understand
23 about your right to testify or not testify and the
24 consequences of those choices?
25             THE DEFENDANT:  No.

159

```
 1          THE COURT:  Are you satisfied with your counsel's
 2   advice about whether or not you should testify?
 3          THE DEFENDANT:  Yes, Your Honor.
 4          THE COURT:  And have you made a decision personal to
 5   yourself as to whether you would like to testify?
 6          THE DEFENDANT:  Yes, Your Honor.
 7          THE COURT:  What is that decision?
 8          THE DEFENDANT:  No, Your Honor.
 9          THE COURT:  Thank you.  You may sit down.
10          MR. FREEDMAN:  Your Honor, I would like to renew the
11   motion at the close of all the evidence.
12          THE COURT:  The motion will be denied for the same
13   reasons as stated before.
14          How long do the parties want for closing argument?
15          MS. RANDALL:  Your Honor, the government would
16   request 45 minutes.
17          THE COURT:  Mr. Freedman?
18          MR. FREEDMAN:  Your Honor, I would imagine
19   somewhere -- 15, 20 minutes, somewhere in that range.
20          THE COURT:  Thank you.
21          All right.  We'll allow both sides 45 minutes if you
22   start feeling verbose.
23          All right.  Recall the jury, please.
24          MS. RANDALL:  Your Honor, are we going to discuss
25   the jury instructions?
```

**JA216**

160

1          THE COURT:  I'm sorry, I meant to do that.  We

2    circulated the jury instructions before the start of the

3    trial.  My understanding was, Mr. Freedman, you had one

4    objection to one of them which we then altered a bit by

5    including some language from a recent Fourth Circuit case.

6          Are there other objections to the proposed

7    instructions?

8          MR. FREEDMAN:  No, Your Honor, except, you know,

9    we've made our Rule 29 motion.  But other than that, just the

10   one that appears on page 10 of the proposed instructions that

11   was submitted.

12         THE COURT:  And even in light of the alteration we

13   made to the original draft of that, you still have an

14   objection?

15         MR. FREEDMAN:  Your Honor, I would just object to

16   the first sentence.  I don't have an objection to the rest of

17   that instruction, just as to the first sentence.

18         THE COURT:  All right.  I'll overrule that

19   objection.  Thank you.

20         MS. RANDALL:  Your Honor, may we be heard on that

21   new addition to the instruction?

22         THE COURT:  Yes.

23         MS. RANDALL:  Our concern is the sentence where it

24   says, "The government must prove the defendant engaged in the

25   sexual activity."  We realize that language is coming from the

**JA217**

161

*Palomino* decision and in that case the defendant was engaged
in actual sexual intercourse with the victim.  In this case,
since we have masturbation which is more of a solo act, I
think using the words "the defendant engaged in the sexual
activity" is somewhat misleading in the fact it sounds like
the defendant has to be the one doing the sexual activity.  So
we would ask that that be reworded to make it clear that --
the way the statute itself -- if you look at the way the
statute reads, the minor has to engage in sexual activity.

     THE COURT:  Then we'll have to work in, though, the
specific intent belongs to the defendant, not to the minor.

     MS. RANDALL:  I think if you just changed it to
something like the government must prove -- let me pull the
statute out so I'm reading from the statute.

     THE COURT:  Well, how about this?  We say, "The
government must prove that the minor engaged in the sexual
activity and the defendant acted with specific intent to
produce the visual depiction."

     MS. RANDALL:  I think that would clear it up, yes.

     THE COURT:  And Mr. Freedman, I understand you
continue to object.

     MR. FREEDMAN:  I would object to that.

     MS. RANDALL:  And one other matter, Your Honor, is
just on the verdict form, the word "between" appears before
the date.  And since it's -- for counts one and two.  And

162

1  since that's just a solo date, I don't know if that should

2  just read on or about June 20th instead of between on or about

3  June 20th.

4          THE COURT:  All right.  We'll make that change.

5          All right.  Are we ready for the jury, then?

6          MS. RANDALL:  May I move the podium over real quick?

7          THE COURT:  Of course.

8          The way I do this, just to break up these

9  instructions, I give them sort of a first set of generalized

10  instructions and then we have arguments and then I give them

11  the substantive instructions.  So don't think you have to pop

12  up as soon as they get here.

13          All right.  Call the jury up.

14          (Jury entered the courtroom.)

15          THE COURT:  All right.  Members of the jury, the

16  evidence portion of the trial has concluded and you will soon

17  hear arguments from the attorneys, but I want to first

18  instruct you as to the general principles of law that apply to

19  this case.  After counsel have made their closing arguments, I

20  will discuss the specific offenses charged, give you the

21  elements of the offenses and follow -- that you can follow in

22  guiding your deliberations.

23          As I told you in the preliminary instructions, it is

24  your duty and your responsibility in this trial to find the

25  facts.  You may find those facts only from the evidence which

**JA219**

163

1  has been presented during this trial.  The evidence consists

2  of the testimony of the various witnesses and the exhibits

3  which have been admitted into evidence by the Court.

4          In reaching your decision as to the facts, it is

5  your sworn duty to follow the law as the Court instructs you.

6  You will apply the law given to you by the Court to the facts

7  which you find from the evidence and reach a verdict.

8          Counsel may refer to some of the governing rules of

9  law in their arguments.  If, however, any difference appears

10  to you between the law as stated by counsel and that as stated

11  by the Court, you are to be governed by the Court's

12  instructions.

13          You are not to single out one instruction alone as

14  stating the law, but must consider all of the instructions as

15  a whole.  You may not substitute or follow any personal or

16  private notion or opinion as to what the law is or ought to

17  be.

18          You are required to perform these duties without

19  bias, prejudice, or sympathy for either party.  The law does

20  not permit jurors to decide cases on the basis of bias,

21  prejudice, or sympathy, or any other basis other than solely

22  upon the facts and the law arising from this case.

23          This case involves charges brought against the

24  defendant by a bill of indictment.  I remind you that an

25  indictment is but a formal method of accusing the defendant of

**JA220**

164

1  a crime.  Its purpose is to inform the defendant of the

2  charges against him and bring him to trial.  It is not

3  evidence of any kind against the defendant, nor does it permit

4  any presumption or inference of guilt.  In other words, an

5  indictment is not consistent either with guilt or lack of

6  guilt.  It simply puts the question at issue for your

7  decision.  It is up to you, the jury, to decide whether the

8  government has proved each element of the crimes alleged in

9  the bill of indictment beyond a reasonable doubt.

10       You are here to decide whether the government has

11  proved beyond a reasonable doubt that the defendant is guilty

12  of the crimes charged.  The defendant is not on trial for any

13  act, conduct, or offense not alleged in the indictment.

14  Neither are you concerned with the guilt of any other person

15  or persons not on trial as a defendant in this case.

16       Every defendant in a criminal case is presumed to be

17  innocent and that presumption continues throughout the course

18  of the trial.  This presumption will end only if you reach the

19  jury room and arrive unanimously at the conclusion, if you do,

20  that the government has shown to your satisfaction that the

21  defendant is guilty beyond a reasonable doubt.  This burden on

22  the government does not change at any time during the course

23  of the trial.  The presumption of innocence in favor of a

24  defendant is not a mere formality to be disregarded by the

25  jury at its pleasure.  It is a substantive part of our

**JA221**

165

1  criminal law.  Accordingly, the government must prove each of

2  the elements of the crimes charged in this indictment beyond a

3  reasonable doubt before there can be a conviction.

4         The term "reasonable doubt" means just what it says.

5  It is a doubt based upon reason and common sense.  Its meaning

6  is no doubt self-evident and understood by you and the Court

7  will not attempt to define it further.

8         There are two types of evidence which a jury may

9  properly consider in determining whether the government has

10 met its burden as to any offense.  One is direct evidence,

11 such as the evidence of an eyewitness.  The other is

12 circumstantial evidence.  Circumstantial evidence is evidence

13 of facts or circumstances from which the existence or

14 nonexistence of other facts in controversy may be inferred.

15 As a general rule, the law makes no distinction between direct

16 and circumstantial evidence but simply requires that before

17 convicting a defendant, you, the jury, must be satisfied of

18 the guilt of such defendant beyond a reasonable doubt from all

19 of the evidence in the case.

20        While you should only consider evidence presented

21 during the trial of the case, you are permitted to draw such

22 reasonable inferences from the testimony and exhibits as you

23 feel are justified in the light of common experience.  In

24 other words, you may make deductions and reach conclusions

25 which reason and common sense lead you to draw from the facts

**JA222**

1  which have been established by the testimony and the evidence

2  in this case.

3        You are not required to accept testimony even though

4  the testimony is uncontradicted and the witness is not

5  impeached.  You may decide because of the witness's bearing

6  and demeanor, or because of the inherent improbability of his

7  testimony, or for other reasons sufficient to you that such

8  testimony is not worthy of belief.

9        During the trial you heard testimony from a witness

10 who was allowed to give his opinion in a certain field.  This

11 witness was permitted to testify even though he may not have

12 actually witnessed any of the events involved in this trial.

13 A person's training and experience may give him specialized

14 knowledge in a technical field.  The law allows that person to

15 state an opinion about matters in this particular field.  But

16 merely because the witness has expressed an opinion does not

17 mean that you must accept this opinion.  The same as with any

18 other witness, it is up to you to decide whether you believe

19 his testimony and choose to rely upon it.  Part of that

20 decision will depend on your judgment about whether the

21 witness's background, training, and experience is sufficient

22 to give the opinion that you heard.  You must also decide

23 whether the opinions were based on sound reasons, judgment,

24 and information.

25        Your decision on the facts of this case should not

167

1   be determined by the number of witnesses testifying for or

2   against a party.  You should consider all of the facts and

3   circumstances in evidence to determine which of the witnesses

4   you choose to believe or not believe.

5          The defendant has elected not to testify in this

6   case.  As I told you earlier, the Court instructs you that he

7   has a constitutional right not to take the stand and testify

8   and not to speak at all or offer any evidence, the burden of

9   proof being entirely upon the government.  You must draw no

10  adverse inferences from any -- of any kind from his exercise

11  of his privilege not to testify.  This right is a fundamental

12  one in America's criminal justice system and one which cannot

13  be disregarded by the jury at its pleasure.

14         The lawyers during the course of the trial may have

15  objected to some of the things that were said or done during

16  the trial.  This simply means that the lawyer is requesting

17  that I make a decision on a particular rule of law.  Do not

18  hold that against a lawyer who makes an objection.  Lawyers

19  have a duty to object whenever they think that something is

20  not permitted by the rules of evidence.  Those rules are

21  designed to make sure that both sides receive a fair trial.

22  Do not draw any conclusion from such objections.  These relate

23  only to the legal questions that I must determine and should

24  not influence your thinking.

25         If I sustain an objection to a question, the witness

168

1  is not allowed to answer it.  Do not attempt to guess what

2  answer might have been given had I allowed the question to be

3  answered.  If an objection was overruled, treat the answer

4  that the witness gave as you would any other.

5          Let me emphasize that a lawyer's question is not

6  evidence.  At times a lawyer may have incorporated into a

7  question a statement that assumes certain facts to be true and

8  asked the witness if the statement was true.  If the witness

9  does not answer or denies the truth of the statement, and if

10 there is no evidence in the record proving that the assumed

11 fact is true, then you may not consider the fact to be true

12 simply because it was contained in the lawyer's question.  On

13 the other hand, if the witness adopts or agrees to the assumed

14 fact in his answer, then the witness may be considered to have

15 testified to the facts assumed in the question and his

16 testimony is evidence of those facts.

17         You may continue, of course, to use your notes and

18 take notes.  You are instructed that your notes are only a

19 tool to aid your own individual memory and should not be a

20 substitute for your memory.

21         The punishment provided by law for the offense

22 charged in the indictment, should there be a verdict of

23 guilty, is a matter exclusively within the province of the

24 Court and should never be considered by the jury in any way in

25 arriving at an impartial verdict as to the guilt or lack of

**JA225**

1  guilt of the defendant.

2          You will now hear closing arguments from the

3  attorneys.  Again, closing arguments are not evidence.  They

4  are their contentions of what you should find the evidence to

5  be.  The burden of proof is on the government, as you know, so

6  the government has the right to give the first argument and

7  then follow up defense counsel's argument with their second

8  argument.

9          The jury is with the government.

10          MS. RANDALL:  Thank you, Your Honor.

11          Good afternoon, ladies and gentlemen.

12          This is A.P.  You just had a chance to hear him

13  testify.  And then this is M.C. who you heard testify earlier

14  this morning.  These are two minors who did not know each

15  other in 2018 and 2019, but they have one thing in common.

16  They were manipulated, tricked, and used by someone they

17  trusted, and that someone was Michael Scott Hoover.  They

18  became the subject of his pornographic videos and films and

19  images that he made using this iPhone here in the Western

20  District of North Carolina.

21          And although the defendant took many steps to hide

22  his crime, it was ultimately discovered.  We are here today

23  despite his best efforts to hide his crime.  His phone was not

24  as secure as he thought it was.  How could he anticipate that

25  his employer, Wells Fargo, would one day come and take back

170

1    their phone that they had assigned to him?  Not only would
2    they take it back, but they would ask one of their digital
3    forensic examiners to look through it.  And he especially
4    could not anticipate that the private digital examiner that
5    would look at his work phone was a former detective and a
6    member of the Internet Crimes Against Children Task Force who
7    had experience with child pornography and child exploitation.
8        As you will recall from the testimony this morning,
9    defendant's supervisor, his manager, took possession of his
10   cell phone back in August of 2019.  It was then turned over to
11   Avery Turner, the digital forensics examiner and former
12   detective, to be examined.
13       Turner first confirmed the phone was in fact the
14   defendant's phone.  He then had to take special effort to
15   unlock the phone through, as he explained, the special
16   software.  He had to call into someone and then had 60 seconds
17   to quickly get in and change the password.  That's how locked
18   down that phone was.  The fact that his employer had to go
19   through double authentication, he said, with human resources
20   before then calling someone to change the password is why the
21   defendant was so secure and so sure about using his phone to
22   commit a crime.
23       However, once Avery Turner found the video he told
24   you about, the video that we now know was M.C. masturbating in
25   the woods, he did the right thing and he turned the phone

**JA227**

1   immediately over to law enforcement for a further examination.

2   And they got a search warrant and turned the phone over to

3   Assistant Special Agent in Charge Nathan Anderson who has

4   years of experience in examining cell phones and has been

5   certified using a type of software.

6           And you heard him testify about what he found.  He

7   found the video that Mr. Turner had seen of the minor.  But

8   then he found more.  As he continued to look, he found more

9   images and more videos showing two different minor males

10  engaging in very similar types of sexually explicit conduct.

11  And then he examined the data associated with those images and

12  videos and shared that with law enforcement partners who were

13  then able to locate the children depicted.  And that is how

14  you ended up getting to hear from A.P. and M.C. telling about

15  how those videos were created.  They told you how they ended

16  up being the unwilling subjects of these sexually explicit

17  videos and images.

18          And now that you've heard all the testimony about

19  the discovery of those files, as well as the minors depicted

20  in them and how they were created, it's time for you to

21  deliberate on the charges that the defendant faces.

22          In the indictment the defendant has three charges

23  against him.  Count one and count two are for using,

24  persuading, inducing, enticing, or coercing a minor to engage

25  in sexually explicit conduct for the purpose of creating a

visual depiction of that conduct.  Count one is for the images
and videos created of A.P.  Count two is for the images and
videos created of M.C.

And so now we're going to talk a little bit about
what the law is and how the evidence you heard applies to that
law.

As I said, count two -- well, first let's talk about
in general both counts because the elements are going to be
the same for both.

Count one, as I said, is going to read minor victim
1, but I'm telling you now that's A.P.  It involves the images
created on June 20 of 2018.

Count two refers to minor victim 2, that is M.C., on
August 4 of 2019.

For both of those the elements that the government
has to prove beyond a reasonable doubt are:

First, that the minor named in the count was under
the age of 18.

Second, that the defendant used or employed or
persuaded or induced or enticed or coerced the minor named in
the count to engage in sexually explicit conduct for the
purpose of producing a visual depiction of that conduct.

And then finally, that the visual depiction was
produced using materials that had been mailed, shipped, or
transported in and affecting interstate and foreign commerce

173

1  by any means, including by computer.

2         Let's talk about count two first because you heard

3  M.C. testify first.

4         Count two are Government's Exhibits 3A, 3B, and 3C.

5  I'm not going to show those exhibits to you now at this time

6  because you just saw them a couple hours ago, but you can

7  access them again at any point during your deliberations if

8  you would like to see them.  But they were the pornographic

9  images and videos that were created by the defendant on August

10 4, 2019, on Mount Mitchell.  There were two videos saved in

11 two different places and then an image depicting M.C.

12 masturbating in the woods.

13        Although they don't show his face, you know it was

14 M.C.  He told you it was him.  You saw other pictures taken

15 from that same day in the same location of him being on that

16 hiking trip and wearing the same clothes depicted in the

17 video.  All of that evidence is sufficient to show that was

18 M.C. depicted although you could not see his face in the

19 videos.

20        So first you have to figure out if M.C. was under

21 the age of 18 at the time he produced those videos.  So how do

22 you know he was under the age of 18?  Well, he testified he is

23 still under the age of 18 when he testified here today.  So if

24 he's under the age of 18 today, he certainly was back in

25 August of 2019.

174

1          He also told you his date of birth was XXXXXXX XX of

2     2006.  The meta data shows you that that video was created in

3     August of 2019.  So that would mean he was 12 years old when

4     he went on that hiking trip and became an unwilling subject of

5     that video.

6          Element 2 has a number of factors within it.  First

7     I want to talk about the fact the government has to prove use,

8     employ, persuade, induce, entice, or coerce a minor.  You do

9     not have to find all of those things.  You just have to find

10    one of those.  That's why the word "or" is between each of

11    them.

12         And in this case the easiest one and the simplest

13    one is that the defendant simply used a minor in producing

14    that.  Because when a minor is simply photographed or

15    videotaped, in the world of child pornography that is using a

16    minor.  That's how you know that the government has met that

17    part of that element.

18         How do you know it was the defendant who was the one

19    using the camera to record this video?  Well, M.C. told you it

20    was the defendant.  He caught him in the act.  He turned and

21    he saw him holding the camera and recording him while he was

22    masturbating.  The defendant even showed him the video after

23    he was done.  M.C. told you he saw it.  He knew it was in slow

24    motion.  And he told him to delete it.

25         And then there's even further evidence.  The

**JA231**

175

1  circumstantial evidence the judge told you that you can use:
2  It was on his work phone, a phone that was password protected.
3      There was even a copy of the same video hidden in a
4  secret calculator app.  Even if he let other people use his
5  computer or his phone, there was an app on there that had a
6  special password you had to type into to get into where he
7  kept pictures and videos that he told M.C. that he shouldn't
8  see.  And that is where a copy of this video of M.C. was
9  found.
10      Next you have to find that the defendant acted with
11  the purpose of producing a visual depiction of the conduct.
12  I'm sorry, I skipped one.  We have to show that the defendant
13  engaged -- or the victim engaged in sexually explicit conduct.
14  The Court will tell you how the law defines sexually explicit
15  conduct.  And there are several different types of sexually
16  explicit conduct, but one of them includes masturbation.  And
17  clearly those videos depict masturbation.
18      It also includes a lascivious display of the
19  genitals.  And the Court will tell you how to determine if an
20  image or video shows a lascivious display of the genitals.  I
21  would argue to you that a close-up, lengthy, slow motion
22  recording of a child masturbating is lascivious.
23      However, masturbation alone is sufficient to show
24  that something is sexually explicit conduct.  So if you find
25  that M.C. was, in fact, masturbating in that video, that is a

**JA232**

1   minor engaged in sexually explicit conduct.

2           And finally with the second element you have to find
3   that the defendant acted with the purpose of producing a
4   visual depiction of that conduct.

5           So ladies and gentlemen, the defendant's only role
6   in that video you saw was as the photographer, the producer,
7   the videographer, whatever you want to call it.  He is the one
8   holding the camera.  He is the one that directed M.C. to
9   masturbate before he started recording the video.  He is the
10  one who pulled his phone out, went to the camera app, pushed
11  record -- actually took a picture.  Then went to the video
12  function and pushed record and chose to make it in slow
13  motion.  He chose how long to make the video.  He chose to
14  make it in slow motion.  He chose to zoom in so close that you
15  couldn't see the child's face.  He only wanted to record one
16  thing that day and that was a child masturbating.

17          He didn't tell M.C. he was making the video, which
18  is further evidence because he knew M.C. would not have agreed
19  to making the video.  M.C. told you that he would never have
20  done that if he knew he was taking the video.  But he wanted
21  that video so that's why he did it where M.C. didn't see him.

22          And then when M.C. did notice that he had taken the
23  video, he lied to him.  He said he would delete it.  But we
24  know he didn't delete it right away because we found it in two
25  different places and the time stamps show it wasn't deleted

1   right away.

2         If fact, if you look at the meta data that Nathan
3   Anderson testified to, it shows you that the video was created
4   on August 4th at 2:54 and 17 seconds PM.  It was moved to the
5   notes about 15 minutes later.  It was then moved to the app,
6   the calculator app, the next morning.  So you know he didn't
7   delete it right away.  Same thing with the picture.  It was
8   taken at 2:54:13 and about 15 -- actually, about 20 minutes
9   later it was shared -- it was moved over to the notes folder.

10        This is significant because these are multiple
11  purposeful steps he did.  He made a note.  He named the note
12  Hupie or Hupe, the H-u-p-e word.  He chose which files to put
13  in it.  And he chose to only put child pornography in that
14  note.  And then he did it sometime after he actually took the
15  pictures.  That is evidence that he wanted to preserve the
16  video and image for at least some time.  He wanted -- he hid
17  it because he wanted to tell M.C. he had deleted it.  And no
18  one would go looking in notes for pictures and videos and M.C.
19  would think he deleted it.  And then he took the further step
20  of hiding it in the calculator app which is an app designed to
21  hide things.

22        And then we had those other pictures we looked at
23  before with -- on the hiking trip of him -- of M.C. and the
24  defendant and then M.C. and the two other girls.  He didn't
25  move those.  He kept those in the camera roll, ladies and

178

1   gentlemen.  That shows this was not an accident because those

2   stayed in the original place.  He only moved the ones the

3   victim engaged in sexually explicit conduct.

4           And as I said, he's the one who told M.C. to

5   masturbate so that he could create the video.

6           And you can look at the other evidence you heard:

7   the search terms.  Talking about looking for a boy

8   masturbating, selfies of boys.  That's all evidence of what

9   the defendant's purpose was when he told M.C. to masturbate;

10  that he wanted a recording of it.

11          Then the third element is that the visual depiction

12  was produced using materials that had been mailed, shipped, or

13  transported in and affecting interstate or foreign commerce by

14  any means, including by computer.

15          All of the images and videos you saw today were

16  created with an iPhone 7 Plus.  More specifically, they were

17  found and located on this iPhone 7 Plus, the phone that

18  belonged to the defendant and was used by the defendant.

19          And the evidence was this particular iPhone has

20  traveled in and affected interstate and foreign commerce.

21  First of all, you saw it was actually stamped on the back

22  "Assembled in China."  And then we have the records from Apple

23  showing exactly where it was manufactured in China; that it

24  was imported into the United States through Tennessee before

25  finding its way to the defendant in Wilkes County, North

**JA235**

1  Carolina.  And there's been no challenge to any of that
2  evidence.  This evidence alone, ladies and gentlemen, is
3  sufficient to find that the government has met this third
4  element because the law says a visual depiction of a minor
5  engaged in sexually explicit conduct is produced using those
6  materials if -- if it was produced using a material that had
7  previously been shipped or transported in interstate or
8  foreign commerce, like in this case from China.

9          Count one, as I said, involves A.P.  It's a
10 violation of the same offense, though it is alleged to have
11 occurred on June 20th of 2018.  It involves Government's
12 Exhibits 4A, 4B, which was the videos on the couch, and 4C,
13 4D, 4E, 4F, 4G, 4H, 4I, 4J, and 4K.  As I said, those were
14 pornographic images and videos taken of A.P. laying on a
15 couch, as he testified, in the defendant's home back in 2018.
16 Those will also be available to you if you wish to review them
17 again.

18         We know it's A.P. because he told you it was him.
19 He recognized himself and identified himself.  And you also
20 had this picture of him taken from earlier that day on the
21 defendant's phone of him being in the presence of the
22 defendant -- or at least it was the defendant who took the
23 picture, and that's exactly what he looked like on that day.

24         So how do you know the minor was under the age of
25 18, the first element the government has to prove?  He told

180

1   you his date of birth was XXXXX XX of 2001.  You know this
2   video was produced on June 19th of 2018.  That would make him
3   a little over 17 years old when these videos and images were
4   produced.

5           Second, again, you have to find the defendant used,
6   employed, persuaded, induced, enticed, or coerced a minor to
7   engage in sexually explicit conduct for the purpose of
8   producing a visual depiction of that conduct.  Again, under
9   the law, if you photograph or video a minor engaging in
10  sexually explicit conduct, you are using that minor as
11  required under the law.

12          How do you know again that the defendant is the one
13  using him in this case?  A.P. didn't know he was recording
14  him, but he gave you a lot of other information about the
15  relationship he had with the defendant that you can use to
16  find that the defendant was the one recording him.

17          He told you about how the defendant would act
18  inappropriately around him.  Would put his hand on him and
19  make sexual comments to him.  And then it escalated to where
20  he would talk to him repeatedly about masturbation and would
21  talk to him about how he saw him masturbating and would
22  comment on it.

23          This is a man who was very into the victim
24  masturbating.  He talked about it.  He encouraged him to do
25  it.  He showed him pornography to try and get him to

1  masturbate.  So if you have a video of someone masturbating,

2  who's more likely to take the video than someone who's been

3  very interested previously in him masturbating?

4          Again, it was on his work phone, his password

5  protected work phone that was used by the defendant.

6          Furthermore, those particular images and videos were

7  saved with other inappropriate videos of A.P.  You heard how

8  he went on a camping trip with the defendant several months

9  later in September where it was just the two of them on the

10 Appalachian Trail and they spent the night, one night in the

11 hammocks.  And you saw some images and videos of A.P. walking

12 in the woods nude from the back side as well as laying in a

13 hammock.  And he told you he was masturbating.  Those images

14 and videos were saved with the images and videos of A.P. on

15 the couch in a note on the defendant's phone.

16         You can also use the fact that this defendant

17 recorded another video of another minor masturbating, in this

18 case being M.C.  The fact that he had done it to another

19 child, you can use that to find that beyond a reasonable doubt

20 it was the defendant who did it again in this case.

21         Who else would be using the defendant's password

22 protected work phone to take images and videos of two

23 different minors masturbating and save them to different notes

24 on his phone?  And those are the images and videos of them

25 camping.

**JA238**

182

1        Next, again, the government has to prove that A.P.
2   was engaged in sexually explicit conduct in the images and
3   videos.  As I previously informed you, masturbation,
4   lascivious display of the genitals, both of those under the
5   law are sexually explicit conduct.  So if you find that these
6   images and videos depicted either of those things, that is
7   sexually explicit conduct.

8        Next, that the defendant acted with the purpose of
9   producing a visual depiction of such conduct.  Like I said for
10  the images and videos involving M.C., the defendant's only
11  role in the creation of these videos and images was as the
12  videographer, as the producer of those videos.  And again, he
13  had to take multiple steps:  Take the phone out; put it into
14  camera -- or put it into video.  You saw there were two
15  different videos and a slew of images; each time choosing to
16  take all of those images and all of those videos.

17       If you remember in the video we watched, the longer
18  video of A.P. laying on the couch, he's standing behind him
19  and he starts out further back.  He zooms in on the child's
20  genitals, moves up to his face for a few seconds, and then
21  goes back down to his genitals.  It's clear what he was
22  interested in capturing on this video.  And then he zooms the
23  camera out a little bit and just happenstance, A.P.'s hand
24  comes up and blocks the view of the person filming it and so
25  they move so they can recapture the genitals again because

1  that was the aim of making this video.  If the hand was

2  blocking the masturbation, he moved so he could capture that.

3  That's how you know what the purpose was in creating this

4  video.

5          You can also use other evidence, circumstantial type

6  evidence.  He didn't tell A.P. he was making the video.  He

7  hid behind him so that he wouldn't know.  You can look at just

8  the sheer number of images and videos that were created to

9  know that he was purposely trying to do this.

10          And then again, you can look at what he did with the

11  images after that.  As you heard through the testimony of

12  Nathan Anderson, many of these images and videos were saved to

13  the note about an hour later.  Different time stamps, but all

14  about an hour later.  But then again, a couple weeks later on

15  July 4th the images and videos were again saved to the note.

16  So again, this shows him purposefully moving and interacting

17  and possessing the images and videos.

18          His intent is also by what was in the note.  He had

19  the note full of the images and videos he created on

20  June 20th, 19th and 20th.  Then he had all the images and

21  videos that he created of A.P. when they were on their hiking

22  trip.  And then he had that image of A.P. just in his

23  underwear, just the close-up shot of the boy laying on the

24  couch in his underwear.  All of those were grouped together

25  separate and apart from the rest of the images and videos he

184

1   had of A.P. or any other children that were not sexually

2   explicit.

3           And then finally for count two we have to prove that

4   the visual depiction was made using something that had been

5   transported in and affecting interstate and foreign commerce.

6   Again, the meta data showed that those images and videos were

7   created by an iPhone 7 Plus.  And you heard that the iPhone 7

8   Plus that the images and pictures were stored on was

9   manufactured in China and traveled in interstate and foreign

10  commerce and ended up in Wilkes County, North Carolina.

11          The third count of the indictment is possession of

12  child pornography, and this is for possessing all of the

13  images and videos that he created.  And there are three

14  elements for the third count as well.

15          The indictment alleges that between June 20th of

16  2018 through on or about August 15th of 2019, the defendant

17  did possess child pornography.

18          Now, this is a wide date range.  It starts when the

19  images of A.P. were created and then they go through after the

20  images of M.C. were created.  You don't have to find he

21  possessed the images that entire time frame.  You just have to

22  all agree at some point within that time frame, the defendant

23  knowingly possessed child pornography.  Even if it was for a

24  short time, that just at some point in that time frame he did,

25  in fact, possess child pornography.

185

1          And these are the elements you must find.

2          First, that the defendant knowingly possessed or

3   accessed with the intent to view any material that contained

4   an image of child pornography.

5          Well, what is child pornography?  There is a legal

6   definition of child pornography the Court will give you, but

7   for this -- for my argument, the most relevant part you'll

8   hear is that it's any visual depiction, including photographs,

9   films, videos, pictures, computer and computer-generated

10  images and videos of sexually explicit conduct where the

11  production of the visual depiction involves the use of a minor

12  engaging in sexually explicit conduct.

13         The Court will instruct you that possession can be

14  actual or constructive.  Actual possession is, you know,

15  you're holding something in your hand.  Constructive

16  possession is when you may not have something on your person

17  at the time, but you have the intent and -- you're able to

18  control it.  You know, I brought my purse to the courthouse

19  with me today but I left it in the office.  I don't have it on

20  me, but I'm possessing it because I brought it here.  I plan

21  to leave with it.  I'm exercising control over it.

22         So how do you know the defendant was in possession

23  of these images and videos?  Well, just look at all the

24  different examples of how he exercised control over them and

25  made decisions about what to do with them.  As you heard,

**JA242**

186

 1  photos and videos are generally found in a certain part of the
 2  phone, the camera roll, the digital gallery.  I think it was
 3  called the media gallery.  But these images and videos were
 4  not found there.  They had to be moved to another part of the
 5  phone which takes someone exerting control over them to get
 6  them there.  He had to pick and choose which images and videos
 7  he wanted to move.  And in this case he only moved the
 8  pornographic ones; and when he moved them, he was exerting
 9  control over them.

10         And by moving the files and the meta data that came
11  with that, we learned something important.  We learned that he
12  kept the files for at least some period of time.  And by
13  keeping those files, ladies and gentlemen, he was possessing
14  them.  As we talked about with the videos and images of M.C.,
15  it was over -- it was about 15 minutes before he moved them.
16  And then he still had the video of M.C. the next day because
17  that's when he moved it into the calculator app.  So he
18  possessed that video over that entire time period.  He could
19  have possessed it longer.  We don't know when they were
20  deleted.  I think that was clear from Special Agent Anderson's
21  testimony.

22         Similar with A.P., we have all the images and videos
23  with the dates and the time stamps that go with those.  We had
24  them all being created on June 19th over a time period of
25  about ten minutes, I think it was.  And then we have them

**JA243**

187

1  being moved, like, actually changed and moved to another part
2  of the phone on -- about an hour later; some late on
3  June 19th, some in the early hours of June 20th.  And then you
4  have them again being moved on July 4th so you know those
5  images and videos were still on his phone.  Even though they
6  were created on June 19th, they were still on his phone on
7  July 4th because they had to be there for him to move them
8  into the notes.  So he was in possession of those images and
9  videos of A.P. at least from June 19th through July 4th.  And
10 that's again him showing -- exercising control over them.
11 These are purposeful and intentional acts.

12        These are just -- these are the actual slides
13 showing the dates and times of when they were moved that we
14 just talked about.  Again, the time stamps show all that.

15        Like the production counts, for possession we have
16 to show that the images and videos were produced using
17 materials that had been mailed, shipped, and transported in
18 and affecting interstate and foreign commerce, including by
19 computer.  It this case, as you heard, all the meta data shows
20 that the images and videos were produced by an iPhone; and you
21 know that iPhone was manufactured outside the state of North
22 Carolina and transported into North Carolina.  The previous
23 movement across state lines of a cell phone that the defendant
24 later uses to possess child pornography is sufficient to meet
25 that element.

**JA244**

188

1          Finally, we have to show that when the defendant
2     possessed or accessed with intent to view the material, the
3     defendant knew the material contained child pornography.
4          So how do we know that the defendant knew that those
5     images and videos contained child pornography?  Well, we
6     believe the evidence shows that he created them.  And when he
7     created them, he knew he was recording people under the age of
8     18 engaging in masturbation, which is sexually explicit
9     conduct.
10          These children in the video are people he saw
11     frequently.  They were XXXXXX XXXXXXX that he would see,
12     socialize with, take on trips.  He clearly knew they were
13     under the age of 18.  He clearly knew they were engaged in
14     sexually explicit conduct.  And I think there's abundant
15     evidence he knew the content of those files because he
16     specifically saved only the ones depicting child pornography
17     in the notes but left the ones that did not depict child
18     pornography elsewhere.  How would he know which ones to save
19     if he did not know the contents of them?
20          This is a defendant who tried mightily to hide his
21     crimes.  He picked children that trusted him and that he had
22     easy access to.  No one would question his efforts to be alone
23     with them because he XXX XXXXXX.  He used passwords.  He moved
24     files to unusual locations.  He used apps where you normally
25     don't find pictures.  He even had a secret app to try and hide

**JA245**

189

his crime.  He tried to not even let the minors know what he
was doing.  Yet here we are today.  The images and videos are
no longer hidden in his phone.  You have all seen them and
heard how they got created and then later found.

When you consider all of the testimony and review
all of the evidence in this case and hear the law as the judge
instructs you, the evidence clearly shows beyond a reasonable
doubt that the defendant committed each one of these crimes
and for that we ask you to return a verdict of guilty on all
counts.

THE COURT:  Mr. Freedman.

MR. FREEDMAN:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen of the jury.

You've heard some fairly offensive conduct here
today.  And this is not a case about whether Mr. Hoover should
have provided alcohol to minors.  It's not a case whether he
should have been touching them or trying to reach over their
pants.  That's not what the charges are here today.  It's
offensive.  There's no question.  But that's not what he's
been indicted here in the Western District of North Carolina
for and it's not what he's being presented to the jury for.

Nor is this a referendum on the fact that the
defendant advocates for child pornography.  You were asked
extensively during voir dire about whether you belong to any
organizations that encourage child pornography.  We're not

**JA246**

190

1   here to indicate there's anything proper about child
2   pornography.  Child pornography is horrible and it victimizes
3   people and it victimizes them over and over again.  There's no
4   question about that.

5           And we're not here to decide -- to advocate for the
6   production of child pornography in any fashion at any time.
7   That's not what we're here today for.

8           What we're here today for is has the government
9   proven beyond a reasonable doubt that under the statute he
10  intended to produce child pornography and whether he knowingly
11  possessed child pornography?  And on those issues we contend
12  the government has failed in their burden.  The government
13  must prove each and every element of an offense beyond a
14  reasonable doubt.  The Court will instruct you on what beyond
15  a reasonable doubt is.  But beyond a reasonable doubt is the
16  highest standard of proof we have in the justice system in the
17  United States.  We heard during voir dire about how in civil
18  cases it's preponderance of the evidence.  It's beyond a
19  reasonable doubt.  It excludes all reasonable doubt.  And the
20  government must prove that.

21          We've got no burden to come forward and prove
22  anything.  You were instructed during voir dire and you were
23  just recently instructed by the Court that the defendant has
24  no obligation to testify, has no burden of proof, has nothing
25  to come forward and say because it's the burden on the

191

government at that point.  And you've been instructed that you
would not hold that against the defendant if he elected to
exercise his constitutional rights and I am certain you will
do that.

Before I go any further, let me thank you for your
time and attention.  This case has not been a very long case,
but it's obviously a very serious case.  It's very serious for
the boys who testified.  It's very serious for the government.
It's very serious for Mr. Hoover.  So while it has been a
brief trial, it's an extremely important trial and we
appreciate you giving your time and your efforts to a case
like this, especially having to sit through some of the
testimony that you sat through.

But for the jury, we could not have the justice
system that we have here in the United States.  And the reason
why we have a jury is because the 12 of you bring your common
experiences and your common sense and what you've seen and
come together to make some sort of collective decision.  And
you are the sole triers of the credibility of the witnesses.
You're the sole triers of the facts of the case.  And you're
the only ones who apply the law to the facts and determine
whether the government has proved Mr. Hoover guilty or not.
Not the government, not myself, not the judge will interfere
with that because it is your duty and your duty alone to do so
as the Court has instructed you.

1          Let me state as well, if I say something different
2    from the law that Judge Bell tells you, if he doesn't correct
3    me first, you go ahead and go with Judge Bell's recitation of
4    the law.  I'm trying to tell you what I believe my
5    understanding of the law to be.  And if I tell you something
6    different about the evidence in the case than you remember,
7    then you go with your memory.  I'm not trying to substitute my
8    memory for yours.  I'm just trying to tell you what my memory
9    of the case was.
10          Again, as we said, it was very short.  We first
11    heard from Mr. Gregg who testified about having worked with
12    Mr. Hoover for about six years, getting along fine with him.
13    They were in the IT department at Wells Fargo.  Mr. Hoover was
14    a manager himself, but he still reported to Mr. Gregg.
15          The government during its closing argument talked
16    about how is it that Mr. Hoover would expect that if he hid
17    something on his phone, it wouldn't be detected?  How could he
18    not?  He worked in IT.  How would he not know that?  And how
19    would he not know that Wells Fargo at some point would have
20    access to that phone?  You heard Mr. Gregg testify that when
21    they were given the phones, it was the property of Wells
22    Fargo.  We know they got -- the government got a search
23    warrant for the phone, but they were able to download the
24    phone themselves.  Wells Fargo was able to do that.  And
25    obviously they had an IT person -- a security person in

1  Mr. Turner who could determine that.

2          And the secret app?  Apparently the secret app was

3  not such a secret app because it was there for all the world

4  to see.  We know that M.C. saw the secret app and we know that

5  Mr. Turner had no problem accessing the secret app and opening

6  it up.

7          So to say that Mr. Hoover could never expect Wells

8  Fargo to have access to that phone or to be able to determine

9  anything on that phone, I would contend, defies common sense.

10          We then heard extensively from Agent Anderson in the

11  case and Agent Anderson gave us quite an extensive view of

12  Cellebrite extraction.  He told us all that our phones are

13  marking our very presence almost at all times down to the

14  longitude and latitude and time of day and everything else.

15  Of course, he couldn't tell you who was utilizing the phone at

16  that time, but he could tell you that that phone was

17  utilizing -- was taking those pictures along the way.

18          He could also tell you as well that there was no

19  other pornography on that phone.  I would contend there's no

20  pornography on the phone.  The government's contending that

21  those photographs constitute pornography.  But there was no

22  pornography on that phone.  If Mr. Hoover is such a

23  pornographer, if he's obsessed with all the -- doing these

24  various things, where's the pornography on the phone?  We

25  heard from Mr. Turner when he was involved with

1   investigations, sometimes it was not uncommon for there to be

2   thousands of images out there.  There were no images of

3   pornography on the phone.

4           There was some searches.  It looked like they all

5   occurred around one day -- well, the ones we know about

6   occurred around May 20, 2017.  We don't know who conducted

7   those searches.  The government will say it had to be

8   Mr. Hoover because his phone was password protected.  But we

9   heard from both Mr. Turner and from Mr. Anderson that there

10  are passwords that are changed, but there's also fingerprints,

11  up to five fingerprints, five different people that can have

12  access to the phone.  Who do we know -- other than Mr. Hoover,

13  who do we know for sure had access to the phone?  We know at

14  some point M.C. had access to the phone because he told you.

15  And we know A.P. had access to the phone and to the computers.

16  And I believe A.P. was quite forthright on the witness stand

17  when he said he looked at pornography on the phone, and he

18  said it was not child pornography.

19          But if over this three-year period of time,

20  two-to-three-year period of time, if both M.C. and A.P. had

21  access to the phone to do various things, then who else did?

22  We know A.P. had access to the security code.  And I'm not

23  suggesting A.P. did anything malevolent with the phone.  I

24  would suggest he did not.  I'm just saying that just because

25  somebody has a phone doesn't mean they're the only ones who

195

1   utilize that phone.  And nothing about Special Agent
2   Anderson's testimony limits the access to the phone to
3   Mr. Hoover.  In fact, he said he couldn't tell you a hundred
4   percent who took those photographs and who took those videos
5   on that occasion.  So we sort of have -- we've got that from
6   the testimony.
7           We have M.C. who's testified about Mr. Hoover on
8   several occasions touching him inappropriately, which is not
9   what's before this jury.  It's hard, it's so hard to hear this
10  evidence and not get emotional and not get upset.  It's
11  difficult to continue to look at those photographs.  But
12  you've got to separate passions and emotions and prejudices
13  and just analyze the case itself.
14          So what's the evidence in terms of M.C. that he was
15  out in the woods engaged in the activity he said that he was
16  engaged in?  And I would contend, you know, it's not -- that
17  no one got him to do that.  He was -- that was his choice in
18  terms of what he did and that was not as a result of
19  Mr. Hoover's actions.
20          And in terms of A.P.'s -- in terms of A.P.'s
21  testimony, have you heard one shred of evidence as to who took
22  that picture?  None.  We have no evidence about who -- we know
23  the phone took the picture.  We know where the picture -- the
24  video was taken.  We know that it was A.P.  A.P. didn't --
25  apparently did not know anybody was in the room with him at

**JA252**

196

1    that time.  We don't know who took the picture.  We know that
2    it was moved at some point, but it was moved fairly shortly
3    thereafter.  But we don't know who took the picture.  There
4    were other people -- we don't know who was in the house.  We
5    know nothing.  That's up to the government to prove to you
6    beyond a reasonable doubt.  It's not, ah, it's his phone; it
7    must have been him.

8              Did we hear any evidence from A.P. at any other time
9    that he saw Mr. Hoover doing anything inappropriate with his
10   phone in terms of taking pictures?  Did we hear anything
11   during M.C.'s testimony that other than this one occasion he
12   was out taking his phone, this grand pornographer, again, who
13   has no downloads, no access, no indication of anything that he
14   has been searching for pornography or utilizing his phone in
15   an improper fashion except the allegations on these occasions
16   from the government.

17             And in terms of the elements of the case, you've
18   been over the elements a bunch and I won't go over them again.
19   But the government has to prove -- in terms of child
20   possession -- possession of child pornography, excuse me, the
21   government has to prove that it's a knowing possession.  We
22   know that the videos were deleted.  We don't know when.
23   Apparently the iPhone, which tells us everything else, doesn't
24   tell us when those videos were deleted, but they were deleted.
25   And you've heard no evidence to indicate Mr. Hoover was ever

**JA253**

1  aware or knew that he possessed child pornography.

2       In terms of the other two counts, the production

3  counts, you've been through the elements, but let me

4  emphasize, the defendant used, employed, persuaded, induced,

5  enticed, or coerced the minor named in counts one and two to

6  engage in sexually explicit conduct for the purpose of

7  producing a visual depiction of that conduct.

8       Whatever conduct A.P. engaged in on that occasion

9  A.P. engaged in on that occasion.  It wasn't as a result of

10  being coerced.  It wasn't as a result of being induced or

11  enticed or employed.  Mr. Hoover -- there was no suggestion at

12  all that Mr. Hoover used him in any fashion to say, "Go ahead

13  and do this so I can film this."  And as I stated before, we

14  don't even know who filmed it.  But there's nothing to

15  indicate that Mr. Hoover engaged in those activities.

16       You'll also receive another instruction about the

17  government has to prove that the sexual activity that was

18  engaged in, the defendant had a specific intent to produce a

19  visual depiction.  It is not sufficient simply to prove that

20  the defendant purposely took a picture.  It is not -- just the

21  fact that a picture was taken is not in and of itself

22  sufficient.  The government must prove that producing a visual

23  depiction of sexually explicit conduct was one of defendant's

24  purposes for using, employing, persuading, enticing, or

25  coercing the victim to engage in sexually explicit conduct.

198

1  And it was a significant or motivating purpose; it was not

2  merely incidental to the sexually explicit conduct.

3           I would contend anything that occurred -- as I

4  stated, there's no downloads of pornography.  There's no

5  access to pornography.  You've heard testimony about him

6  making inappropriate comments.  You've heard testimony about

7  him touching on the thigh.  You've heard plenty of testimony

8  about him doing things he shouldn't have been doing.  And I

9  would contend to you whatever he was doing, he was doing for

10 that purpose and that purpose alone, not for the purpose of

11 producing pornography.  Whatever was done was not done for

12 that purpose.  And if that's the case, then I would contend

13 the government has failed in their burden.

14          We don't know who took the picture of A.P.  Nobody

15 encouraged him to engage in that activity.  And he is clearly

16 not guilty of that offense.

17          In terms of M.C., he was engaged in some

18 inappropriate -- according to the government's evidence, he

19 was engaged in inappropriate conversation and touching, but

20 not for the purpose of producing these photographs.  If so, I

21 would contend, we would have a whole secret calculator full of

22 pictures.  We would have a whole notes full of pictures.  We

23 would have downloads of pornography.  This was all incidental

24 to his activity.

25          So when you go back -- I'm not asking you to

**JA255**

199

1   encourage this behavior.  I'm not asking you to advocate for
2   child pornography or the production of child pornography.  I'm
3   asking you to make the government prove their case on these
4   three charges.  And I'm asking you and imploring you to say on
5   these charges that are before you, not other activity, not
6   anything that may be going on, but for these charges, the
7   government has failed in their burden and that you should find
8   the defendant not guilty.

9        One last point I wish to say.  If he was doing this
10  for the purpose of production of pornography, then why wasn't
11  he accessing the photographs?  If you look -- I asked Agent
12  Anderson, I talked to him about can you tell how often he
13  accessed those photographs?  He said he can't.  But what he
14  can do is determine when was the last time he accessed the
15  photograph.  And you'll have access -- you'll have access to
16  all the evidence that you want if you were to request it.

17       Shortly after -- whenever the items were moved from
18  the original photographs to notes, that was generally the last
19  access day.  I believe the most -- the longest access day
20  between when the photographs were taken and when they were
21  moved was approximately two weeks.  If he's doing this for the
22  child pornography, he's not utilizing it because he's not
23  accessing it.  And I would contend you can utilize that and
24  utilize your common sense to make a determination that he is
25  not guilty of these offenses.

1          Thank you.

2          THE COURT:  The government has 17 minutes remaining.

3          MS. RANDALL:  Thank you, Your Honor.

4          Ladies and gentlemen, I'll just -- I'll just be

5    brief and address some of the points that were raised by

6    Mr. Freedman just now.

7          You heard a lot of testimony about what he calls

8    inappropriate conversations and inappropriate touching

9    involving M.C. and A.P.  And he's correct, the defendant is

10   not on trial for those.  But that is evidence that you can use

11   to help figure out who created those images and videos and

12   what their purpose was.  The judge has told you that during

13   the testimony and he told you during the instructions that you

14   can use circumstantial evidence and that type of evidence to

15   help you figure out the other elements that the government

16   does have to prove, and that is why that evidence has been

17   presented to you and why you should consider it in your

18   deliberations because one of the questions he raises is how

19   can you tell who was using that phone when these images and

20   videos were created?  Well, we know A.C. and M.C. did not make

21   those images and videos themselves.  Both their hands are

22   visible in those videos and images.  They're not the ones

23   creating them.  And there's no evidence of anyone else

24   accessing that phone other than A.P., M.C., and the defendant,

25   and we know they didn't make those.

1          But needless to say, maybe someone else used the
2     phone to make those images and videos.  Does it make sense,
3     common sense, that somebody else would use the defendant's
4     phone, know the password, enter the password, create these
5     images and videos on two different dates a year apart of two
6     different boys, and then repeatedly get back on the
7     defendant's phone to store them in notes that the person
8     created?  Again, a year apart.  And then do it again with A.P.
9     on another hiking trip and go back and store those images and
10    videos in the same note he had created to store the images and
11    videos that were created in June.  Does that really make sense
12    that somebody else was going to do that?  And oh, by the way,
13    search for NAMBLA and boys masturbating, and all of that,
14    without the defendant knowing, someone who works in IT.  Does
15    that really make sense, ladies and gentlemen?
16         Who talked to A.P. about masturbation?  Who talked
17    to him about wanting to see him masturbate?  The defendant.
18    Who would want to have a video of the defendant -- of A.P.
19    masturbating?  The defendant.
20         Those images and videos from that hiking trip, it
21    was just the defendant and A.P.  You had a picture of them
22    taken together.  And there's a video that day.  Now, you don't
23    see the actual act.  A.P. told you he was masturbating.
24    Someone chose to make a video of just that: A.P. laying in a
25    hammock and masturbating.  The defendant was the only other

1  person there.  And that video was created and then saved with
2  the images of A.P. on the couch.  If someone else made the
3  images and videos of A.P. on the couch and then saved them to
4  the defendant's phone without the defendant knowing, how did
5  those other images and videos get saved with them when we know
6  the defendant was the only other person on that hiking trip
7  with A.P.?  The fact that they're all saved together tells you
8  everything you need to know.

9        Mr. Freedman also addressed the part of the elements
10  about whether the victims were coerced, enticed, induced, or
11  used to create the images and videos.  And as I told you, you
12  only have to find one of those.  And I want you to listen to
13  the law as the judge gives it to you.  He will define use for
14  you and he will tell you that when a child is videoed or
15  photographed, that is sufficient for you to find a child was
16  used.  There doesn't have to be the coercion.  There doesn't
17  have to be an enticement.  He did not have to tell A.P. to
18  masturbate when he was recording the video for him to use
19  A.P.  When he took out the camera -- when he sees A.P.
20  masturbating and he takes out that camera or the video and
21  decides to create this image and video, that is him using
22  A.P. to create child pornography.

23        And he talked a lot about what -- if you find the
24  defendant made the video, what was his purpose?  Ladies and
25  gentlemen, his only purpose -- when those videos and images

were created, the only role he played in that image and video

was as the creator of it.  His only role was making sure an

image or video existed when it was done.  That is how you know

it was a dominant purpose of his because his only -- he

created the video.  But for his actions, there would be no

video.

          And he also talked a lot about the access dates and

about the fact that the defendant doesn't have thousands of

images and videos.  Wouldn't there be all this other evidence

if that was his purpose?  And you don't have to access an

image or a video a thousand times or have thousands of images

and videos to have that purpose, ladies and gentlemen.  You

have to think about what was in Mr. Hoover's mind when he was

taking that video of A.P.  Why did he want to take that

image -- all of those images?  Think about that.  Think about

how many images he created and how many videos he created.  If

this was incidental, if that was not the main reason he was in

that room holding his phone, why would he take that many

images and that many videos of A.P.?

          And the same with M.C.  There are not as many images

or videos, but he directly instructed M.C. what he wanted him

to do.  That's how you know what his purpose was.  He told

M.C., "I want you to masturbate," and then he hid himself

behind him to record it so he could capture it.  His whole

goal when he was with M.C. was to create that video.

204

1          When Ms. Spaugh got up and spoke to you earlier this

2     morning, she said at the end of this trial I would get up here

3     and ask you to do two things, and that's what I'm going to ask

4     you to do right now.  Number one, follow the law as the judge

5     gives it to you.  And two, hold the defendant accountable.

6          When you review all of the evidence in this case and

7     all of the testimony and use your common sense, it is clear

8     beyond a reasonable doubt that the government has proved each

9     and every element in this case..

10          Thank you.

11          THE COURT:  All right.  Members of the jury, the

12     Court will now read the superseding bill of indictment, the

13     statutes the defendant is charged with violating, and the

14     essential elements of the offenses.  Keep in mind as I review

15     and summarize the charges that when you go to the jury room to

16     decide this case, you will have a copy of the superseding bill

17     of indictment with you so it will not be necessary for you to

18     try to memorize while I speak exactly how the charges are laid

19     out.  Also, you will have a copy of these instructions that

20     I'm about to give to you in the jury room as well so you

21     don't -- you can continue to take notes, but you'll have these

22     instructions with you in the jury room and you don't have to

23     memorize them.

24          Although the indictment may charge the defendant

25     with committing an offense in several ways, using conjunctive

205

1  language, that means saying and this way, and that way, and

2  that way, it is not necessary for the government to prove that

3  the defendant did each of those things.  It is sufficient if

4  the government proves beyond a reasonable doubt that the

5  defendant did any of these alternative acts as charged.

6        The indictment charges that the offenses alleged in

7  the indictment were committed on or about a certain date.

8  Although it is necessary for the government to prove beyond a

9  reasonable doubt that the offenses were committed on a date

10  reasonably near the date alleged in the indictment, it is not

11  necessary for the government to prove that the offenses were

12  committed precisely on the date charged.

13        Count one in the superseding bill of indictment

14  reads as follows:

15        The defendant, Michael Scott Hoover, is charged in

16  counts one and two of the superseding bill of indictment as

17  follows:

18        Count one.  On or about June 20, 2018, in Wilkes

19  County, within the Western District of North Carolina, and

20  elsewhere, the defendant, Michael Scott Hoover, did employ,

21  use, persuade, induce, entice, and coerce minor victim 1 to

22  engage in sexually explicit conduct for the purpose of

23  producing any visual depiction of such conduct using materials

24  that had been mailed, shipped, or transported in and affecting

25  interstate and foreign commerce by any means, including by

**JA262**

1  computer, in violation of Title 18, United States Code,

2  Section 2251(a) and (e).

3         Count two reads:

4         On or about August 4, 2019, in Yancey County, within

5  the Western District of North Carolina, and elsewhere, the

6  defendant, Michael Scott Hoover, did employ, use, persuade,

7  induce, entice, and coerce minor victim 2 to engage in

8  sexually explicit conduct for the purpose of producing any

9  visual depiction of such conduct using materials that had been

10  mailed, shipped, or transported in and affecting interstate

11  and foreign commerce by any means, including by computer, all

12  in violation of Title 18, United States Code, Section 2251(a)

13  and (e).

14         Title 18, United States Code, Section 2251(a)

15  provides, in pertinent part, as follows:

16         Any person who employs, uses, persuades, induces,

17  entices, or coerces any minor to engage in any sexually

18  explicit conduct for the purpose of producing any visual

19  depiction of such conduct shall be guilty of an offense

20  against the United States if that visual depiction was

21  produced or transmitted using materials that had been mailed,

22  shipped, or transported in or affecting interstate or foreign

23  commerce by any means, including by computer.

24         The essential elements of counts one and two are as

25  follows:

207

1          For you to find the defendant guilty of using a
2     minor to produce a visual depiction of a minor engaging in
3     sexually explicit conduct charged in these two counts, the
4     government must prove the following elements beyond a
5     reasonable doubt:
6          First, that the minor named in counts one and two of
7     the superseding bill of indictment was under the age of 18;
8          Two, that the defendant used or employed or
9     persuaded or induced or enticed or coerced the minor named in
10    counts one and two to engage in sexually explicit conduct for
11    the purpose of producing a visual depiction of that conduct;
12    and
13         Third, that the visual depiction was produced using
14    materials that had been mailed, shipped, or transported in and
15    affecting interstate or foreign commerce by any means,
16    including by computer.
17         I will now define certain terms used in these
18    essential elements.  You are to apply these definitions as you
19    consider the evidence.  If I do not define certain concepts or
20    words, you will assign to them their usual, ordinary, everyday
21    meanings.
22         As used in these instructions, the term "minor"
23    means any person under the age of 18 years.  When you consider
24    whether a person is under the age of 18, you may use your life
25    experience in observing children.  The government does not

**JA264**

208

1  have to prove that the defendant knew that the victim was less
2  than 18 years old.
3          A person is "used" if they are photographed or
4  videotaped.
5          The term "producing" means producing, directing,
6  manufacturing, issuing, publishing, or advertising.
7          The government does not have to prove that the
8  defendant's sole purpose or the primary purpose of engaging in
9  such conduct was to produce a visual depiction.  However, the
10 government must prove that the minor engaged in the sexual
11 activity and that the defendant had the specific intent to
12 produce a visual depiction.  It is not sufficient simply to
13 prove that the defendant purposefully took the picture.  The
14 government must prove that producing a visual depiction of the
15 sexually explicit conduct was one of the defendant's purposes
16 for using, employing, persuading, enticing, or coercing the
17 victim to engage in sexually explicit conduct and that it was
18 a significant or motivating purpose and was not merely
19 incidental to the sexually explicit conduct.
20         In deciding whether the government has proven that
21 the defendant acted for the purpose of producing a visual
22 depiction of the sexually explicit conduct, you may consider
23 all of the evidence concerning the defendant's conduct.
24         As used in these instructions, the term "sexually
25 explicit conduct" means actual or simulated sexual

1  intercourse, including genital-genital, oral-genital,

2  anal-genital, or oral-anal, whether between persons of the

3  same or opposite sex; or bestiality; or masturbation; or

4  sadistic or masochistic abuse; for -- this gets a little

5  confusing, but this will be back there with you -- for conduct

6  that occurred on or about December 7, 2018, the lascivious

7  exhibition of the genitals or pubic area of any person; and

8  for conduct that occurred after December 7, 2018, the

9  lascivious exhibition of the anus, genitals, or pubic area of

10  any person.

11         The definition -- the term "lascivious exhibition"

12  means a depiction that displays or brings to view to attract

13  notice to the genitals or pubic area of children in order to

14  excite lustfulness or sexual simulation in the viewer.  Not

15  every exposure of the genitals or pubic area constitutes a

16  lascivious exhibition.  In deciding whether the government has

17  proved that a particular visual depiction constitutes a

18  lascivious exhibition, you should consider the following

19  factors:

20         First, whether the focal point of the visual

21  depiction is on the minor's genitals or pubic area;

22         Second, whether the setting of the visual depiction

23  makes it appear to be sexually suggestive.  For example, in a

24  place or pose generally associated with sexual activity;

25         Third, whether the minor is displayed in an

1  unnatural pose or in inappropriate attire considering the age

2  of the minor;

3          Fourth, whether the child is fully or partially

4  clothed or nude;

5          Fifth, whether the visual depiction suggests coyness

6  or a willingness to engage in sexual activity; and

7          Sixth, whether the visual depiction is intended or

8  designed to elicit a sexual response in the viewer.

9          A picture or image need not involve all of these

10  factors to be a lascivious exhibition of the genitals or pubic

11  area.  It is for you to decide the weight or lack of weight to

12  be given to any of these factors.  Ultimately, you must

13  determine whether the visual depiction is lascivious based on

14  its overall content.

15          "Visual depiction" includes undeveloped film and

16  videotape and data stored on computer disks or by electronic

17  means which is capable of conversion into visual image and

18  data which is capable of conversion into a visual image that

19  has been transmitted by any means, whether or not stored in a

20  permanent format.

21          As used in these instructions, the term "computer"

22  means an electronic, magnetic, optical, electrochemical, or

23  other high speed data processing device performing logical,

24  arithmetic, or storage functions, and includes any data

25  storage facility or communications facility directly related

211

1   to or operating in conjunction with such device, but such term

2   does not include an automated typewriter -- you remember

3   those -- or typesetter or a portable handheld calculator or

4   other similar device.

5           The term "interstate commerce" includes commerce

6   between one state, territory, possession, or the District of

7   Columbia and another state, territory, possession, or the

8   District of Columbia.  Interstate commerce simply means the

9   movement of goods, services, money, and individuals between

10  any two or more states or between one state and the District

11  of Columbia.

12          "Foreign commerce" includes movement of goods,

13  services, money, and individuals from one country to another.

14          To satisfy this element, the government must prove

15  that the defendant's conduct affected interstate or foreign

16  commerce in any way, no matter how minimal.  The government is

17  not required to prove that the defendant knew his conduct was

18  in or affecting interstate or foreign commerce.

19          The local or intrastate production of visual

20  depictions of a minor engaged in sexually explicit conduct

21  with a computer, a cell phone, or a camera that traveled in

22  interstate or foreign commerce is part of an economic class of

23  activities that substantially affect interstate or foreign

24  commerce.

25          A visual depiction of a minor engaging in sexually

**JA268**

1    explicit conduct is "produced" using materials mailed,

2    shipped, or transported in or affecting interstate or foreign

3    commerce if the visual depiction is stored, created, or

4    recorded on a device containing materials that were mailed,

5    shipped, or transported in or affecting foreign commerce.

6        The term "knowingly" describes a defendant's state

7    of mind, meaning that the defendant was conscious and aware of

8    his actions, realized what he was doing or what was happening

9    around him, and did not act because of ignorance, mistake, or

10   accident.

11       I instruct you that a minor cannot legally consent

12   to participating in illegal sexual conduct.  A person under

13   the age of 18 lacks the capacity to consent to illegal sexual

14   conduct.  Accordingly, any argument regarding a minor's

15   consent must not be considered by you in reaching your

16   verdict.  And I don't believe you heard any such argument.

17       Count three of the indictment reads as follows:

18       Defendant Michael Scott Hoover -- let's see.  From

19   on or about June 20, 2018, through on or about August 15,

20   2019, in Wilkes County, within the Western District of North

21   Carolina, and elsewhere, the defendant, Michael Scott Hoover,

22   knowingly possessed, and accessed with intent to view, any

23   material that contained an image of child pornography, as

24   defined in Title 18, United States Code, Section 2256(8), that

25   has been mailed and shipped and transported using any means

213

1  and facility of interstate and foreign commerce, and in and

2  affecting interstate and foreign commerce by any means,

3  including by computer, and that was produced using materials

4  that have been mailed and shipped and transported in and

5  affecting interstate and foreign commerce by any means,

6  including by computer.

7          All in violation of Title 18, United States Code,

8  Section 2252A(a)(5)(B).

9          That section provides, in pertinent part, as

10  follows:

11          Any person who knowingly possesses or knowingly

12  accesses with intent to view any book, magazine, periodical,

13  film, videotape, computer disk, or any other material that

14  contains an image of child pornography that has been mailed or

15  shipped or transported using any means or facility of

16  interstate or foreign commerce by any means, including by

17  computer, or that was produced using materials that have been

18  mailed or shipped or transported in or affecting interstate or

19  foreign commerce by any means, including by computer, shall be

20  guilty of an offense against the United States.

21          For you to find the defendant guilty of possession

22  of child pornography as charged in count three of the

23  superseding bill of indictment, the government must prove the

24  following essential elements beyond a reasonable doubt:

25          First, that the defendant knowingly possessed or

214

1  accessed with the intent to view any material that contained
2  an image of child pornography as alleged in the superseding
3  bill of indictment;

4          Second, that the material had been mailed or shipped
5  or transported using any means of interstate or foreign
6  commerce, or in or affecting interstate or foreign commerce by
7  any means, including by computer, or was produced using
8  materials that had been mailed, shipped, transported in or
9  affecting interstate or foreign commerce by any means,
10  including by computer; and

11          Third, that when the defendant possessed or accessed
12  with the intent to view the material, the defendant knew the
13  material contained an image of child pornography.

14          I have previously defined several of these terms,
15  including "interstate or foreign commerce," "computer," and
16  "knowingly."  You should apply these definitions in deciding
17  count three as well except that I instruct you as follows
18  regarding interstate or foreign commerce:

19          The previous movement across state lines of a
20  computer or cell phone that the defendant later used to
21  possess visual depictions of child pornography is sufficient
22  to establish that the child pornography affected interstate
23  commerce.  That is, the computer or cell phone need not
24  have -- need not have had child pornography on it when the
25  computer or cell phone moved in interstate or foreign

**JA271**

215

1  commerce.  The previous movement through interstate or foreign
2  commerce of a computer or cell phone that later was used to
3  possess visual depictions of child pornography is sufficient
4  to establish that the child pornography was transported in
5  interstate commerce.
6         The first element of count three which the
7  government must prove beyond a reasonable doubt is that the
8  defendant possessed a visual depiction.  To possess something
9  means to have it within a person's control.  This does not
10 necessarily mean that the person must hold it physically, that
11 is, have actual possession of it.  As long as the visual
12 depiction is within the defendant's control, he possesses it.
13        If you find that the defendant either had actual
14 possession of the depiction or that he had the power and
15 intention to exercise control over it even though it was not
16 in his physical possession, you may find that the defendant
17 [sic] has proven possession.
18        The law also recognizes that possession may be sole
19 or joint.  If one person alone possesses it, that is sole
20 possession.  However, it is possible that more than one person
21 may have the power and intention to exercise control over the
22 visual depiction.  This is called joint possession.  If you
23 find that the defendant had such power and intention, then he
24 possessed the depiction even if he possessed it jointly with
25 another person.

**JA272**

216

1          The government must prove that the defendant
2    possessed the depiction knowingly.  An act is done knowingly
3    when it is done voluntarily and intentionally and not because
4    of accident, mistake, or some other innocent reason.
5          "Child pornography" means any visual depiction,
6    including any photograph, film, video, picture, or computer --
7    or computer-generated image or picture, whether made or
8    produced by electronic, mechanical, or other means, of
9    sexually explicit conduct where:
10         One, the production of such visual depiction
11   involves the use of a minor engaging in sexually explicit
12   conduct;
13         Two, such visual depiction is a digital image,
14   computer image, or computer-generated image that is, or is
15   indistinguishable from, that of a minor engaging in sexually
16   explicit conduct; or
17         Three, such visual depiction has been created,
18   adapted, or modified to appear that an identifiable minor is
19   engaging in sexually explicit conduct.
20         I have previously defined several of these terms,
21   including "minor," "sexually explicit conduct," and "visual
22   depiction."  You should apply those definitions in deciding
23   count three as well.
24         Now, members of the jury, you've heard the evidence
25   and the arguments of counsel for the government and for the

217

1   defendant.  It is your duty to remember the evidence whether
2   it has been called to your attention or not.  And if your
3   recollection of the evidence differs from that of the
4   attorneys, you are to rely solely upon your recollection of
5   the evidence in your deliberations.
6          You, as jurors, must decide this case based solely
7   on the evidence presented here within the four walls of the
8   courtroom.  This means that during your deliberations you must
9   not conduct any independent research about this case, the
10  matters in this case, the individuals or groups involved in
11  the case, or legal concepts.  Your duty to follow this
12  instruction is a serious responsibility and the failure to
13  follow it may result in being found in contempt of court.
14         During your deliberations you must not communicate
15  with or provide any information to anyone by any means about
16  this case.  You may not use any electronic device to
17  communicate to anyone any information about this case or to
18  conduct any research about this case while you are serving as
19  jurors.
20         I have not reviewed the contentions of the parties,
21  but it is your duty not only to consider all of the evidence,
22  but also to consider all the arguments, the contentions and
23  positions urged by the attorneys, and any other contention
24  that arises from the evidence, and to weigh them all in the
25  light of your common sense and as best you can to determine

**JA274**

218

1  the truth of this matter.

2         The law, as indeed it should, requires the presiding

3  judge to be impartial.  Therefore, do not assume from anything

4  I may have done or said during the trial that I have any

5  opinion concerning any of the issues in this case.

6         I instruct you that a verdict is not a verdict until

7  all 12 jurors agree unanimously as to what your decision

8  should be.  You may not render a verdict by majority vote or

9  any other voting mechanism aside from a unanimous verdict of

10 12.

11        The Court suggests that as soon as you reach the

12 jury room before beginning deliberations you select one of

13 your members to serve as foreperson.  This individual has the

14 same vote as the rest of the jurors but simply serves to

15 preside over the discussions.

16        Once you begin deliberating, if you need to

17 communicate with me, the foreperson will send a note -- will

18 send a written message to me by knocking on the door and

19 handing it to the marshal or court security officer.  However,

20 you are not to tell me how you stand numerically as to your

21 verdict.  For instance, should you be split in your voting at

22 any particular time, you would not tell me the specific

23 numbers of your division in your note.

24        We use a verdict sheet.  This is simply the written

25 notice of the decision that you reach in this case.  As soon

219

1   as you have reached a verdict as to the counts alleged in the

2   superseding bill of indictment, you will return to the

3   courtroom and your foreperson will, on request, hand the

4   verdict sheet to the clerk.  There are places on the verdict

5   sheet for the foreperson to enter the verdict, sign it and

6   date it.

7         During the trial several items were received into

8   evidence as exhibits.  We have a computer system in the

9   deliberation room that enables you to view exhibits

10  electronically.  And if you ask to see any of the exhibits, we

11  will provide them to you and give you the appropriate

12  instruction on how to do so.

13        If you need a break during your deliberations, you

14  may do so in the jury room.  Or if you need a break outside

15  the jury room, a marshal or court security officer will escort

16  you.  But you must not deliberate during a break unless all 12

17  of you are together.  If you are not together, then do not

18  talk about the case until all of you are back together.

19        Does either side request a sidebar at this point?

20        MR. FREEDMAN:  No, Your Honor.

21        MS. RANDALL:  No, Your Honor.

22        THE COURT:  All right.  Members of the jury, you may

23  take this case and see how you find.  If the two alternates

24  would remain where you are, please, just for a moment.  The 12

25  of you please retire to the jury room to begin your

1  deliberations.

2      You can take your notes with you.  Yeah, go to the

3  same room downstairs.

4      (Jury of 12 exited the courtroom.)

5      THE COURT:  All right.  For our two alternates, I'm

6  not going to make you sit here and wait and see if we need

7  you, but we might.  And it does happen that deliberations

8  start and a juror for some reason is unable to complete it, at

9  which point we substitute one or both of you if necessary into

10 deliberations and actually deliberations start all over again.

11 You don't come in at the last minute and say we've already

12 decided this thing so just raise your hand.  That's not the

13 way it works.

14      So I'll let you go, but I do admonish you because

15 you could become jurors in the jury room, do not discuss this

16 case with anyone.  Don't even start thinking about how you

17 would vote because those sort of things are supposed to be

18 done in deliberation with your fellow jurors.  Don't do any

19 research, as always.

20      Feel free to contact the clerk's office at the end

21 of the day tomorrow, whatever, maybe we can reach out to you

22 and let you know when we know for sure we're not going to need

23 you.  And once there is a verdict, then, of course, you're

24 released from service and we know that we won't need you.  And

25 at that point you'll be free to discuss or not discuss the

1   case with whomever you want.  Nobody can make you talk about

2   it, but I'm not going to try to stop you from talking to

3   somebody either.

4            Thank you both for your service.  Hopefully we won't

5   need to call you back, but appreciate your being willing to be

6   called back.  You may go.

7            Everyone remain seated while the jury is leaving.

8            JUROR NO. 14:  Call back at 9:00, is that what

9   you're saying?

10           THE CLERK:  I'll call.

11           THE COURT:  Ms. Compton will take care of it.

12           If you were taking notes, if you would leave them

13   with Ms. Compton, please, and not take them with you.

14           (Alternates exited the courtroom.)

15           THE COURT:  Ms. Randall.

16           MS. RANDALL:  Your Honor, one thing that I think we

17   need to address on the record that we'd forgotten to do before

18   is that the defendant is supposed to notify the Court whether

19   they're going to be requesting a jury trial on the forfeiture.

20           THE COURT:  Well, I was just about to ask.  Is there

21   anything to forfeit?

22           MS. RANDALL:  The iPhone, Your Honor.

23           THE COURT:  Doesn't the iPhone belong to Wells

24   Fargo?

25           MS. RANDALL:  It does.  We just included it in the

**JA278**

222

1    indictment just because he did have an interest in it at some
2    point.
3            THE COURT:  Mr. Freedman, in the event of a guilty
4    verdict --
5            MR. FREEDMAN:  We're not asking for a trial.
6            THE COURT:  I assume that there would be a consent
7    order of some --
8            MR. FREEDMAN:  As to the iPhone.
9            THE COURT:  As to the iPhone if that's all there is.
10           MS. RANDALL:  Yes.
11           THE COURT:  All right.  We will be in recess
12    awaiting word from the jury.
13           (Recess pending a verdict at 3:53 PM.)
14                              *****
15           (Court back in session at 4:18 PM.)
16           THE COURT:  I'm told we have a verdict.  If you
17    would bring up the jury, please.
18           (Jury entered the courtroom.)
19           THE COURT:  Has the jury selected a foreperson?
20           JUROR NO. 2:  Yes, Your Honor.
21           THE COURT:  If you would please hand the verdict
22    sheet to the clerk.
23           (Verdict sheet tendered to the Court.)
24           THE COURT:  We, the jury, return the following
25    unanimous verdict as to the charges contained in the

**JA279**

223

1    superseding bill of indictment:

2                As to count one, guilty.

3                As to count two, guilty.

4                As to count three, guilty.

5                Is this your verdict, so say you all?

6                (Affirmative response.)

7                THE COURT:  Do you request a polling?

8                MR. FREEDMAN:  I do request a polling, Your Honor.

9                THE COURT:  Please poll the jury.

10               THE CLERK:  Ladies and gentlemen of the jury, in the

11   case of the United States of America versus Michael Scott

12   Hoover, you returned a verdict as previously published.

13               Juror number 1, was this your verdict and is it

14   still your verdict?

15               (No response.)

16               THE CLERK:  Ma'am?

17               THE COURT:  Juror number 1?

18               THE CLERK:  Was this your verdict and is this still

19   your verdict?

20               JUROR NO. 1:  Guilty.

21               THE CLERK:  Juror number 2?

22               JUROR NO. 2:  Yes.

23               THE CLERK:  Juror number 3?

24               JUROR NO. 3:  Yes, ma'am.

25               THE CLERK:  Number 4?

224

1          JUROR NO. 4:  Yes.

2          THE CLERK:  Number 5?

3          JUROR NO. 5:  Yes.

4          THE CLERK:  Six?

5          JUROR NO. 6:  Guilty

6          THE CLERK:  Number 7?

7          JUROR NO.7:  Yes.

8          THE CLERK:  Number 8?

9          JUROR NO. 8:  Yes

10         THE CLERK:  Number 9?

11         JUROR NO. 9:  Yes.

12         THE CLERK:  Ten?

13         JUROR NO. 10:  Yes.

14         THE CLERK:  Eleven?

15         JUROR NO. 11:  Yes.

16         THE CLERK:  And 12?

17         JUROR NO. 12:  Yes.

18         THE COURT:  Members of the jury, I greatly

19    appreciate your being here.  I hope you feel privileged to

20    have sat on a jury.  As I said before, we can't do this

21    without you.  And it really is one of the great hallmarks of

22    our country and our system that these cases are decided by

23    members of the public.  Not by elected officials, not by

24    judges, not by lawyers, you folks.

25              So, again, my thanks.  I think you won't be called

1   again for federal court for some time.

2           If you took notes, if you would please just leave

3   them in your seats there and we'll collect them.

4           And you are free to go and discuss this case, or

5   not, with whoever you want.  No one can make you talk about

6   it, but you can now talk with anybody you want about it if

7   that's your desire.  Thank you.

8           Everyone remain seated while the jury leaves.

9           (Jury exited the courtroom.)

10          THE COURT:  So I understand that the forfeiture

11  issue is going to be waived for jury purposes and there will

12  be some sort of consent order entered.

13          MR. FREEDMAN:  That's correct, Your Honor.

14          And I would also renew my motion notwithstanding the

15  verdict of the jury.

16          THE COURT:  Motion is denied for the reasons stated

17  earlier.

18          Anything else to address today?

19          MR. FREEDMAN:  No, Your Honor.

20          THE COURT:  I want to thank the lawyers for their

21  courtesy and professionalism to one another.  It was a well

22  tried case and a pleasure to have been with all of you.  And

23  the witnesses showed great courage and calm and demeanor on

24  the witness stand.  I was very impressed.  And of course,

25  Agent Anderson, you're always a good witness.  You're too

226

1    frequently a witness in this courtroom in my opinion, but

2    those are the nature of the cases we deal with apparently.

3            All right.  Mr. Hoover is remanded to the custody of

4    the marshals pending sentencing and the Court is in recess.

5            (End of proceedings at 4:26 PM.)

6                            *****

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

227

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6            I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10 the foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is

13 in conformance with the regulations of the Judicial Conference

14 of the United States.

15

16            Dated this 17th day of April 2022.

17

18

19                        s/Cheryl A. Nuccio

20                        Cheryl A. Nuccio, RMR-CRR
                          Official Court Reporter
21

22

23

24

25

**JA284**

FILED in Court
Statesville, NC

APR 2 2 2021

US District Court
Western District of NC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION

UNITED STATES OF AMERICA     )     DOCKET NO.: 5:20-cr-88-KDB

          **v.**                    )

MICHAEL SCOTT HOOVER       )     **VERDICT FORM**

                                 )

       We, the jury, return the following unanimous Verdict as to the charges contained in the

Superseding Bill of Indictment:

1.  As to Count One, charging the defendant with a violation of 18 U.S.C. § 2251(a) and (e)

    on or about June 20, 2018, we, the jury, find the defendant:

          Guilty: __✓__           Not Guilty:_____

2.  As to Count Two, charging the defendant with a violation of 18 U.S.C. § 2251(a) and (e)

    on or about August 4, 2019, we, the jury, find the defendant:

          Guilty: __✓__           Not Guilty:_____

3.  As to Count Three, charging the defendant with a violation of 18 U.S.C. § 2252A(a)(5)(B)

    from on or about June 20, 2018, through on or about August 15, 2019, we, the jury, find

    the defendant:

          Guilty: __✓__          Not Guilty:_____

                                              Foreperson

                            _April 22, 2021_
                                      Date

**JA285**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CASE NO.: 5:20-CR-88-KDB-DSC

UNITED STATES OF AMERICA

v.

MICHAEL SCOTT HOOVER

## SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

Michael Scott Hoover ("Scott") comes before the Court for sentencing having been convicted by a jury for production of child pornography and possession with intent to view child pornography, in violation of 18 U.S.C. § 2251 and 18 U.S.C. § 2252A. Through counsel, he submits this memorandum to assist the Court in fashioning an appropriate sentence pursuant to 18 U.S.C. § 3553 (a).

The Presentence Report ("PSR") has determined the advisory Guidelines call for a sentence of 840 months. By way of comparison, the median federal sentence for murder is 240 months.[1] As the Court is well aware, the advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553 (a)). The defense submits that

---

[1] United States Sentencing Commission Quarterly Data Report September 30, 2019 at 17. Located at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_FY19.pdf.

1

after all of the relevant statutory factors are taken into consideration, a sentence far below the advisory guideline range is appropriate.

## **SCOTT HOOVER'S HISTORY AND CHARACTERISTICS**

Scott Hoover grew up in a poor family in the North Carolina mountains. After graduating from high school, he chose to serve his country and enlisted in the Navy. He was deployed to the Middle East and served in Operations Desert Shield and Desert Storm. There, he flew numerous combat missions and performed as door gunner, in mine searches, and in surface surveillance. He participated in numerous search and rescue missions. For his service in he was awarded the Sea Service Deployment Ribbon, the National Defense Service Medal, and the Southwest Asia Service Medal. As a result of his combat experiences, Scott has been diagnosed with Post-Traumatic Stress Disorder.

After receiving an honorable discharge, Scott decided to continue his education. He enrolled in Wilkes County Community College and earned his Associate's Degree. He eventually received his Bachelor's Degree from Gardner-Webb University in 2006, graduating *cum laude*.

Since leaving the Navy, Scott has maintained gainful full-time employment, even during the years that he was attending college. He first worked as a service technician for two different companies before taking a job as a senior program analyst at Lowe's. After five years at Lowe's, he left for a

better job at Wells Fargo. From 2013 until his arrest in this case, Scott held the title of Vice-President/Team Lead at Wells Fargo.

<u>**DISCUSSION**</u>

## I.    The Overly Harsh Penalties for Certain Child Pornography Offenses Warrant a Downward Variance

Courts throughout the country have noted the severity of the United States Sentencing Guidelines as they are applied to offenses involving child pornography and have found them to be overly harsh.   Courts have also observed that the guidelines are arbitrary due to a lack of empirical analysis in formulating the guidelines.   As a consequence, courts have routinely applied downward variances to comply with the mandate of 18 U.S.C. 3553(a) to impose sentences that are "sufficient, but not greater than necessary."

While much of the criticism of the child pornography guidelines have focused on USSG §2G2.2 (discussed in more detail below), courts have recognized that the same criticism can be at aimed at USSG §2G2.1, the guideline that applies to production of child pornography. *See*, *e.g.*, *United States v. Price*, 775 F.3d 828 (7th Cir. 2014).  In *Price*, the Seventh Circuit upheld a downward variance from 40 years to 18 years where the defendant was convicted of producing and distributing child pornography. *Price*, 775 F.3d at 841. The 22-year sentence reduction was upheld even though the defendant molested children, appeared to pose future danger, and showed no remorse. *Id*. at 830, 834-35. The Seventh Circuit recognized that the district court properly concluded that USSG §2G2.1 "presents some of the same

3

problems" as USSG §2G2.2; notably that:

> [b]oth guidelines … are vulnerable to the critique that
> they are not the product of the Sentencing Commission's
> empirical study and independent policy judgment … [and]
> that both guidelines call for enhancements that apply in
> nearly every case, exerting virtually automatic upward
> pressure on sentences and failing to separate less
> dangerous offenders from those who are more dangerous.

*Id*. at 841.

With regard to the criticism of USSG § 2G2.2 that should be similarly

applied to USSG § 2G2.1, numerous courts have voiced concerns about how

the guideline results in arbitrarily harsh sentences, and have thus concluded

that they warrant downward variances. In *United States v. Beiermann*, 599

F.Supp.2d 1087 (N.D. Iowa 2009), for example, the defendant faced a

guideline range of 210-262 months.  The court imposed a sentence of 90

months, however, noting the following:

> Indeed, in light of *Spears*, I find that I may go one step
> further than simply concluding that the child
> pornography guideline … is entitled to considerably less
> deference than other guidelines, in individual cases,
> because it is the result of congressional mandates, rather
> than the Commission's exercise of its institutional
> expertise and empirical analysis. I find that U.S.S.G. §
> 2G2.2 should be rejected on categorical, policy grounds,
> even in a "mine-run" case, and not simply based on an
> individualized determination that it yields an excessive
> sentence in a particular case…. In short, the harsh
> advisory guideline sentences pursuant to U.S.S.G. §
> 2G2.2 for child pornographers, whatever their criminal
> conduct, criminal histories, or personal characteristics,
> reflect a "put them down the oubliette" mentality that has
> nothing to do with imposing a sentence that is "sufficient,
> but not greater than necessary" to accomplish the goals of
> sentencing.  These flaws mean that this guideline is not

only entitled to little deference, but that I am entitled to
reject it entirely.

*Beiermann*, 599 F.Supp.2d at 1104, 1106.

Similarly, in *United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wisc.

2008), the court varied downward from 210-262 months to 72 months.  The

court explained:

> [T]he guideline for this offense, which contains numerous
> and significant enhancements for factors that are present
> in many if not most cases, diverges significantly from the
> Sentencing Commission's typical, empirical approach, and
> produced a sentence greater than necessary to provide
> just punishment in this case…. Between 1994 and 2007
> the mean sentence in child pornography cases increased
> from 36 months to 110 months…. [T]his increase was not
> the result of the empirical approach often used by the
> Commission, designed to be an expert body on sentencing.
> Rather, it was the result of arbitrary increases by
> Congress slipped into other bills, often with little or no
> debate.

*United States v. Hanson*, 561 F.Supp.2d at 1008-09.  *See also United States v.*

*Baird*, 580 F.Supp.2d 889, 894 (D. Neb.  2008) (granting substantially below

guideline sentence in child pornography case in part because **"**the Guidelines

for child exploitation offenses, like the drug-trafficking Guidelines, were not

developed under the empirical approach, but were promulgated, for the most

part, in response to statutory directives").

In *United States v. Dorvey*, 616 F.3d 174 (2d Cir. 2010), the Second

Circuit criticized the child pornography guideline for failing to make

distinctions between the sentences for less dangerous offenders, "and the

sentences for the most dangerous offenders who, for example, distribute child

5

pornography for pecuniary gain and who fall in higher criminal history

categories." *Dorvey*, 616 F.3d at 187. The Court explained:

> This result is fundamentally incompatible with § 3553(a).
> By concentrating all offenders at or near the statutory
> maximum, § 2G2.2 eviscerates the fundamental statutory
> requirement in § 3553(a) that district courts consider "the
> nature and circumstances of the offense and the history
> and characteristics of the defendant" and violates the
> principle, reinforced in *Gall,* that courts must guard
> against unwarranted similarities among sentences for
> defendants who have been found guilty of dissimilar
> conduct.

*Id.* USSG § 2G2.1 is no different, as it concentrates all offenders at or

near the statutory maximum regardless of their offense conduct,

criminal history category, or background.

## II.   Scott Hoover's History and Characteristics Warrant a Downward Variance, Especially In Light of the Overly Harsh Sentence He Faces.

Even though Scott has no criminal history points (his only prior

convictions are for minor traffic violations), he is subject to a guideline

sentence of life in prison. Due to the statutory maximums for the

offenses of conviction, he is facing a sentence of 840 months in prison, a

*de facto* life sentence. For the reasons previously discussed with regard

to the overly harsh penalties for child pornography offenses, and based

on his background, such a sentence is too severe and a downward

variance is warranted.

Scott overcame growing up in poverty to accomplish a great deal

in his life. He served the United States in the Navy in combat roles

during Operations Desert Shield and Desert Storm. His service was
not without sacrifice, as it left him with Post-Traumatic Stress
Disorder.

After serving his country, he worked toward a bachelor's degree
while working full time and supporting his family. Until his arrest, he
maintained gainful employment and worked his way up to the level of
vice president at Wells Fargo.

Those are not the history and characteristics of one who
deserves to spend the rest of his life in prison. His service, sacrifice,
and accomplishments warrant a measure of leniency. Moreover, his
lack of criminal history warrants a downward variance. *See, e.g.,*
*United States v. White,* 506 F.3d 635  (8th Cir. 2007)  (in case of
distribution of child pornography case where guidelines were 108-135
months, variance to 72 months proper in part because it was the
defendant's first offense, rejecting government's argument that the
court may not consider defendant's lack of prior record because it was
already taken into account by guidelines; after *Booker*, the court can
consider lack of a criminal record apart from the guidelines); *United*
*States v. Paul*, 561 F.3d 970 (9th Cir. 2009) (where defendant convicted
of embezzlement and guidelines were 10-16 months, court's within
guideline sentence of 15 months unreasonably high in part because
defendant was a first-time offender with no criminal record

7

whatsoever); *United States v. Autery,* 555 F.3d 864, 874 (9th Cir. 2009) (where guidelines were 41-51 months, court's *sua sponte* variance to probation not unreasonable in part because defendant's first conviction and Criminal History Category I "did not fully account or his complete lack of criminal history" because defendant with minor criminal history still falls into Category I); *United States v. Huckins* (10th Cir. 2008) 529 F.3d 1312 (where defendant convicted of possession of child pornography and guidelines were 78-97 months, court's variance to 24 months was proper in part because it was defendant's first conviction; the court rejected government's argument that guidelines already considered this by placing defendant in Category I).

**III.    The Advisory Guideline Range Far Exceeds What Is Necessary To Afford Adequate Deterrence To Criminal Conduct And To Protect The Public.**

At his own expense, Scott has submitted for evaluation by forensic psychologists George Demakis and Terri Watters Klosek, who have substantial experience in sex offense cases. A copy of a report summarizing their findings is attached. Those findings include the following:

> In terms of risk for future violence (including that of a sexual nature), Mr. Hoover is at **the lowest end of the medium-risk range**. Protective factors or factors that reduce risk include that he was married at the time of the offenses, lack of prior criminal history, lack of antisocial personality disorder, as well as relatively older age. Future risk is likely to decrease further as he ages. Specifically, research indicates that are **very few recidivists among sexual offenders released after age 60**. In contrast, areas of concern include that he has failed to take responsibility for his convictions and appears to minimize

aspects of the crimes (i.e., the relatively small number of pictures found on his phone).

Exhibit A attached hereto (emphasis in original).

## <u>CONCLUSION</u>

For the reasons stated herein, the defense respectfully requests that this Honorable Court impose a sentence that is far below the advisory guideline range.

This the 14th day of May, 2022.

Respectfully submitted,

/s/ Noell P. Tin
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, N.C. 28203
T: (704) 338-1220
F: (704) 338-1312
ntin@tinfulton.com
*Counsel for Mr. Hoover*

9

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing **SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD VARIANCE** on opposing counsel by submitting a copy thereof through Electronic Case Filing, to be sent to:

>Stephanie Laboy Spaugh
>Assistant U.S. Attorney
>stephanie.spaugh@usdoj.gov

Dated: May 14, 2022.

/s/ Noell P. Tin

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA     )     DOCKET NO. 5:20-CR-88
                             )
            vs.              )
                             )
MICHAEL SCOTT HOOVER,        )
                             )
            Defendant.       )
_____)


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 19, 2022



APPEARANCES:

On Behalf of the Government:

    STEPHANIE LABOY SPAUGH, ESQ.
    CORTNEY S. RANDALL, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    NOELL P. TIN, ESQ.
    Tin Fulton Walker & Owen, PLLC
    301 East Park Avenue
    Charlotte, North Carolina




Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina


**JA296**

2

1                 P R O C E E D I N G S

2          THE COURT:  All right.  Our next matter is the

3   United States versus Michael Scott Hoover, docket number

4   5:20-cr-88.

5          Mr. Hoover, following your conviction at a jury

6   trial, your case was referred to the U.S. Probation Office for

7   preparation of a presentence investigation and report which

8   the Court has received and reviewed.  Have you read that

9   report?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Do you understand what's in it?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Have you had all the time you would like

14  to discuss it with your attorney?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Thank you.  You may sit down.

17         Mr. Tin, there are several objections to the report.

18         MR. TIN:  There are, Your Honor, and I don't need to

19  be heard on the objections.  I'm happy to rest on what

20  Mr. Freedman filed.

21         THE COURT:  Well, the Court has reviewed them

22  closely.  As I say, there are several.  I think the probation

23  office correctly and adequately explained its calculations and

24  is correct as to each of them, except the Court will grant the

25  objection as to paragraph 41 which is the use of a computer

**JA297**

3

 1  two-level enhancement.  The Court generally doesn't apply that

 2  enhancement in such cases, although there are facts under

 3  which it is appropriate.  The Court finds that that

 4  enhancement is generally over applied to these cases and will

 5  sustain that objection.

 6        But otherwise, the Court will adopt the information

 7  in the presentence report without change.  And I think that

 8  still leaves -- let me make sure this is right.  I think even

 9  with that change the guidelines provide for an offense level

10  43 still, I think, and a criminal history category of I, which

11  is an advisory range of 840 months or 70 years.

12        Mr. Tin.

13        MR. TIN:  Thank you, Your Honor.

14        I agree with the Court.  I think that does leave us

15  in the same spot on the guidelines, I think the statutory

16  maximums for each count.

17        I know that Your Honor is already familiar with a

18  lot of arguments about the structure of the guidelines and the

19  objections that have been raised to them.  That they're not

20  the product of empirical study, that they seem arbitrary at

21  points.  The computer enhancement is one example.  I would say

22  that equating a video to 75 images is hard to get your mind

23  around.  Five levels for engaging in a pattern but not being a

24  career offender.  It seems untethered to the statutory

25  principles of sentencing.  I guess that's the best way to put

4

1  it.  Obviously, we cited some cases.  I don't think any of
2  them are any surprise to the Court.  But it's hard to have a
3  sentencing and not at least use that as the defense's starting
4  point.

5      The memorandum sets out Scott's history and
6  characteristics.  Criminal history category I.  A BA from
7  Gardner-Webb.  He graduated with honors.  He was married.  His
8  son was in college.  He was a vice president at Wells Fargo.
9  He grew up poor.  I think his sister's letter to the Court
10  laid out some of how he started out in life and made good.  He
11  was a decorated combat veteran and served in Desert Storm and
12  Desert Shield.  Except for this case there's a whole lot of
13  history and characteristics that ordinarily weigh in favor of
14  leniency.

15      Obviously, it's a serious case and any sentence Your
16  Honor imposes is going to be long.  There's two things I'm
17  hoping to call attention to.

18      The first is that as he stands before the Court,
19  he's lost everything.  He has lost his job.  He's lost his
20  wife.  He's headed to prison for a long period of time even in
21  the best case scenario.  He's lost his money.  He's severely
22  depressed.  He's lost 50 pounds.  There's very little left for
23  him to lose except years.

24      And the second thing, because it speaks to the
25  parsimony provision, he did submit to an evaluation.  It still

**JA299**

5

1   lands him in the medium risk category.  I think that the age
2   factor is what stood out to me; that the recidivism rate is
3   lower, much lower, for people past the age of 60 and he's
4   going to be released, even at the mandatory minimum sentence,
5   beyond the age of 60.  He's 52 as he stands before the Court
6   today.  And I'm hoping that those factors will weigh in favor
7   of a downward variance below a guideline range that we contend
8   is excessive.

9           THE COURT:  Mr. Hoover, you have the right to
10  address the Court if you would like to, but you don't have to
11  say anything.

12          THE DEFENDANT:  No, sir, I'm good.

13          THE COURT:  All right.  Ms. Spaugh.

14          MS. SPAUGH:  Thank you, Your Honor.

15          The defendant took advantage of the trust that was
16  placed in him by the people close to him in order to sexually
17  exploit minors.  This was not a one time thing for him.  His
18  criminal behavior went on for years.  And it only stopped
19  because he finally got caught.  So the government is asking
20  for a guideline sentence and we do believe it's necessary to
21  achieve the purposes of sentencing enumerated in 3553.

22          Looking at the nature and circumstances of this
23  offense, this was an extreme abuse of trust because the
24  victims were either family to him or like family to him.  He
25  picked children that trusted him and that he had easy access

**JA300**

6

1  to knowing that no one would question his efforts to be alone
2  with them because of their relationship.
3        The video that he took of minor victim 1 occurred in
4  July of 2018.  This victim was unaware that he was being
5  recorded at the time.  And then two months later in September
6  of 2018 he created another video of this victim from behind a
7  hammock while on a camping trip, again without that victim's
8  knowledge and while masturbating.
9        But this behavior with just that victim was more
10  than just videos.  Before that he put his hand on the victim's
11  upper thigh near his pubic area and had him sleep in his bed
12  with him on another occasion.
13        He manipulated this victim by supplying him with
14  alcohol starting when he was just 15 years old.  And he
15  groomed him by showing him pornography and introducing him to
16  masturbation.
17        The videos of just one boy were apparently not
18  enough for him because a year later in August of 2019 he took
19  the videos of the second minor victim while on a hiking trip
20  and that victim was only 12 years old when that happened,
21  during which he put his mouth on the child's penis and tried
22  to scare him into keeping quiet by telling him that if he told
23  anyone, they could get in big trouble.
24        And again, his behavior with this victim was not
25  just the videos.  Dating back to about 2017 when the minor

**JA301**

7

1   victim slept at the defendant's house, he woke up to find the
2   defendant in the bed with him touching his penis.

3           And on another occasion he manipulated this victim
4   by telling him that he would buy him a vape, which is an
5   electronic cigarette, if he showed him his penis while in the
6   car one day.  At another time at the defendant's home, the
7   defendant masturbated and put his mouth on the child's penis
8   again.

9           After taking these videos he took steps to hide the
10  evidence on the phone.  He kept some of it in a secret
11  application that looked like a calculator and you had to know
12  a password to get into.  And he stored other evidence in a
13  Note with a nondescript name, which goes to show how
14  calculated he was and how cautious to ensure that he would
15  never be caught.

16          These two victims in these videos were only
17  discovered because an investigation was kicked off by other
18  disclosures.  In fact, multiple other boys have come forward
19  to say that they were also victimized by the defendant when
20  they were children.

21          Initially three boys came forward to law
22  enforcement.

23          Minor victim 3 reported that when he was 15, the
24  defendant would frame it as a game and massage his legs and
25  move closer to his penis until he eventually touched it.  And

**JA302**

he reported that the defendant had touched him multiple times
between 2017 and 2018.

Minor victim 4 told law enforcement that the
defendant had moved his hand up his leg and touched him during
a car ride.  On another occasion the defendant offered to pop
his back, but used it as an opportunity to put his hand down
the child's pants and touch his penis again.

Minor victim 5 disclosed that the defendant touched
his penis over his clothes multiple times and tried to touch
him while he was at his house, and he also saw the defendant
try to touch another boy as well.

Once the defendant was arrested for those state
offenses, more victims and witnesses came forward to law
enforcement which led to minor victim 6 being interviewed who
told law enforcement that the defendant's sexual abuse started
when he was just between 4 and 7 years old and it continued
for several years while camping and at the defendant's home.
The defendant started by teaching him about masturbation and
went on to touch the child's penis and had him touch his.  He
also had them perform oral sex on each other and went so far
as to have this minor victim put his penis in the defendant's
anus.

Minor victim 7 reported that during a camping trip
in 2017, he woke to find the defendant on top of him trying to
put his hand into the minor's pants and said to the minor that

9

1  he wanted to perform oral sex on him.

2          Minor victim 8 told law enforcement that he was in a

3  boy scout troop that the defendant was involved in back in

4  2008 to 2010, and that on multiple occasions those years the

5  defendant put his hand into the child's pants and touched his

6  genitals.  He also reported that the defendant tried to

7  perform oral sex on him.

8          So the defendant's behavior was calculated.  These

9  were not just random kids.  He strategically chose these

10 children that knew and trusted him and that he had a

11 relationship with as family or as family friends because of

12 the easy access and because he could groom them into thinking

13 that they didn't need to tell anyone.  He preyed on children

14 of friends that were going through very difficult family

15 situations as well as family members, and they were all boys

16 of impressionable ages.  These victims' lives have been

17 changed forever and they will be dealing with the effects of

18 what he's done forever.

19         The five-level enhancement for being a repeat and

20 dangerous sex offender against minors doesn't really come

21 close in this case to fully encompassing what he has done

22 here.  A variance would disregard the extent of the ripple

23 effect of his actions.  He caused serious harm to multiple

24 people, not just the boys but also their parents and their

25 families that trusted him and have also been affected by what

**JA304**

1  he's done and now they're left dealing with the fallout.

2          His history and characteristics show that he's shown

3  no remorse or acceptance of the damage that he's done here to

4  so many children.  He's painted a picture of himself as an

5  honorable victim without a criminal history warranting a

6  downward variance, but that creates a bit of a misimpression

7  as to the life he's actually led because he has had past

8  run-ins with law enforcement because of accusations by

9  children.  Both times he was investigated, tried, and

10  acquitted and the charges were expunged so they don't show up

11  in the PSR.

12          He has no family support from his ex-wife or his

13  son.

14          And the report from his psychological screening

15  specifically states that he did not appear to meet the full

16  criteria for PTSD and that it has not been problematic for

17  functioning throughout the years.  And it does say that he is

18  in the medium risk range for risk of future violence, and

19  that's just based on two interactions with him.

20          His sexually deviant behavior went on for years and

21  encompassed multiple victims and it raises grave concern about

22  the need to protect the public from the defendant.

23          No one had disclosed until the domino effect of the

24  first three children.  Minor victim 1 didn't even know that a

25  video had been made so he couldn't disclose.  He was an

**JA305**

11

1   unknowing victim.  Minor victim 2 only disclosed when law
2   enforcement went to him after finding the video and figuring
3   out who it was.  So this just goes to show how underreported
4   these crimes are.

5          We have no reason to believe that he will ever stop
6   by his own volition as long as this has gone on and the
7   disrespect for the law he has shown.  He was only stopped on
8   this occasion by finally being arrested.  We never would have
9   known about these videos or these other victims without those
10  first boys who were brave enough to come forward and tell law
11  enforcement about what happened to them, which makes the
12  guideline sentence especially important to deter others from
13  thinking that they can do the same thing and prey on trusting
14  children and hide the evidence and face anything less than a
15  significant sentence.  Anything less than a guideline sentence
16  here is a variance and the only grounds asserted in this case
17  are outweighed by the remaining 3553(a) factors.  He's proven
18  that he's a serious danger to children, who steals their
19  innocence, affects them forever without hesitation and without
20  remorse.

21         At this time, Your Honor, the government would ask
22  that one of the victims be allowed to speak, which would be
23  AP, who did testify during the trial.

24         THE COURT:  All right.  That's fine.

25         AP:  Thank you, Your Honor.

**JA306**

1          I struggled to find the words to describe how I
2   feel, but now I know exactly how I feel.  This man robbed me
3   of the most important values of my life:  Trustworthiness, my
4   innocence, and my happiness.  Not only me, but he affected so
5   many people, so many children over the years that I believe
6   something like this shouldn't go unpunished.  I know this man.
7   I know his arrogance, his narcissism, and he's able to
8   manipulate other people into believing to trust him.  I
9   believe that someone of his nature and his stature should not
10  be allowed back in society.  Someone like him should spend the
11  rest of his life in prison.

12         I won't let him win.  Next spring I will graduate
13  with a bachelor's degree in criminal justice and will make a
14  contribution and make a point in my life to pursue a career in
15  finding more people like him so that other kids won't have to
16  feel afraid or have to feel that they are alone in this world.
17  Monsters like him don't belong in our in society and I feel
18  better to know that he won't be here.  I want him to know that
19  he's lost everything and everyone else has won.

20         That's all.

21         THE COURT:  Thank you.

22         AP:  Thank you.

23         MS. SPAUGH:  MC's mother is here.  She did ask us to
24  read a statement on her behalf if that's okay with the Court.

25         "I can honestly say that I never imagined something

13

like this would ever happen to my son or to our family.  The
devastation that your actions have caused has completely torn
our family apart.  You took advantage of an innocent child.
There is no manmade punishment that will make up for the
horrible things that you have done.  Your actions were cold,
calculated, and ruthless.  Your punishment is just beginning
and will only encompass months and years.  MC will have to
endure the pain that you have caused for the rest of his life.
You will receive a sentence that upon completion your
punishment will be over.  MC will have to contend with your
horrendous and dreadful actions forever.

        "When preparing this statement words such as
monster, pedophile, barbaric, and degenerate routinely come to
mind.  Your deviant actions had no impact on yourself and were
directed at destroying a child's innocence.  While you won't
receive a just sentence on this side of eternity, rest assured
that one day you will stand before a just God.  The Bible says
in Matthew 18:6, 'But who shall offend one of these little
ones which believe in me, it were better for him that a
millstone were hanged about his neck, and that he were drowned
in the depth of the sea.'  So while serving your earthly
sentence, just remember that your eternal sentence is yet to
be delivered.

        "MC is an innocent child that enjoys football and
baseball.  The tragedy that you purposely caused has shaken

1  him to his very core.  Your devilish actions didn't just harm
2  MC but also affected everyone around him.  MC is an
3  exceptional athlete and student.  He is a very smart young man
4  and excels in his school work and athletic abilities.  He is
5  admired by all his coaches, teachers, and friends.
6         "After the abuse began, MC started pulling away from
7  people.  He's quit sports altogether.  He once dreamed of
8  playing professional sports, but that has been taken away from
9  him.  This is all he talked about and lived for was playing
10 sports.  He would lash out at his younger siblings and be very
11 hateful to them.  He had a lot of anger built up.  One
12 incident he punched the wall and broke his hand.  This
13 required surgery and he was unable to play any sports for
14 several months.  He didn't want to be around people.  His
15 coaches knew something was wrong because he wasn't performing
16 as good as he once did.  He just withdrew from everything.  He
17 moved his bedroom to the basement and stays there most of the
18 time.  It is heartbreaking to see your child that was once a
19 fun-loving, free-spirited child withdraw into a shell.  He was
20 such an innocent child and this was taken away from him.
21        "It was recommended by Dr. North with Mindpath to
22 have some counseling.  He didn't want to participate in these
23 sessions, but we knew it was best.  We knew he needed to talk
24 about what had happened and try to get through it.  Keeping
25 everything bottled up inside was harmful to him and his

15

family.  He wouldn't participate in the sessions.  He just
wouldn't open up to anybody.  He was put on medication for
anxiety to try and help with the anger and the outbursts.  He
had so much anger built up inside him.  He seemed okay
sometimes, but out of nowhere he would have outbursts of
anger.  This put a strain on the entire family.  We never knew
what kind of mood he would be in and what the day would bring.

        "It is hard to watch your child go through any type
of trauma.  But when it is at the hand of someone that the
child trusted, someone you as a parent trusted with your
child, you can't help but feel somewhat responsible.  We're
supposed to protect our children and who would have known that
you would ever harm him.  How do you teach your child to trust
again?  This will be with him his entire life.  He will have
to deal with the pain and try to put this behind him.

        "Because of you our family will never be able to
trust anyone again.  Because of you our family has suffered
continuously throughout the entire process.  When the court
proceedings started, he did not want to be a part of that at
all.  He even made the comment, 'If you love me you won't make
me do this.'  How does a parent swallow that?  It was like we
were making him do something totally wrong.  He has suffered
enough and we are making him face you again.  Even though you
are in custody and he knew you wouldn't be able to hurt him
anymore, making him face you after what you have done was

**JA310**

16

1   tearing me apart.  We talked to him to try to get him to

2   understand that this was necessary so this wouldn't happen to

3   another child.

4          "I hope and pray the judge gives you the maximum

5   sentence under the law.  That way you will at least be forced

6   to accept the consequences of your actions.  You are a

7   monster.  You don't feel emotions, sorrow, or empathy, but I

8   hope and pray that every day you wake up behind bars in a

9   prison cell and you realize that this is what the rest of your

10  life will be.  And I hope you realize that every day MC wakes

11  up, he will be haunted by the horrible things you've done to

12  him."

13         I would also point out to the Court that one of the

14  other minor victims as well as the father is present as well.

15         We would ask the Court to hold open restitution at

16  this time so the victims can explore the possibility of future

17  counseling.

18         I believe we have a consent order of forfeiture

19  relating to the cell phone.  If I could approach with that?

20         THE COURT:  You may.

21         MR. TIN:  Here's the order.  And we're fine with the

22  90 days, Your Honor.

23         (Document tendered to the Court.)

24         MS. SPAUGH:  Your Honor, if we could have one

25  moment.

**JA311**

17

1                    (Government counsel conferred.)

2               MS. SPAUGH:  Your Honor, one of the victims' fathers

3     would like to speak.

4               MR. FAW:  Good afternoon, Your Honor.

5               My three sons were the original ones that come

6     forward when this all began.  Their mother had been diagnosed

7     with cancer.  She fought it for eight years.  We found this

8     out in her seventh year of fighting cancer.  We referred to

9     him as Scott.  He had friended my wife at work.  I had coached

10    his son in baseball when he was a young boy.  So he had gotten

11    pretty close to our family.

12              When my wife was in and out of hospitals going

13    through her fight, sometimes we didn't know if she was going

14    to make it.  That's how he friended my kids.  "I'll take them.

15    I'll take them out to eat, while she's laying in the hospital.

16    I'll take them to Grandfather Mountain while she's laying in

17    the hospital."  That's when some of these incidents were

18    happening.

19              My son was mowing his grass.  That's how this all

20    came about.  One of the children, the one he had taken to

21    Grandfather Mountain and so far had friended him, and we

22    thought the kids really liked him, mentions about "I don't

23    ever want to see him again."

24              "Where did this come from?"

25              "He put his hands on me.  He acted like he was

**JA312**

18

1  trying to do this favor for me and put his hands down my
2  pants."
3         In the process, that other child was on the way to
4  his house at that moment to mow his grass.  And the more and
5  more I found out, the more and more I found out.  The whole
6  time he had been acting like he was helping.
7         My wife died that eighth year knowing that we had
8  let him into our lives and that affected our children.
9         My oldest son, he still has mental problems.  I
10  can't guarantee it's from this or it's from losing his mother.
11  At times he has outbursts just like was stated by the other
12  child.  But this is something he'll have to live with.
13         One of the last things his mother said before she
14  took her last breath, "I hope he gets everything that comes to
15  him."
16         It's so hard to speak about this, but -- and I
17  wasn't going to speak today, but hearing that young man speak,
18  I want to make sure you get everything that's coming to you.
19         That's all I have to say, Your Honor.
20         THE COURT:  Thank you.
21         Anything else?
22         MS. SPAUGH:  No, Your Honor.
23         Just for the record, that was Chris Faw.
24         THE COURT:  All right.  Mr. Hoover, you were, and
25  I'm confident are, a child predator.  Over the course of many

**JA313**

19

1    years with at least eight victims you demonstrated that you
2    were a child predator, victimizing them not only then but for
3    the rest of their lives, as we've heard.  And then even at
4    trial watching those young men have to sit there and watch a
5    jury watch them watch a video of them masturbating was painful
6    to see.

7          The Court has considered your attorney's request for
8    a variance and the Court has considered, as it must, your
9    history and characteristics, some of which are good.  Your
10   navy service is much appreciated.  The presentence report says
11   that you may suffer from PTSD from Desert Storm, which it is a
12   common thing, but it's not particularly well supported in the
13   records and you seemed to function awfully well at work for an
14   awfully long time, so that seems an insufficient reason to
15   vary downward.

16         Your counsel has also argued that the sentencing
17   guidelines for these kind of cases are overly harsh.  And I
18   understand the legal arguments there, but I'm telling you when
19   I just talk to folks I know about child pornography, child
20   abuse, they don't think any sentence is too long.  So I don't
21   know what the sentencing commission might do in the future
22   with respect to some of these things, but my guess is the
23   public is unconcerned with the harshness of these guidelines,
24   and the Court is unconcerned as well.  The Court is fully
25   satisfied with the way the guidelines are right now.

**JA314**

20

1          The Court also notes that even your own forensic
2     psychologist put you at, they call it the low end of medium
3     risk.  Medium risk is significant risk to this Court.  I don't
4     care which end of it you are.  I have no reason to believe
5     that you wouldn't be a recidivist if given the chance.  And
6     the psychologist also made note of your total lack of
7     acceptance of responsibility for these offenses and that you
8     even minimized them.
9          Now, the Court could vary downward for mere
10    appearance sake so that the court of appeals would know that I
11    knew that I could and maybe took some of these arguments into
12    account.  Even if I did, which I'm not going to, even if I
13    did, I would impose a sentence that I was satisfied would make
14    sure you never saw the light of day.  Probably 50 years might
15    do that.  Forty might.  But I'm not going to play a game of
16    trying to appear that I didn't think a guideline sentence was
17    appropriate and still impose a sentence that I would be
18    confident would be the rest of your life, so I'm just going to
19    stick with the guidelines.  I think that's the appropriate
20    sentence.
21          So pursuant to the Sentencing Reform Act of 1984 and
22    *U.S. versus Booker*, it is the order of the Court, having
23    considered all of the factors in 3553(a), that the defendant,
24    Michael Scott Hoover, is hereby committed to the custody of
25    the United States Bureau of Prisons to be imprisoned for a

**JA315**

1  term of 360 months on each of counts one and two to be served
2  consecutively, and a term of 120 months on count three to be
3  served consecutive to the terms imposed on counts one and two
4  to the extent necessary to produce a total term of 840 months,
5  which is 70 years.
6           The Court calls to the attention of the custodial
7  authorities that the defendant has a history of mental health
8  issues and recommends he be allowed to participate in any
9  available mental health treatment programs while incarcerated.
10          The Court recommends that the defendant participate
11 in a sex offender treatment program while incarcerated, if
12 eligible.
13          Upon release from imprisonment, the defendant shall
14 be placed on supervised release for a term of life on each
15 count to be served concurrently.  The term of life is
16 necessary in the Court's judgment, if there ever is a
17 supervised release term, because of his -- the long history of
18 this offense, the period over which it occurred, and his own
19 forensic psychologist's estimation of a significant risk of
20 recidivism.
21          Within 72 hours of release from the custody of the
22 Bureau of Prisons, you are to report in person to the
23 probation office in the district into which you are released.
24          While on supervised release, you shall abide by each
25 of the discretionary conditions of supervised release that

1  have been adopted by this Court and each of the sex offender

2  conditions of supervised release that have been adopted by

3  this Court.  No objections were filed to the imposition -- the

4  anticipated imposition of those conditions and the Court finds

5  each of those is appropriate and necessary during the period

6  of your supervised release.

7          As a special condition of supervised release, the

8  defendant shall participate in a mental health evaluation and

9  treatment program and follow the rules and regulations of that

10 program.  The probation officer, in consultation with the

11 treatment provider, will supervise the defendant's

12 participation in the program.  And the defendant shall take

13 all mental health medications as prescribed by a licensed

14 health care practitioner.

15         It's ordered defendant pay the United States a

16 special assessment of $300.

17         It's ordered the defendant shall pay to the United

18 States additional special assessments of $5,000 per count

19 pursuant to 18 U.S.C. Section 3014 and the provisions of the

20 Justice for Victims of Trafficking Act of 2015.

21         It's further ordered that the defendant pay to the

22 United States an additional special assessment of $50,000 on

23 each of counts one and two and $17,000 on count three pursuant

24 to 18 U.S.C. Section 2259(a) and the provisions of the Amy,

25 Vicky, and Andy Child Pornography Victim Assistance Act of

23

1   2018.

2           The Court will leave open the issue of restitution

3   for a period of 90 days.

4           The Court finds the defendant does not have the

5   ability to pay a fine and no fine will be imposed.

6           Mr. Hoover, you can appeal your conviction if you

7   believe there is some defect in these proceedings.  You also

8   have a right to appeal your sentence under certain

9   circumstances, particularly if you believe it's contrary to

10  law.  Any notice of appeal must be filed within 14 days of

11  entry of the Court's judgment.  If you're unable to afford the

12  cost of an appeal, if you ask, the clerk of court will prepare

13  and file a notice of appeal on your behalf at no cost to you.

14          I suggest you discuss these rights with your

15  attorney, but do you understand them as I have explained them

16  to you?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  The Court will incorporate into this

19  judgment the consent order and judgment of forfeiture that was

20  handed up and signed during this hearing.

21          This matter is concluded and Mr. Hoover is remanded

22  to the custody of the marshals.

23          MS. RANDALL:  Your Honor, one matter.  I'm not sure

24  if it's a standard condition, but we would ask that there be

25  no contact with the victims as one of his conditions.  I know

**JA318**

24

1    there's no contact with minors, but they won't be minors at
2    that point.
3            THE COURT:  They'll be older than I am now.
4            All right.  The Court will order as a special
5    condition of supervised release that the defendant have no
6    contact with any of the victims in this case as described in
7    the presentence report.
8            (End of proceedings at 11:40 AM.)
9                        *****
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**JA319**

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6         I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16         Dated this 31st day of August 2022.

17

18

19                    s/Cheryl A. Nuccio

20                    Cheryl A. Nuccio, RMR-CRR
                      Official Court Reporter

21

22

23

24

25

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Western District of North Carolina

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | (For Offenses Committed On or After November 1, 1987) |
| **V.** | ) | |
| | ) | |
| **MICHAEL SCOTT HOOVER** | ) | Case Number:  DNCW520CR000088-001 |
| | ) | USM Number:  10339-509 |
| | ) | |
| | ) | Noell P. Tin |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐   Pleaded guilty to count(s).

☐   Pleaded nolo contendere to count(s) which was accepted by the court.

■   Was found guilty on count(s) <u>1s,2s,3s</u> after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18 U.S.C. § 2251(a), 18 U.S.C. § 2251(e) | Production of Child Pornography | June 20, 2018 | 1s |
| 18 U.S.C. § 2251(a), 18 U.S.C. § 2251(e) | Production of Child Pornography | August 4, 2019 | 2s |
| 18 U.S.C. § 2252A(a)(5)(B), 18 U.S.C. § 2252A(b)(2) | Possession With Intent to View Child Pornography | August 15, 2019 | 3s |

     The Defendant is sentenced as provided in pages 2 through 9 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984, <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

☐   The defendant has been found not guilty on count(s).

■   Count(s) <u>original indictment</u> is dismissed on the motion of the United States.

     **IT IS ORDERED** that the Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence:  5/19/2022

Kenneth D. Bell
United States District Judge

Date: May 23, 2022

AO 245 B  (WDNC Rev. 02/11) Judgment in a Criminal Case revTitle

Defendant: Michael Scott Hoover                                    Judgment- Page **2** of **9**
Case Number: DNCW520CR000088-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of <u>THREE HUNDRED SIXTY (360) MONTHS as to each of Counts 1s, 2s and ONE HUNDRED TWENTY (120) MONTHS as to Count 3s all such terms to run consecutive to each other, for a total term of EIGHT HUNDRED FORTY (840) MONTHS</u>.

- ■  The Court makes the following recommendations to the Bureau of Prisons:
    1.  Participation in any available mental health treatment programs.
    2.  Participation in sex offender treatment programs, if eligible.

- ■  The Defendant is remanded to the custody of the United States Marshal.

- ☐  The Defendant shall surrender to the United States Marshal for this District:

    - ☐  As notified by the United States Marshal.
    - ☐  At _ on _.

- ☐  The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    - ☐  As notified by the United States Marshal.
    - ☐  Before 2 p.m. on _.
    - ☐  As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this Judgment.


_____
                    United States Marshal

                                        By: _____
                                            Deputy Marshal

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover
Case Number: DNCW520CR000088-001

Judgment- Page **3** of **9**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>LIFE as to each Count to run concurrent to each other</u>.

☐   The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

## CONDITIONS OF SUPERVISION

The defendant shall comply with the mandatory conditions that have been adopted by this court.

1.   The defendant shall not commit another federal, state, or local crime.
2.   The defendant shall not unlawfully possess a controlled substance.
3.   The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court (unless omitted by the Court).
4.   The defendant shall cooperate in the collection of DNA as directed by the probation officer (unless omitted by the Court).

The defendant shall comply with the discretionary conditions that have been adopted by this court and any additional conditions ordered.

5.   The defendant shall report to the probation office in the federal judicial district where he/she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.
6.   The defendant shall report to the probation officer in a manner and frequency as directed by the Court or probation officer.
7.   The defendant shall not leave the federal judicial district where he/she is authorized to reside without first getting permission from the Court or probation officer.
8.   The defendant shall answer truthfully the questions asked by the probation officer. However, defendant may refuse to answer a question if the truthful answer would tend to incriminate him/her of a crime.  Refusal to answer a question on that ground will not be considered a violation of supervised release.
9.   The defendant shall live at a place approved by the probation officer. The probation officer shall be notified in advance of any change in living arrangements (such as location and the people with whom the defendant lives). If advance notification is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.
10.  The defendant shall allow the probation officer to visit him/her at any time at his/her home or any other reasonable location as determined by the probation office, and shall permit the probation officer to take any items prohibited by the conditions of his/her supervision that the probation officer observes.
11.  The defendant shall work full time (at least 30 hours per week) at lawful employment, actively seek such gainful employment or be enrolled in a full time educational of vocational program unless excused by the probation officer. The defendant shall notify the probation officer within 72 hours of any change regarding employment or education.
12.  The defendant shall not communicate or interact with any persons he/she knows is engaged in criminal activity, and shall not communicate or interact with any person he/she knows to be convicted of a felony unless granted permission to do so by the probation officer.
13.  The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.
14.  The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
15.  The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential informant without first getting the permission of the Court.
16.  The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or controlled substance or any psychoactive substances (including, but not limited to, synthetic marijuana, bath salts) that impair a person's physical or mental functioning, whether or not intended for human consumption, or any paraphernalia related to such substances, except as duly prescribed by a licensed medical practitioner.
17.  The defendant shall participate in a program of testing for substance abuse. The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of the testing. The defendant shall participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity) (unless omitted by the Court).
18.  The defendant shall not go to, or remain at any place where he/she knows controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.
19.  The defendant shall submit to a search if the Probation Officer has a reasonable suspicion that the defendant has committed a crime or a violation of a condition of supervised release. Such a search may be conducted by a U.S. Probation Officer, and such other law enforcement personnel as the probation officer may deem advisable, without a warrant or the consent of the defendant. Such search may be of any place where evidence of the above may reasonably be expected to be found, including defendant's person, property, house, residence, vehicle, communications or data storage devices or media or office.
20.  The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release in accordance with the schedule of payments of this judgment. The defendant shall notify the court of any changes in economic circumstances that might affect the ability to pay this financial obligation.
21.  The defendant shall support all dependents including any dependent child, or any person the defendant has been court ordered to support.
22.  The defendant shall participate in transitional support services (including cognitive behavioral treatment programs) and follow the rules and regulations of such program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity). Such programs may include group sessions led by a counselor or participation in a program administered by the probation officer.
23.  The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover                                                    Judgment- Page **4** of **9**
Case Number: DNCW520CR000088-001

ADDITIONAL CONDITIONS:

24.    The defendant shall participate in a mental health evaluation and treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program (including, but not limited to provider, location, modality, duration, and intensity). The defendant shall take all mental health medications as prescribed by a licensed health care practitioner.

25.    The defendant shall not communicate, or otherwise interact, with any of the victims.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover                                                                Judgment- Page **5** of **9**
Case Number: DNCW520CR000088-001

## SEX OFFENDER

## CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.

1. The defendant shall have no direct or indirect contact, at any time, for any reason with any victim(s), any member of any victim's family, or affected parties in this matter unless provided with specific written authorization to do so in advance by the U.S. Probation Officer.

2. The defendant shall submit to a psycho-sexual evaluation by a qualified mental health professional experienced in evaluating and managing sexual offenders as approved by the U.S. Probation Officer. The defendant shall complete the treatment recommendations and abide by all of the rules, requirements, and conditions of the program until discharged. The defendant shall take all medications as prescribed.

3. The defendant shall submit to risk assessments, psychological and physiological testing, which may include, but is not limited to a polygraph examination and/or Computer Voice Stress Analyzer (CVSA), or other specific tests to monitor the defendant's compliance with supervised release and treatment conditions, at the direction of the U.S. Probation Officer.

4. The defendant's residence, co-residents and employment shall be approved by the U.S. Probation Officer. Any proposed change in residence, co-residents or employment must be provided to the U.S. Probation Officer at least 10 days prior to the change and pre-approved before the change may take place.

5. The defendant shall not possess any materials depicting and/or describing "child pornography" and/or "simulated child pornography" as defined in 18 U.S.C. § 2256, nor shall the defendant enter any location where such materials can be accessed, obtained or viewed, including pictures, photographs, books, writings, drawings, videos or video games.

6. The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which the defendant resides, works, is a student, or was convicted of a qualifying offense.

7. The defendant shall have no contact, including any association such as verbal, written, telephonic, or electronic communications with any person under the age of eighteen (18) except: 1) in the presence of the parent or legal guardian of said minor; 2) on the condition that the defendant notifies the parent or legal guardian of their conviction or prior history; and, 3) has written approval from the U.S. Probation Officer. This provision does not encompass persons under the age of eighteen (18), such as waiters, cashiers, ticket vendors, etc. with whom the defendant must deal, in order to obtain ordinary and usual commercial services. If unanticipated contact with a minor occurs, the defendant shall immediately remove himself/herself from the situation and shall immediately notify the probation officer.

8. The defendant shall not loiter within 100 feet of any parks, school property, playgrounds, arcades, amusement parks, day-care centers, swimming pools, community recreation fields, zoos, youth centers, video arcades, carnivals, circuses or other places primarily used or can reasonably be expected to be used by children under the age of eighteen (18), without prior written permission of the U.S. Probation Officer.

9. Except as required for employment (see Condition 4), the defendant shall not use, purchase, possess, procure, or otherwise obtain any computer (as defined in 18 U.S.C. § 1030(e)(1)) or electronic device that can be linked to any computer networks, bulletin boards, internet, internet service providers, or exchange formats involving computers unless approved by the U.S. Probation Officer. Such computers, computer hardware or software is subject to warrantless searches and/or seizures by the U.S. Probation Office.

10. The defendant shall allow the U.S. Probation Officer, or other designee, to install software designed to monitor computer activities on any computer the defendant is authorized to use, except for that of an employer. This may include, but is not limited to, software that may record any and all activity on computers (as defined in 18 U.S.C. § 1030(e)(1)) the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant shall pay any costs related to the monitoring of computer usage.

11. The defendant shall not use or have installed any programs specifically and solely designed to encrypt data, files, folders, or volumes of any media. The defendant shall, upon request, immediately provide the probation officer with any and all passwords required to access data compressed or encrypted for storage by any software.

12. The defendant shall provide a complete record of all computer use information including, but not limited to, all passwords, internet service providers, email addresses, email accounts, screen names (past and present) to the probation officer and shall not make any changes without the prior approval of the U.S. Probation Officer.

13. The defendant shall not have any social networking accounts on networks used or reasonably expected to be used by minors without the approval of the U.S. Probation Officer.

14. The defendant shall not be employed in any position or participate as a volunteer in any activity that involves direct or indirect contact with children under the age of eighteen (18), and under no circumstances may the defendant be engaged in a position that involves being in a position of trust or authority over any person under the age of eighteen (18), without written permission from the U.S. Probation Officer.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover                                       Judgment- Page **6** of **9**
Case Number: DNCW520CR000088-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | JVTA ASSESSMENT | AVAA ASSESSMENT | RESTITUTION | FINE |
|---|---|---|---|---|
| $300.00 | $15,000.00 | $117,000.00 | TBD | $0.00 |

■ The determination of restitution is deferred until 8/17/2022. Upon such a determination an *Amended Judgment in a Criminal Case (AO 245C)* will be entered. Failing such a determination by 8/17/2022, restitution amount becomes $0.00 without further Order of the Court.

## INTEREST

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

■ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

■ The interest requirement is waived.

☐ The interest requirement is modified as follows:

## COURT APPOINTED COUNSEL FEES

☐ The defendant shall pay court appointed counsel fees.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover                                         Judgment- Page **7** of **9**
Case Number: DNCW520CR000088-001

### RESTITUTION PAYEES

The defendant shall make restitution to the following payees in the amounts listed below:

| <u>NAME OF PAYEE</u> | <u>AMOUNT OF RESTITUTION ORDERED</u> |
|---|---|
| TBD | TBD |

☐ Joint and Several Restitution is Ordered as follows:

    ☐   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)* if appropriate:

    ☐   Associated Defendant Name(s) and Case Number(s) *(including defendant number)* if appropriate:

    ☐   Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

The victims' recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim(s) receive full restitution. Any payment not in full shall be divided proportionately among victims.

Pursuant to 18 U.S.C. § 3364(i), all nonfederal victims must be paid before the United States is paid.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover                                    Judgment- Page **8** of **9**
Case Number: DNCW520CR000088-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐ Lump sum payment of $0.00 due immediately, balance due
      ☐ Not later than_____
      ☐ In accordance ☐ (C), ☐ (D) below; or

B ■ Payment to begin immediately (may be combined with ☐ (D) below); or

C ☐ Payment in equal **monthly** installments of **$50.00** to commence **60 days** after the date of this judgment; or

D ☐ In the event the entire amount of criminal monetary penalties imposed is not paid prior to the
      commencement of supervision, payments shall be made in
      equal **monthly** installments of **$50.00** to commence **60 days** after release from imprisonment to a term of
      supervision. The U.S. Probation Officer shall pursue collection of the amount due, and may request to modify
      a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court costs:

■ The defendant shall forfeit the defendant's interest in the following property to the United States as set forth in the
Consent Order document 49 entered 5/19/2022:
      Document No. 49 is incorporated into this judgment.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of
imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. **All criminal
monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street,
Room 1301, Charlotte, NC 28202,** except those payments made through the Bureau of Prisons' Inmate Financial
Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.

**The Defendant shall receive credit for all payments previously made toward any criminal monetary penalties
imposed.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

## JA328

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: Michael Scott Hoover                                    Judgment- Page **9** of **9**
Case Number: DNCW520CR000088-001

### STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)    _____    Date: _____
            Defendant

(Signed)    _____    Date: _____
            U.S. Probation Office/Designated Witness


☐ The Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CASE NO.: 5:20-CR-88-KDB-DSC

**UNITED STATES OF AMERICA**

**v.**

**MICHAEL SCOTT HOOVER**

### NOTICE OF APPEAL

NOW COMES Defendant Michael Scott Hoover, pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure, and hereby gives notice of appeal of this Court's judgment entered on May 23, 2022 to the United States Court of Appeals for the Fourth Circuit.

Defendant is indigent and asks that he be appointed counsel for his appeal. Counsel asks that separate counsel be appointed in the event defendant wishes to raise a claim of ineffective assistance.

Dated:   May 27, 2022

Respectfully submitted,

/s/ Noell P. Tin

TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, N.C. 28203
T: (704) 338-1220
F: (704) 338-1312
ntin@tinfulton.com

1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send notification of such filing to opposing counsel:

Stephanie Laboy Spaugh
Assistant U.S. Attorney
stephanie.spaugh@usdoj.gov

Dated: May 27, 2022

/s/ Noell P. Tin

2